Jeffery R. Finley, AZ Bar No. 009683
**SCHNEIDER WALLACE COTTRELL**
**KONECKY WOTKYNS LLP**
8501 North Scottsdale Road, Suite 270
Scottsdale, Arizona  85253
Telephone: (480) 428-0143
Facsimile: (866) 505-8036
jfinley@schneiderwallace.com
pvanzanzen@schneiderwallace.com

David R. Deary*
W. Ralph Canada, Jr.*
Jim L. Flegle*
Wilson E. Wray*
John McKenzie*
Donna Lee*
**LOEWINSOHN FLEGLE**
**DEARY SIMON LLP**
12377 Merit Drive, Suite 900
Dallas, Texas 75251
(214) 572-1700 Telephone
(214) 572-1717 Facsimile

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Dimitri Shivkov, individually and as a trustee of the Phoenix 2010 Revocable Trust; Vassil Zhivkov; Kristina Tsonev; Spectra Services, Inc.; DVS Holdings, LLC; Robert C. Miller; Brenda Mae Miller; Bruce G. Robinson; Sara Van Alstyne Robinson; Symphony Homes, LLC; Symphony Development Corp.; Keith Butler; Rebecca M. Butler; Eric K. Wilke; Julie T. Wilke; John Linder; Nina Linder; Affilion of Cobre Valley, LLC; Affilion of Huntsville, PLLC; Affilion of Texas PLLC; Taylor-Wilke Holdings, LLC; Traditions Emergency Medicine, P.A.; Treadstone Equity Group, LLC; UTA Investments, LLC; Boomerang WB, LLC; AZ Storage 1, LLC; AZ Storage 2, LLC; | **Case No.** <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY DEMAND** |

1   Boomerang Sonoran, LLC; RV Storage, LLC;
2   Stone Haven Lodge, LLC; UTA Holdings,
    LLC; Wilke Medical Direction, PLLC; 5T
3   Capital Fund II, LLC; 5T Capital Holdings,
    LLC; 5T Capital LLC; Ingenuity Auto Leasing,
4   LLC; Ingenuity Aviation, LLC; Ingenuity
5   Equity Group II, LLC; Ingenuity Equity Group
    III, LLC; Ingenuity Equity Group, LLC;
6   Ingenuity Leasing Company II, LLC; Ingenuity
7   Leasing Company, LLC; Ingenuity Matrix,
    Inc.; Ingenuity Professional Services, PLLC;
8   and Bourne Tempe Land, LLC on behalf of
    themselves and all others similarly situated;
9
10          *Plaintiffs*,
11   vs.
12   Artex Risk Solutions, Inc.; TSA Holdings, LLC
13   f/k/a Tribeca Strategic Advisors, LLC; TBS
     LLC d/b/a PRS Insurance; Karl Huish; Jeremy
14   Huish; Jim Tehero; Arthur J. Gallagher & Co.;
15   Debbie Inman, Epsilon Actuarial Solutions,
     LLC; Julie A. Ekdom; AmeRisk Consulting,
16   LLC, and Provincial Insurance, PCC;
17          *Defendants*
18
19
20
21
22
23
24
25
26
27
28

**CLASS ACTION COMPLAINT**

Dimitri Shivkov ("Shivkov"), individually and as a trustee of the Phoenix 2010 Revocable Trust, Vassil Zhivkov ("Zhivkov"), Kristina Tsonev ("Tsonev"), Spectra Services, Inc. ("Spectra"), DVS Holdings, LLC, Robert C. Miller, Brenda Mae Miller, Bruce G. Robinson, Sara Van Alstyne Robinson, Symphony Homes, LLC, Symphony Development Corp., Keith Butler, Rebecca M. Butler, Eric K. Wilke, Julie T. Wilke, John Linder, Nina Linder, Affilion of Cobre Valley, LLC, Affilion of Huntsville, PLLC, Affilion of Texas PLLC, Taylor-Wilke Holdings, LLC, Traditions Emergency Medicine, P.A., Treadstone Equity Group, LLC, UTA Investments, LLC, Boomerang WB, LLC, AZ Storage 1, LLC, AZ Storage 2, LLC, Boomerang Sonoran, LLC, RV Storage, LLC, Stone Haven Lodge, LLC, TW Management, LLC, UTA Holdings, LLC, Wilke Medical Direction, PLLC, 5T Capital Fund II, LLC, 5T Capital Holdings, LLC, 5T Capital LLC, Ingenuity Auto Leasing, LLC, Ingenuity Aviation, LLC, Ingenuity Equity Group II, LLC, Ingenuity Equity Group III, LLC, Ingenuity Equity Group, LLC, Ingenuity Leasing Company II, LLC, Ingenuity Leasing Company, LLC, Ingenuity Matrix, Inc., Ingenuity Professional Services, PLLC, and Bourne Tempe Land, LLC (collectively "Plaintiffs") file this Class Action Complaint at Law to assert claims, on behalf of themselves and all others similarly situated, against Defendants Artex Risk Solutions, Inc. ("Artex"), TSA Holdings, LLC f/k/a Tribeca Strategic Advisors , LLC ("Tribeca"),  TBS LLC d/b/a PRS Insurance ("PRS"), Karl Huish, Jeremy Huish, Jim Tehero ("Tehero"), Arthur J. Gallagher & Co. ("Gallagher"), Debbie Inman ("Inman"), Epsilon Actuarial Solutions, LLC ("Epsilon"), Julie A. Ekdom ("Ekdom"), AmeRisk Consulting, LLC ("AmeRisk"),

and Provincial Insurance, PCC ("Provincial") (collectively, "Defendants") and state as follows:

## I.     JURISDICTION AND VENU

1.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(d) because the Class Action Fairness Act of 2005 confers diversity jurisdiction upon this Court, as members of the proposed Class are citizens of states that are different from Defendants' state(s) of citizenship, and the aggregate amount in controversy exceeds $5,000,000. In addition, this Court has jurisdiction over Plaintiffs' claims based on 28 U.S.C. §1331 and/or 28 U.S.C. §1337, which provide jurisdiction for claims under the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. §1961 et seq.; and 28 U.S.C. §1367, which provides jurisdiction for supplemental state claims, including common-law fraud and conspiracy claims.

2.     Personal jurisdiction comports with due process under the United States Constitution, the long-arm statutes of Arizona, and the provisions of 18 U.S.C. §1965(b) and (d).

3.     Without limiting the generality of the foregoing, each Defendant (directly or through agents who were at the time acting with actual and/or apparent authority and within the scope of such authority) has:

   a.     transacted business in Arizona;

   b.     contracted to supply or obtain services in Arizona;

   c.     availed themselves intentionally of the benefits of doing business in Arizona;

d.  produced, promoted, sold, marketed, and/or distributed their products or services in Arizona and, thereby, have purposefully profited from their access to markets in Arizona;

e.  caused tortious damage by act or omission in Arizona;

f.  caused tortious damage in Arizona by acts or omissions committed outside such jurisdiction while (i) regularly doing business or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

g.  committed acts and omissions which Defendants knew or should have known would cause damage (and, in fact, did cause damage) in Arizona to Plaintiffs and members of the Class while (i) regularly doing or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

h.  engaged in a conspiracy with others doing business in Arizona that caused tortious damage in Arizona; and/or

i.  otherwise had the requisite minimum contacts with Arizona such that, under the circumstances, it is fair and reasonable to require Defendants to come to Court to defend this action.

4.  Venue is proper under 28 U.S.C. §1391, because acts giving rise to the causes of action alleged in this complaint arose in, among other places, the District of Arizona, and the harmful effects of Defendants' fraud and wrongful conspiracy were felt in, among other places, the District of Arizona.  In addition, venue is proper under 18 U.S.C. §1965 because Plaintiffs Spectra Services, Inc., Affilion of Cobre Valley, LLC, Treadstone Equity Group, LLC, UTA Investments, LLC, Boomerang WB, LLC, AZ Storage 1, LLC, AZ Storage 2, LLC, Boomerang Sonoran, LLC, RV Storage, LLC, Stone Haven Lodge, LLC, TW Management, LLC, UTA Holdings, LLC, 5T Capital Fund II,

3

LLC, 5T Capital Holdings, LLC, 5T Capital LLC, Ingenuity Auto Leasing, LLC, Ingenuity Aviation, LLC, Ingenuity Equity Group II, LLC, Ingenuity Equity Group III, LLC, Ingenuity Equity Group, LLC, Ingenuity Leasing Company II, LLC, Ingenuity Leasing Company, LLC, Ingenuity Matrix, Inc., and Ingenuity Professional Services, PLLC, have their principal places of business in this District and because Dimitri Shivkov, Vassil Zhivkov, Kristina Tsonev, Keith Butler, Rebecca M. Butler, John Linder, and Nina Linder reside in this District.

## II.     **PARTIES**

5.     Plaintiff Dimitri Shivkov is an individual and a citizen of Arizona.  His address is 3034 W. Gran Paradiso Drive Phoenix, Arizona 85086.  He is also the trustee of the Phoenix 2010 Revocable Trust.

6.     Plaintiff Vassil Zhivkov is an individual and a citizen of Arizona.  His address is 3034 W. Gran Paradiso Drive Phoenix, Arizona 85086.

7.     Plaintiff Kristina Tsonev is an individual and a citizen of Arizona.  Her address is 3373 E. Leslie Dr. Gilbert, Arizona 85086.

8.     Plaintiff Spectra Services, Inc. is an Arizona corporation with its principal place of business in Phoenix, Arizona.

9.     Plaintiff DVS Holdings, LLC, is an Arizona limited liability company whose members are residents of Arizona with its principal place of business in Phoenix, Arizona.

10.     Plaintiff Robert C. Miller is an individual and a citizen of Utah.  His address is 8780 Parleys Lane, Park City, Utah 84098.

11. Plaintiff Brenda Mae Miller is an individual and a citizen of Utah. Her address is 8780 Parleys Lane, Park City, Utah 84098.

12. Plaintiff Bruce G. Robinson is an individual and a citizen of Utah. His address is 1944 East Yale Avenue, Salt Lake, Utah 84108.

13. Sara Van Alstyne Robinson is an individual and a citizen of Utah. Her address is 1944 East Yale Avenue, Salt Lake, Utah 84108.

14. Plaintiff Symphony Homes, LLC is a Utah limited liability company whose members are residents of Utah with its principal place of business in Salt Lake City, Utah.

15. Plaintiff Symphony Development Corp. is a Utah corporation with its principal place of business in Salt Lake City, Utah.

16. Plaintiff Keith Butler is an individual and a citizen of Arizona. His address is 2036 N Gilbert Rd., Suite 2-612, Mesa, Arizona 85203.

17. Rebecca M. Butler is an individual and a citizen of Arizona. Her address is 2036 N Gilbert Rd., Suite 2-612, Mesa, Arizona 85203.

18. Plaintiff Eric K. Wilke is an individual and a citizen of Texas. His address is 3145 Arapaho Ridge Drive, College Station, TX 77845.

19. Julie T. Wilke is an individual and a citizen of Arizona. Her address is 3145 Arapaho Ridge Drive, College Station, TX 77845.

20. Plaintiff John Linder is an individual and a citizen of Arizona. His address is 701 West Macaw Drive, Chandler, Arizona 85286.

21.     Plaintiff Nina Linder is an individual and a citizen of Arizona. Her address is 701 West Macaw Drive, Chandler, Arizona 85286.

22.     Plaintiff Affilion of Cobre Valley, LLC is an Arizona limited liability company whose members are residents of Arizona and Texas with its principal place of business in Globe, AZ.

23.     Plaintiff Affilion of Huntsville, PLLC is a Texas professional limited liability company whose members are residents of Arizona and Texas with its principal place of business in Huntsville, TX.

24.     Plaintiff Affilion of Texas PLLC is a Texas professional limited liability company whose members are residents of Arizona and Texas with its principal place of business in Corsicana, TX.

25.     Plaintiff Taylor-Wilke Holdings, LLC is a Texas limited liability company whose members are residents of Texas with its principal place of business in College Station, TX.

26.     Plaintiff Traditions Emergency Medicine, P.A. is a Texas professional association whose members are residents of Texas with its principal place of business in College Station, TX.

27.     Plaintiff Treadstone Equity Group, LLC is an Arizona limited liability company whose members are residents of Arizona and Texas with its principal place of business in Phoenix, AZ.

28.     Plaintiff UTA Investments, LLC is an Arizona limited liability company whose members are residents of Texas with its principal place of business in Chandler, AZ.

29.     Plaintiff Boomerang WB, LLC is an Arizona limited liability company whose members are residents of Arizona and Texas with its principal place of business in Mesa, AZ.

30.     Plaintiff AZ Storage 1, LLC, is an Arizona limited liability company whose members are residents of Arizona with its principal place of business in Chandler, AZ.

31.     Plaintiff AZ Storage 2, LLC, is an Arizona limited liability company whose members are residents of Arizona with its principal place of business in Chandler, AZ.

32.     Plaintiff Boomerang Sonoran, LLC is an Arizona limited liability company whose members are residents of Arizona and Texas with its principal place of business in Mesa, AZ.

33.     Plaintiff RV Storage, LLC is an Arizona limited liability company whose members are residents of Arizona with its principal place of business in Chandler, AZ.

34.     Plaintiff Stone Haven Lodge, LLC is an Arizona limited liability company whose members are residents of Arizona with its principal place of business in Mesa, AZ.

35.     Plaintiff UTA Holdings, LLC, is an Arizona limited liability company whose members are residents of Arizona with its principal place of business in Chandler, AZ.

36.     Plaintiff Wilke Medical Direction, PLLC is a Texas professional limited liability company whose members are residents of Texas with its principal place of business in College Station, TX.

37.     Plaintiff 5T Capital Fund II, LLC, is an Arizona limited liability company whose members are residents of Arizona and Texas with its principal place of business in Mesa, AZ.

38.     Plaintiff 5T Capital Holdings, LLC is an Arizona limited liability company whose members are residents of Arizona and Texas with its principal place of business in Mesa, AZ.

39.     Plaintiff 5T Capital LLC, is an Arizona limited liability company whose members are residents of Arizona and Texas with its principal place of business in Mesa, AZ.

40.     Plaintiff Ingenuity Auto Leasing, LLC is an Arizona limited liability company whose members are residents of Arizona with its principal place of business in Mesa, AZ.

41.     Plaintiff Ingenuity Aviation, LLC is an Arizona limited liability company whose members are residents of Arizona with its principal place of business in Mesa, AZ.

42.     Plaintiff Ingenuity Equity Group II, LLC is an Arizona limited liability company whose members are residents of Arizona with its principal place of business in Mesa, AZ.

43.     Plaintiff Ingenuity Equity Group III, LLC is an Arizona limited liability company whose members are residents of Arizona with its principal place of business in Mesa, AZ.

44.     Plaintiff Ingenuity Equity Group, LLC is an Arizona limited liability company whose members are residents of Arizona with its principal place of business in Mesa, AZ.

45.     Plaintiff Ingenuity Leasing Company II, LLC is an Arizona limited liability company whose members are residents of Arizona with its principal place of business in Mesa, AZ.

46.     Plaintiff Ingenuity Leasing Company, LLC is an Arizona limited liability company whose members are residents of Arizona with its principal place of business in Mesa, AZ.

47.     Plaintiff Ingenuity Matrix, Inc., is an Arizona corporation with its principal place of business in Mesa, AZ.

48.     Plaintiff Ingenuity Professional Services, PLLC, is an Arizona professional limited liability company whose members are residents of Arizona with its principal place of business in Mesa, AZ.

49.     Plaintiff Bourne Tempe Land, LLC is a Texas professional limited liability company whose members are residents of Texas with its principal place of business in College Station, TX.

50.     Defendant Artex Risk Solutions, Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business in Rolling

Meadows, Illinois.  It is a wholly owned subsidiary of Defendant Gallagher.  Artex is registered to do business in Arizona with the Arizona Corporation Commission and at all relevant times has maintained an office in Mesa, Arizona.  Artex's registered agent for service of process in Arizona is Corporation Service Company, 8825 N 23rd Avenue, Suite 100, Phoenix, AZ 85021.  This Court has personal jurisdiction over Artex pursuant to the Constitutions and laws of the United States and the State of Arizona.    At all relevant times, Artex has done and is doing business in the State of Arizona.  As described hereafter, Artex has contracted with Arizona residents, and either of parties was to perform the contract in whole or in part in the State of Arizona.  Additionally, Artex has committed torts, in whole or in part, in the State of Arizona, including intentional tortious acts directed at residents of the State of Arizona, where the brunt of the harm was felt.  In addition, venue and jurisdiction as to this defendant is proper in this District under 18 U.S.C. §1965.

51.    Defendant TSA Holdings, LLC f/k/a Tribeca Strategic Advisors, LLC ("Tribeca") is a limited liability company organized and existing under the laws of Arizona with its principal place of business in Mesa, AZ.  At all relevant times, Tribeca has maintained an office in Mesa, Arizona.  Tribeca's registered agent for service of process in Arizona is HC Agents LLC, 1635 N Greenfield Rd, Suite 115, Mesa, AZ 85205.  This Court has personal jurisdiction over Tribeca pursuant to the Constitutions and laws of the United States and the State of Arizona.    In addition, venue and jurisdiction as to this defendant is proper in this District under 18 U.S.C. §1965.

52.     Defendant TBS LLC d/b/a PRS Insurance is a limited liability company organized and existing under the laws of Arizona with its principal place of business in Mesa, AZ.  At all relevant times, PRS has maintained an office in Mesa, Arizona.  PRS's registered agent for service of process in Arizona is HC Agents LLC, 1635 N Greenfield Rd, Suite 115, Mesa, AZ 85205.  This Court has personal jurisdiction over PRS pursuant to the Constitutions and laws of the United States and the State of Arizona.   In addition, venue and jurisdiction as to this defendant is proper in this District under 18 U.S.C. §1965.

53.     Defendant Karl Huish is an individual and, on information and belief, a citizen of Arizona.  Upon information and belief, Karl Huish's business address is 1635 N. Greenfield Rd, Suite 127, Mesa, Arizona 85205.  Karl Huish is or was during the relevant period an employee of Artex, with an office in Mesa, Arizona.  In addition, venue and jurisdiction as to this defendant is proper in this District under 18 U.S.C. §1965.

54.     Defendant Jeremy Huish is an individual and, on information and belief, a citizen of Arizona.  Upon information and belief, Jeremy Huish's business address is 1635 N. Greenfield Rd, Suite 127, Mesa, Arizona 85205.  Jeremy Huish is or was during the relevant period an employee of Artex, with an office in Mesa, Arizona.  In addition, venue and jurisdiction as to this defendant is proper in this District under 18 U.S.C. §1965.

55.     Defendant Jim Tehero is an individual and, on information and belief, a citizen of Arizona.  Upon information and belief, Tehero's business address is 1635 N.

11

Greenfield Rd, Suite 127, Mesa, Arizona 85205.  Tehero is or was during the relevant period an employee of Artex, with an office in Mesa, Arizona.  In addition, venue and jurisdiction as to this defendant is proper in this District under 18 U.S.C. §1965.

56.     Defendant Arthur J. Gallagher & Co. is a corporation organized and existing under the laws of Delaware with its principal place of business in Rolling Meadows, Illinois.  It wholly owns Defendant Artex.  Gallagher is registered to do business in Arizona with the Arizona Corporation Commission and at all relevant times has maintained an office in Mesa, Arizona.  Gallagher's registered agent for service of process in Arizona the Prentice-Hall Corporation, 8825 N 23rd Avenue, Suite 100, Phoenix, AZ 85021.  This Court has personal jurisdiction over Gallagher pursuant to the Constitutions and laws of the United States and the State of Arizona.  In addition, venue and jurisdiction as to this defendant is proper in this District under 18 U.S.C.  §1965.

57.     Defendant Debbie Inman is an individual and, on information and belief, a citizen of Illinois.  Upon information and belief, Inman's business address is 2850 Golf Road, Rolling Meadows, Illinois, 60008.  Inman is or was during the relevant period an employee of Artex.  This Court has personal jurisdiction over Inman pursuant to the Constitutions and laws of the United States and the State of Arizona.   At all relevant times, Inman has done and is doing business in the State of Arizona.  As described hereafter, Inman has committed torts, in whole or in part, in the State of Arizona, including intentional tortious acts directed at a resident of the State of Arizona, where the brunt of the harm was felt.  Inman has purposefully availed herself of the benefits and protections of the laws of the State of Arizona and could reasonably anticipate being

subject to the jurisdiction of courts of the State of Arizona.  This suit against Inman will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.

58.     Defendant Epsilon Actuarial Solutions, LLC is a limited liability company organized and existing under the laws of Arizona with its principal place of business in Gilbert, Arizona.  Epsilon's registered agent for service of process is Julie A. Ekdom, 1507 E. Treasure Cove Dr., Gilbert, AZ 85234.  This Court has personal jurisdiction over Epsilon pursuant to the Constitutions and laws of the United States and the State of Arizona.  In addition, venue and jurisdiction as to this defendant is proper in this District under 18 U.S.C. §1965.

59.     Defendant Julie A. Ekdom is an individual and, on information and belief, a citizen of Arizona.  Upon information and belief, Ekdom's business address is 1507 E. Treasure Cove Dr., Gilbert, AZ 85234.  Ekdom is or was during the relevant period a principal and chief executive officer of Epsilon.  In addition, venue and jurisdiction as to this defendant is proper in this District under 18 U.S.C. §1965.

60.     Defendant AmeRisk Consulting, LLC is a limited liability company organized and existing under the laws of Arizona with its principal place of business in Phoenix, Arizona.  AmeRisk's registered agent for service of process is WAS Inc., 9141 E. Hidden Spur Trl., Scottsdale, AZ 85255.  This Court has personal jurisdiction over AmeRisk pursuant to the Constitutions and laws of the United States and the State of Arizona.  In addition, venue and jurisdiction as to this defendant is proper in this District under 18 U.S.C. §1965.

61.     Defendant Provincial Insurance, PCC is a protected cell company organized and existing under the laws of Anguilla.  Provincial is domiciled in Anguilla and is not licensed in the United States.  At all relevant times, Provincial has done and is doing business in the State of Arizona, and maintains a regular place of business 1635 N. Greenfield Rd, Suite 127, Mesa, Arizona 85205.  Provincial does not currently have a designated agent upon whom service may be made in this civil action.  As described hereafter, Provincial has contracted with Arizona residents, and either of the parties was to perform the contract in whole or in part in the State of Arizona.  Additionally, Provincial has committed torts, in whole or in part, in the State of Arizona, including intentional tortious acts directed at a resident of the State of Arizona, where the brunt of the harm was felt.  Provincial's conduct in the State of Arizona has been committed by officers, directors, employees, and/or agents of Provincial acting within the scope of their employment or agency.  Provincial has purposefully availed itself of the benefits and protections of the laws of the State of Arizona and could reasonably anticipate being subject to the jurisdiction of courts of the State of Arizona.  This suit against Provincial will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.  In addition, venue and jurisdiction as to this Defendant is proper in this District under 18 U.S.C. §1965.

### III.   NATURE OF THE CLAIMS

**A.     The Captive Insurance Strategies**

62.     Plaintiffs, on their own behalf and on behalf of the Class, as herein defined, bring this action against Defendants seeking the recovery of damages that Plaintiffs and the Class sustained in connection with their participation in Captive Insurance Strategies

that Defendants designed, developed, promoted, sold, implemented, and managed. Plaintiffs, on their own behalf and on behalf of the Class, bring claims for breach of fiduciary duty, negligence, negligent misrepresentation, disgorgement, rescission, fraud, violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§1961–1968), violations of Arizona's RICO statute (A.R.S. §13-2301, et seq.), breach of contract/duty of good faith and fair dealing, civil conspiracy, and aiding and abetting breaches of fiduciary duty and fraud.   Plaintiffs and the Class seek compensatory damages against Defendants for damages arising from Captive Insurance Strategies that Plaintiffs and the Class entered into and utilized on their federal and state tax returns on the promotions and advice of Defendants from 2005 onwards ("Captive Insurance Strategies").   Unbeknownst to Plaintiffs and the Class, the Defendants and the Other Participants[1] jointly and in concert developed, promoted, sold, implemented, and managed the Captive Insurance Strategies.

63.    The Captive Insurance Strategies are set forth in detail below.   The Defendants and the Other Participants, acting pursuant to an elaborate and carefully devised common scheme and unlawful conspiracy, counseled and advised Plaintiffs and the Class to undertake the Captive Insurance Strategies, claiming the Captive Insurance Strategies would provide non-tax benefits including, but not limited to, lawful insurance coverage, and in addition would legally reduce Plaintiffs' and the Class's federal and state taxes.   At the time Defendants marketed and sold the Captive Insurance Strategies to

---

[1]   The "Other Participants" include individuals and entities such as actuaries, underwriters, attorneys, accountants, brokers, and others not named as Defendants herein who assisted Defendants in designing, promoting, selling, implementing, and managing the Captive Insurance Strategies.

Plaintiffs and the Class, Defendants knew or should have known that the Captive Insurance Strategies did not provide insurance recognized under the Internal Revenue Code ("IRC" or "Code") and would not and could not yield the tax treatment Defendants represented. Importantly, Defendants' primary motive in their pre-planned scheme was to exact significant fees and commissions from Plaintiffs and the Class. The Internal Revenue Service ("IRS") ultimately determined that Plaintiffs and the Class owed substantial back taxes, interest, and penalties as a result of their participation in the Captive Insurance Strategies.

64.     It was not reasonable to expect that Plaintiffs and the Class were knowledgeable and they were not, in fact, knowledgeable about complex insurance and tax matters, including tax law and captive insurance. Plaintiffs and the Class detrimentally relied on Defendants as their trusted insurance, tax, actuarial, and underwriting advisors for comprehensive insurance, tax, actuarial, and underwriting advice, and upon Defendants' repeated unequivocal representations that the Captive Insurance Strategies were completely legal tax-advantaged insurance strategies within the meaning of Code section 831(b) which created actual insurance—not self-insurance, as defined under the Code — and had the requisite business purpose and economic purpose to be fully deductible for tax purposes as insurance expense and not illegal tax shelters.

65.     Unbeknownst to Plaintiffs and the Class, Defendants entered into undisclosed, illegal business arrangements with each other and the Other Participants. Through these arrangements, Defendants systematically identified potential or existing clients who had substantial income in a particular tax year. The Defendants unlawfully

abused their positions of trust, confidence, and prestige with their clients, including Plaintiffs and the Class—in accordance with the Defendants' pre-planned and fraudulent scheme—by fraudulently inducing those clients into transactions with Defendants for legal, accounting, tax, insurance, and actuarial advice and services in connection with the Captive Insurance Strategies.

66.    Each of the Defendants and Other Participants knew or should have known that these purported tax-advantaged Captive Insurance Strategies were, in reality, nothing more than illegal and abusive tax shelters.  To profit from their scheme, the Defendants and Other Participants intentionally concealed the true nature of the strategies from tax authorities and from Plaintiffs and the Class.

67.    The Defendants and Other Participants knew or should have known that the IRS would disallow the Captive Insurance Strategies, due to *inter alia* the lack of business purpose and economic substance to the transactions in the way they designed, implemented, and managed them; the improper circular flow of funds, including the use of funds being cycled as loans or distributions back to Plaintiffs and the Class; the lack of proper risk shifting and risk distributions; and most importantly, the organizational scheme that was designed by the Defendants primarily to allow them to charge and collect, in multiple ways, fees and expenses across the entire structure, without any real intent to fund the captive insurance companies for real risk management and in a structure that supported actual insurance and re-insurance purposes.  Despite these issues, Defendants and Other Participants continued to promote and sell the Captive Insurance Strategies and advise Plaintiffs and the Class they were lawful.

17

68.     Defendants prepared federal tax returns in connection with the Captive Insurance Strategies, and the Defendants and Other Participants advised Plaintiffs and the Class to sign and file individual federal tax returns using and reporting the deductions generated by the Captive Insurance Strategies.  Even after the Defendants and Other Participants learned that the IRS had begun to audit and disallow deductions claimed through similar tax strategies, the Defendants and other Participants continued to advise, promote, and encourage Plaintiffs and the Class to use the Captive Insurance Strategies to offset income and/or capital gains on their income tax returns.

69.     After Defendants and convinced their clients to pursue the tax-advantaged Captive Insurance Strategies, Defendants jointly worked with each client to execute the technical portion of the Captive Insurance Strategies and then operated and managed all aspects of the Plaintiffs and Class members' Captive Insurance Strategies.  Artex prepared certain federal tax returns for entities that were used to implement the Captive Insurance Strategies and for the individual Plaintiffs and the Class.  At no point in time did the Defendants or the Other Participants ever disclose to Plaintiffs and the Class that they had conspired to fraudulently, recklessly, or negligently, design, promote, sell, implement, and manage the Captive Insurance Strategies, and were in no way independent from each other. These facts only recently were discovered by Plaintiffs and include the presence in the transactions of so many affiliated and related parties with no arms-length supporting business purpose to manage, shift, insure and minimize risk factors in any actual insurance business.

70.     Unbeknownst to Plaintiffs and the Class, the Defendants and Other Participants conspired to design, promote, sell, implement, and manage the Captive Insurance Strategies for the purpose of receiving and splitting substantial fees.  The receipt of those fees was the primary, if not sole, motive of Defendants in the development and execution of the Captive Insurance Strategies.  Unbeknownst to Plaintiffs and the Class, the Defendants designed the Captive Insurance Strategies and conspired to provide a veneer of legitimacy to one another's opinions of the lawfulness and tax consequences of the Captive Insurance Strategies by agreeing to the representations and advice that would be made to Plaintiffs and the Class.

71.     Artex represented to its clients, including Plaintiffs and the Class, that the Artex tax and insurance professionals had designed proprietary tax-advantaged insurance plans that would provide non-tax benefits including, but not limited to, lawful insurance coverage, and in addition would legally reduce the federal and state taxes for the Plaintiffs and the Class.  Further, Artex structured the arrangements so that Plaintiffs and the Class could "borrow back" or distribute any excess funds used in the insurance arrangements.  Artex and the Defendants represented that this arrangement was lawful.  However, Artex and the other Defendants knew or should have known that such borrowing or distributions of excess premiums was impermissible under applicable law known to Defendants and the Other Participants.  In reality, insurance companies do not provide opportunities and benefits for the insured to access any excess funds without the funds being loaned at market rates and also being secured by actual cash value or other collateral that can support repayment of the loan if enforced.  Defendants further knew or

should have known that the Captive Insurance Strategies did not comply with the applicable insurance and tax laws for several reasons, including but not limited to failing to properly shift risk, distribute risk, or operate as lawful insurance companies operate. Defendants knew or should have known that these "Captive Insurance Strategies" were, in reality, nothing more than illegal and abusive tax shelters.  To profit from their scheme, Defendants counted on their ability to conceal the true nature of the Captive Insurance Strategies from Plaintiffs, the Class, and tax authorities – which they did.

72.   Despite Defendants' knowledge that the Captive Insurance Strategies were illegal and abusive tax shelters, Artex assisted Plaintiffs and the Class with the preparation of certain of their federal and state tax returns using the represented legal tax deductions generated by the Captive Insurance Strategies.

73.   The Defendants and Other Participants aggressively implemented their fraudulent scheme.  The Defendants and the Other Participants solicited their own clients to enter into the Captive Insurance Strategies.  The Defendants and the Other Participants identified successful individuals—such as Plaintiffs and the Class—as potential clients based on the knowledge of the Defendants and the Other Participants of the finances of the Plaintiffs and the Class, and identified and established a network of other professionals who could and would serve as a referral source of potential clients.

74.   The receipt of fees and pecuniary gain from those fees was the primary motive for the Defendants and Other Participants' conduct; the provision of professional services to clients was merely an incidental byproduct of, not a motivating factor for, the Defendants and Other Participants' conduct alleged herein.  Further, the Defendants and

Other Participants' arrangement gave each of the participating Defendants and Other Participants an unlawful incentive to promote and implement captive insurance arrangements that unlawfully provided Plaintiffs and the Class, via the "loans" and/or distributions, with readily available cash "at will" to pay for professional services allegedly rendered by Defendants and Other Participants, but failed to satisfy the applicable insurance and tax laws, including the economic substance, business purpose and step transaction doctrines.  This was partly because the form and economic substance of the arrangements were to drive clients to claim tax deductions for expenses that could not be properly justified, to subsequently avoid taxes with unsecured "borrow back" provisions, and to cycle back premiums to affiliated parties for those purported expenses.

75.     The Defendants and Other Participants had a financial, business, and property interest in inducing Plaintiffs and the Class, as well as other clients, to enter into Captive Insurance Strategies, and to do so, promised, opined, and assured Plaintiffs and the Class that the Captive Insurance Strategies complied with all applicable insurance and tax laws and would legally reduce taxes for Plaintiffs and the Class.

76.     At all times alleged herein, Defendants knew that Plaintiffs and the Class placed reasonable trust and faith in Defendants as the insurance, legal, tax, actuarial, and underwriting advisors for Plaintiffs and the Class with respect to all aspects of the Captive Insurance Strategies.

77.     Based on Defendants' promotions, misrepresentations, and omissions, Plaintiffs and the Class paid substantial fees to Defendants and the Other Participants to implement the Captive Insurance Strategies.  Ultimately, as a direct result of Defendants'

fraudulent unlawful conduct, the IRS disallowed the tax effects of the Captive Insurance Strategies entered by the Plaintiffs and the Class and assessed Plaintiffs and the Class with, among other things, substantial back-taxes, interest, and penalties.

**B.      Captive Insurance Strategies Unlawfully Promoted to Plaintiffs and the Class**

> **1.      Captive Insurance Generally**

78.      Premiums paid for insurance are deductible as ordinary and necessary business expenses under 26 USC § 162(a); Sec. 1.162-1(a), Income Tax Regs.  But amounts set aside in a loss reserve as self-insurance are not.  The question of whether amounts paid are deductible as insurance expenses therefore turns on whether the payments qualify as insurance or self-insurance.  The Supreme Court ruled over 75 years ago that insurance is a transaction that involves "an actual 'insurance risk'" and that "[h]istorically and commonly insurance involves risk-shifting and risk-distributing." *Helvering v. Le Gierse*, 312 U.S. 531, 539 (1941).

79.      In general, to determine whether an arrangement qualifies as insurance, the arrangement must:

> a.      involve risk-shifting;
>
> b.      involve risk-distribution;
>
> c.      involve insurance risk; and
>
> d.      meet commonly accepted notions of insurance.

80.      A microcaptive insurance company is a company whose premiums remain below the Section 831(b) threshold and is related to its insureds by ownership.  Two advantages accrue to the microcaptive and its insureds if the microcaptive insurance company meets the Section 831 criteria and engages in bona fide insurance arrangements.

22

First, for the insureds, the premium paid to the microcaptive is deductible to the insured for tax purposes.  Second, for the microcaptive and its owners, the premiums received by the microcaptive are not taxable as income.  The shared ownership between the microcaptive and its insureds means the owners can deduct the premium expense that the insureds paid to the microcaptive while paying no taxes on premiums received by the microcaptive—as an additional layer of tax incentive, captive insurance managers like Artex sometimes offered to provide "estate planning captives" where ownership of the microcaptive was held by children of the insured's owner.

81.    Captive insurance transactions involve a situation where the insureds and the insurer are related.  A pure captive insurance company only insures the risks of companies related to it by ownership.  The practice dates back to at least the 1950s when Youngstown Sheet and Tube set up its own insurance company to insure its coke and iron mines.  The concept spread and the IRS challenged whether the payments between a company and its captive were deductible insurance expenses or instead nondeductible self-insurance.[2]  To qualify as deductible insurance expenses, despite the fact that the insured and insurer are related, the insurance must comply with and adhere to the laws and requirements of how such insurance is properly underwritten and backed by adequate reserves for the nature of the risk.  Further, there must be an understanding of and compliance with all applicable tax and regulatory requirements.  This includes the "economic substance" and "step transaction" doctrines that are involved in all aspects of the captive structure, including (i) related party loans or distributions, and (ii) the need of

---

[2] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

transactions to be supported by real risk and business purpose, including bona fide risk transfer and risk distribution. A captive cannot merely serve as a vehicle to provide a business expense in pursuit of a tax deduction.  Defendants had duties to fully and accurately disclose and explain to Plaintiffs and the Class each and every one of these requirements.

82.    Once a microcaptive insurance company is formed, it must price its insurance policies.  Underwriting is the process by which insurers determine the price, terms and conditions, and acceptability of a risk.  To perform this task under their standard of care, underwriters can rely on actuaries, if reasonable.  Actuaries are responsible for defining the rating scheme and the underwriters are responsible for making the individual selections and adjustments for the given risks.  The standard of care requires the actuary to use published rates and large datasets for particular risks and to make adjustments for policy limits, estimates of the frequency and severity of loss, deductibles, the claims history of a particular customer, and other factors that can be combined into equations that are used by the actuary to set a premium for a particular policy.  The applicable standard of care also requires that actuaries ensure their work is appropriate for the intended use, consider whether their work includes large enough risk classes "to allow credible statistical inferences regarding expected outcomes," and check the reasonableness of their results. *See* Actuarial Standard of Practice No. 12: Risk Classification (for All Practice Areas), sec. 3.3 (Actuarial Standards Bd. 2005).  "The Actuarial Standards Board (ASB) is vested by the professional actuarial societies with the responsibility for promulgating Actuarial Standards of Practice (ASOPs) for actuaries

providing professional services in the United States.  Actuaries are required to follow the ASOPs by their actuarial societies." *Acuity, A Mut. Ins. Co., & Subs. v. Commissioner*, T.C. Memo. 2013-209, at *4.  The work of an actuary must be reproducible and explainable to other actuaries. *See* Actuarial Standard of Practice No. 41: Actuarial Communications, sec. 3.2 (Actuarial Standards Bd. 2010).

### 2.    The History of Defendant Artex

83.    By its own description, Artex is a licensed insurance management company that advises clients regarding captive insurance.  At the time of Artex's introduction to Spectra, its internet address was "www.captiveadvisors.com."  Artex was formed in 2007 as a subsidiary of Defendant Gallagher, a publicly traded company headquartered in the greater Chicago area.   Gallagher also manages Arizona-based captive insurance companies.

84.    Gallagher established Artex for the purpose, at least in part, of designing, promoting, selling, implementing, and managing Captive Insurance Strategies.  Its brokers, agents, and/or employees would refer clients to Artex, and these referral sources would usually receive bonuses or commissions for the referrals.  In addition, when referring clients to Artex, Gallagher's brokers, agents, and/or employees would frequently attend sales meeting with Artex and the referred clients and be copied on communications to the referred clients.  In its 2017 10-K filed with the Securities and Exchange Commission, Gallagher admitted "[o]ur micro-captive advisory services are under investigation by the Internal Revenue Service (IRS). . . . Among other matters, the IRS is investigating whether we have been acting as a tax shelter promoter in connection with these operations."  In addition, Gallagher acknowledged "[w]hile the IRS has not

25

made specific allegations relating to our [or Tribeca's] operations . . . if the IRS were to successfully assert that the micro-captives organized and/or managed by us do not meet the requirements of IRC Section 831(b), we could be subject to monetary claims by the IRS and/or our micro-captive clients."

85.   According to its website, Artex provides, and has provided at all relevant times, "middle market risk solutions" to "closely-held, profitable business[es] looking to transfer uninsured business enterprise risks to captives for financial benefits."  Per Artex, this solution "[u]sually does not impact existing P&C [property and casualty] insurance."

86.   Tribeca was established by Karl Huish in 1999.   Tribeca purportedly specialized in the design, implementation, licensing, and management of captive insurance companies.   In December 2010, Gallagher, through Artex, acquired substantially all the assets of Tribeca.  Karl Huish and his associates continue to operate in Arizona through Artex.

87.   Under Artex's captive program, Artex assisted owners of closely held companies to form one or more captives.  After forming the captives, Artex would then oversee, operate, and manage all captive operations.   The insured then purchased insurance policies issued by Provincial, which was represented to be a fronting insurance carrier.   In the insurance industry, a fronting insurance carrier insures risks and then reinsures all or a portion of those risks with reinsurers.

88.   Artex designed, developed, promoted, sold, implemented, and managed at least three different types of Captive Insurance Strategies: Series Business Unit Captives, Pure Captives, and Protected Cell Captives.   Series Business Unit and Pure Captives

pooled risk through a reinsurance arrangement with Provincial. Protected Cell Captives, conversely, used off-shore entities called protected cell companies. These companies segregate assets among different cells with a common "core" that manages the cells and can possess its own assets. Protected Cell Captives pooled risks by reinsuring a portion of the insurance risk of each cell through the "core" of the protected cell company.

89. Provincial is, and was at all relevant times, indirectly owned by Defendant Karl Huish and a family member. Artex, directly or indirectly, performed various business operations of Provincial and collected premiums on policies issued by Provincial, which were then paid to Artex.

90. Starting in 2011, Artex used "General Terms and Conditions" as a boilerplate for all coverages offered by Provincial. For some, but not all, of their clients, Artex and Tribeca used Provincial as a vehicle that purportedly distributed and transferred risk among various insureds. The General Terms and Conditions for Provincial were copyrighted by ISO Properties, a company that creates pro forma property and casualty policies. Ostensibly, the General Terms and Conditions coupled with the coverage-specific declarations and endorsements served as Provincial's fronting policies. In exchange for these policies, the insured paid the premiums reflected on the declaration pages.

91. Provincial ceded the policies to the captive insurance company in a reinsurance arrangement. Policies issued by Provincial were reinsured in two layers – a primary layer (facultative reinsurance) and an excess of loss layer (the latter also known as a quota share reinsurance program).

92.     The primary layer, referred to as the facultative reinsurance, covered losses claimed only by the captive's related insured. In exchange for the captive providing "reinsurance," Provincial remitted the net ceded premium back to the captive for the facultative reinsurance.  The facultative reinsurance premiums were generally paid to the captive within a few weeks of the insured's premium payment to Provincial.

93.     Provincial issued a Reinsurance Contract with regard to the facultative reinsurance. It specified that the captive was liable to contribute 100% of its related insured's claims and loss adjustment expenses for losses in the facultative reinsurance. No other Insured was covered by the facultative reinsurance—only the captive's related insured; and no other insurance company was liable for the insured's losses up to the first 25% of exposure ($250,000 for a $1,000,000 policy limit).

94.     Provincial issued a Facultative Reinsurance Certificate that listed all policies with the captive reinsured on a facultative basis.  The Facultative Reinsurance Certificate showed the captive's maximum liability for each policy listed and specified the amounts of the reinsurance premiums by coverage line.  In almost all instances, the facultative reinsurance premiums equaled 49% of the net premium for the insured of the Captive Insurance Company.

95.     Plaintiffs and Class members who paid premiums to Provincial did so at Artex's direction to allegedly achieve risk distribution.  Defendants represented that for the Artex clients who used Provincial, the quota share layer, was reinsured into Provincial's pool.  For some clients, Artex attempted to distribute risks by reinsuring the excess layer among different cells within the same captive insurance company.

Provincial's pool was managed by Artex employees. The pool received approximately 51% of all reinsured policy premiums. The quota share reinsurance program was governed by the "Master Reinsurance Contract" between Provincial and the captive pool participants. In addition to being liable for its related Insured's claims, a captive participating in Provincial's pool was also purportedly liable for claims by unrelated Insureds whose captives also participated in the pool. Under the quota share reinsurance program, the captive was liable to contribute a quota share of the amount by which a claim exceeded the primary layer (the first 25% of exposure), subject to the maximum limit of Provincial's policy.

96.     If Provincial's pool sustained a claim, each captive's quota share dictated how much the captive was liable to pay (*i.e.*, its quota share payment). The quota share percentage was a fraction: the net premiums payable by the captive's second layer reinsurance (*i.e.*, total quota share reinsurance premiums for the year), divided by the aggregate of all net premiums received by Provincial's pool. A captive's quota share of the pool's claims was proportionate to the percentage of the total net premiums the captive paid as its quota share payment.

97.     Provincial was required to determine the total insurance pool premiums and total claims within 45 days of the end of the calendar year. The pool held no premiums at the end of the calendar year; all reinsurance premiums were already reimbursed to the captives that paid them. Generally, the captive received the quota share reinsurance premiums within only a few weeks of the insurance payment. By the end of the insurance year, Provincial held no insurance premiums. Provincial's liquidity and ability

29

to pay claims therefore turned entirely on its participating captives honoring their obligations to pay their quota share in the event of a claim.  The best Provincial could do to ensure payment of a pooled claim was to rely on the posting of collateral by the Captives for the captives' potential obligations for the quota share reinsurance.  Artex knew or should have known as part of its due diligence in acquiring Tribeca that Provincial lacked liquidity and could not meet its insurance obligations unless the participating captives met their quota share obligations.

98.    Although Provincial's pool had been in existence since 2002, there were apparently *zero* pool claims through 2010.  In 2011, there were 197 participants in the pool with 940 policies and total premiums paid of $51,702,549.  The very first claim to be approved for payment was $8,274 and represented the only claim paid for 2011.  Each participant in the 2011 pool received a bill in May 2012 for its quota share percentage of the $8,274 claim.  Most bills for each captive were under $100.

99.    In 2012, total premiums for 245 participants in the program were $64,843,395 and approved pool claims were $210,615.  In 2013, total premiums for 246 participants were $79,216,777 and approved pool claims were $1,102,062.

100.    By allocating 51% of reinsurance premiums to quota share and 49% to primary, Provincial and Artex suggested that more than half of the risks were for quota share claims.  This is an important benchmark for Artex, as anything short of this allocation would cause Artex's captive policies to fail risk distribution rules.  Notwithstanding the 51% allocation of reinsurance premiums to the quota share layer, the

overpriced, vague, and defective policies carried little possibility of potential coverage for any valid claims.

101.    Regarding other captive insurance companies and policies arranged by Artex, the IRS concluded that the deductions for purported captive insurance premiums were disallowed because the transactions, among other things, lacked economic substance.    Alternatively, the IRS concluded that the transactions did not constitute insurance for purposes of federal tax law.  The IRS concluded that the transactions were not ordinary and necessary business expenses within the meaning of I.R.C. § 162(a) and were not otherwise deductible.  Accordingly, the IRS concluded that the deductions for purported captive insurance premiums and fees were disallowed.

**C.    Spectra's Captive Insurance Strategy**

**1.  The Captive Insurance Strategy is Promoted to Spectra**

102.    Plaintiff Spectra was founded in 2005.  It is directly or beneficially owned by Shivkov, Zhivkov, and/or Tsonev (together with DVS Holdings, LLC, the "Shivkov Plaintiffs").  Spectra is a technical services company that provides technical expertise and resources for infrastructure projects in the telecommunications market.   Spectra's services include engineering surveys, project management and coordination; installation, testing, and integration of equipment; and quality control inspections and audits.

103.    Shivkov is the founder and CEO of Spectra.  In 2011, Shivkov and Spectra met with Artex.  The meeting was for the purpose of learning about captive insurance, in general, and the Captive Insurance Strategies, in particular.

104.    On or about October 12, 2011, Brian Maughan of Artex had a telephone conversation with Shivkov.  Maughan followed up his phone call with Shivkov by

sending an email on the same day with brochures, presentations, and a fact finder worksheet. These documents contained false representations and material omissions.

105. Artex's brochures and presentations emphasized the wealth accumulation, estate planning, asset protection, and asset growth features of captive insurance as "Motivating Factors" for forming a captive. These materials also promoted "retain[ing] premium dollars" as one of the advantages of forming a captive. They further represented that "[w]ith a captive, self-insured risks can be converted into tax-deductible premiums that are paid to a captive." In addition, these materials represented that if insurance claims were "as projected, the captive may retain substantial profits" for distribution.

106. In an October 12, 2011 presentation, Artex represented, for example on slide 7, that the captive insurance company "must qualify as 'insurance company'" under Code Section 831(b). Slide 19 of this presentation also contained a timeline of significant events in "30 Years of Captive Taxation." The final slide in the presentation listed Jeremy Huish's name, contact information, and credentials, which included "J.D., CPA, LL.M. (tax)." These slides represented that Defendants had tax professionals, like Jeremy Huish, who analyzed the tax implications of the Captive Insurance Strategies and concluded that the Strategies complied with all tax laws.

107. In addition to the representations, advice, and opinions about tax treatment in its October 12, 2011 presentation, Artex also represented that the captive insurance companies would provide bona fide insurance for material risks. For instance, on slide 11 of this presentation, Artex used the image of an iceberg to represent that risks covered

by commercial insurance were just the "tip" of the iceberg while the remainder of the iceberg beneath the waterline amounted to "uninsured risks."

108.    On or about October 26, 2011, James Tehero of Artex sent an engagement letter to Spectra, addressed to Shivkov.  In the engagement letter, Artex recommended forming an insurance company, which would be "a separate Series Business Unit ('SBU') of Fortress Insurance, LLC, a Delaware Series LLC captive insurance company."  Artex recommended a "Feasibility Study" to determine the feasibility of forming a captive insurance company for Spectra, which was represented to *inter alia*, evaluate the suitability of a captive for Spectra, form and license the insurance company, obtain the necessary approvals in the jurisdiction of formation, evaluate Spectra's business risks, prepare a business plan, prepare license applications, and handle compliance with government regulations and filings in the jurisdiction of formation to permit the insurance company to accept insurance premiums—all in a legal manner.

109.    Artex used the Feasibility Study to highlight limitations of Spectra's general liability policies and show where captive related insurance could supply coverage benefits by covering "gaps" in the commercial insurance that Spectra purchased.  These alleged coverage gaps consisted of low-likelihood, high impact claims scenarios.  As discussed further below, Spectra in fact made very few claims under its captive insurance policies.  Artex did not disclose the importance of these factors in its presentations to Plaintiffs.

110.    Artex proposed in the engagement letter that Artex would, *inter alia*, act as Spectra's insurance manager for the purpose of statutory or regulatory compliance, assist

in arranging and coordinating for an annual actuarial study and financial audit services for the insurance company, assist in identifying "insurance opportunities" and procuring reinsurance, "[c]ause to have prepared and filed the annual federal tax return for the insurance company", provide bookkeeping for the insurance company, and draft the insurance policies and related documents. Artex was responsible for preparing all of the tax returns for the captive insurance company.

111. In exchange for its turn-key services, Artex required Spectra to pay it large fees, $40,000.00 for the creation of the new insurance company, ongoing fees of $30,000.00 per year to manage it, and additional fees to Provincial for providing reinsurance services equal to 2.5 percent of all premiums paid. In exchange for these fees, Artex managed and administered all aspects of the Captive Insurance Strategies and DVS Series. Artex's services included the preparation of DVS Series' tax returns, which were used by Spectra in preparing its tax returns. Once Artex prepared DVS Series' tax returns, Artex represented to Shivkov that he should sign these tax returns. Shivkov reasonably relied on this advice.

112. In an effort to further bolster their opinions and advice that the Captive Insurance Strategies were legal and to convince Plaintiffs and Class members to sign the engagement agreement and implement the Captive Insurance Strategies, Artex told Shivkov that the IRS had already analyzed the Captive Insurance Strategies and found them to be legal. Specifically, Artex advised Shivkov that the IRS previously audited some clients who participated in the Captive Insurance Strategies; Artex worked with

these clients to defend the audit; and these clients prevailed in the audit, with the IRS concluding the Captive Insurance Strategies were legal and allowing the tax benefits.

113.   On or about November 11, 2011, Shivkov signed and agreed to the engagement agreement on behalf of Spectra based on the fraudulent and negligent representations and omissions of Defendants.   Artex never discussed the content or substance of the engagement letter, and Shivkov relied upon Artex's numerous representations relating to the Captive Insurance Strategies in deciding to sign the engagement agreement.

## 2.   Based on Defendants' Misrepresentations and Flawed Advice, Spectra Engaged in Captive Insurance Strategies from 2011-2015

114.   Based on Defendants' misrepresentations and flawed advice, on November 28, 2011, Shivkov caused DVS Insurance, LLC to be formed as the owner of an as-yet-to-be-formed captive insurance company.   The name of DVS Insurance, LLC was later changed to DVS Holdings, LLC.   On December 29, 2011, DVS Series of Fortress Insurance, LLC ("DVS Series") was formed as an entity 100% owned by DVS Insurance, LLC.   DVS Insurance, LLC was directly or beneficially owned by Shivkov, Zhivkov, and Tsonev.

115.   Prior to the incorporation of DVS Series, Shivkov and Jeremy Huish applied for the admission of DVS Series to the Delaware Department of Insurance on December 5, 2011.   Seven days later, on December 12, 2011, AmeRisk delivered the feasibility study of DVS Series that Artex had commissioned on behalf of DVS Series. The feasibility study purported, among other things, to apply actuarial methods to calculate premiums for "gaps" in commercial coverage.   The feasibility study did not

make any *recommendations* as to coverage, but instead *assumed* Spectra would purchase 11 policies from its captive: Administrative Actions, Loss of Key Contract, Business Overhead – Disability, Loss of Key Customer, Capital Call Income Replacement, Loss of Key Employee, Collection Risks, Loss of Key Supplier, General Liability Difference in Condition, Product/Service Rework, and Legal Expense.

116.   The Feasibility Study contained financial statements for DVS Series. These financial statements universally stated that DVS Series would only be taxed on its investment income.  This treatment, in turn, was based on the representation that the DVS Series election under Section 831(b) was correct.  This representation was false when made by Artex, Karl Huish, Jeremy Huish, Tehero, Gallagher, and AmeRisk.  Further, Artex, Karl Huish, Jeremy Huish, Tehero, Gallagher, and AmeRisk knew, or should have known, that the representations about DVS Series' taxes were false because they knew or should have known that DVS Series was not a bona fide insurer.  They also knew or should have known that the policies sold through Artex's captive insurance program were not bona fide insurance.  Once the IRS reached these conclusions, the Section 831(b) designation would, and indeed did, fail, and the premiums paid to and received by Provincial and DVS Series would and did not receive the represented favorable tax treatment.

117.   The Feasibility Study also contained misrepresentations regarding the quality and type of insurance coverage Spectra would obtain through participating in Artex's captive insurance scheme.  Artex and AmeRisk, as part of the Feasibility Study, represented:

1
2
3
4

> The property and casualty insurance program contemplated by Spectra's management is for coverages that are highly rated by the insurance industry, and coverages that are excluded or simply unavailable under current insurance coverage forms. Coverages typically represent non-standard commercial insurance coverages. Spectra's insurance captive will offer product designs that meet the specific needs of its parent organization.

5
6
7
8
9
10
11
12
13
14
15
16

This representation by Artex, Huish, Tehero, Gallagher, and AmeRisk was false when made.  Further, Artex, Huish, Tehero, Gallagher, and AmeRisk knew, or should have known, that the representations that DVS Series would provide insurance that both was "highly rated by the insurance industry" and "meet[s] the specific needs of its parent organization" were false when made.  In fact, the insurance that DVS Series provided pursuant to Artex's management was not "highly rated by the insurance industry" and did not "offer product designs that [met] the specific needs of its parent organization."  These defects were used by the IRS to disregard and disallow the tax treatment Spectra claimed with respect to premiums paid to Provincial and DVS Series.

17
18
19
20
21
22
23
24
25
26
27
28

118.   In connection with forming DVS Series, Artex also prepared a business plan for it.  On or around December 5, 2011, Artex sent Shivkov the DVS Series business plan, which repeated many of the earlier misrepresentations Artex made in person, via email, and in the Feasibility Study.  In the DVS Series business plan, Artex represented that "the Company will underwrite highly customized policies carefully tailored to the specific needs of its insured.  Underwriting will, therefore, be on a case by case basis with policy terms and conditions determined in consultation with the Spectra's legal advisors."  The business plan also misrepresented that "[r]ating considerations will be ratified by independent actuaries and/or risk management consultants."  These statements were false when made, and Artex knew they were false when made.  Artex did not design

the Captive Insurance Strategies to protect against actual insurable risks customized to the needs of Spectra. Nor were the rating considerations ratified by independent actuaries and/or risk management consultants.

119.    On the issue of investments, Artex also prepared an investment policy for DVS Series. On or around December 5, 2011, Artex sent this investment policy to Shikov. In the investment policy, Artex misrepresented that:

> [t]he primary objectives of the Company in managing its Portfolio of Investments, in descending order of importance, are to:
>
> • Preserve the principal value of the Portfolio of Investments.
>
> • Anticipate liquidity requirements for the payment of claims and other corporate needs and maintain appropriate liquidity to satisfy such claims and other corporate needs.
>
> • Maximize income from the Portfolio of Investments with returns that are consistent with the investment risk.
>
> • Provide fiduciary control of cash and investments by individuals approved by the Series Member.

In fact, Artex did not structure the investments of DVS Series with the objective of preserving principal, anticipating liquidity requirements, or maximizing income with returns that are consistent with investment risk. Instead, Artex structured the investments of DVS Series so that it could preserve capital to loan back to Spectra. The Artex representations regarding the investment objectives were false when made, and Artex knew that they were false.

120.    The investment policy further misrepresented that "[t]he company is taxable as a corporation under section 831 of the Internal Revenue Code." This representation was false when made, and Artex knew that it was false. Because of the

way Artex structured, managed, and administered DVS Series, it could not and did not comply with Section 831(b), and therefore would not be taxable as a corporation under section 831 of the Internal Revenue Code.

121.   Artex also never disclosed that the Captive Insurance Strategies could not meet the requirements of the applicable common law tax doctrines such as the economic substance doctrine.  It also never disclosed the potential for IRS penalties.  In fact, Artex instead represented that the IRS found the captive insurance arrangements were lawful.

122.   Effective December 18, 2011, DVS Insurance, LLC entered into a Series Agreement with Fortress Insurance, LLC ("Fortress") for the purposes of creating a designated series of members, managers, limited liability company interests, or assets of Fortress   to be known as DVS Series.   Jeremy Huish of Artex signed the Series Agreement on behalf of Fortress.  The Series Agreement was filed with the Delaware Department of Insurance on the same day and accepted by the Delaware Department of Insurance on December 29, 2011.  Also on December 29, 2011, DVS Series elected to be taxed on its investment income as a small insurance company under section 831(b).

123.   From 2011 through 2013, Spectra purchased 33 insurance policies from DVS Series.  These policies were the same each year and the same policies that AmeRisk negligently and fraudulently reviewed in connection with its initial feasibility study: Administrative Actions, Loss of Key Contract, Business Overhead – Disability, Loss of Key Customer, Capital Call Income Replacement, Loss of Key Employee, Collection Risks, Loss of Key Supplier, General Liability Difference in Condition, Product/Service Rework, and Legal Expense.  Spectra paid $498,774 in premiums in 2011, $351,930 in

premiums in 2012, and $361,735 in premiums in 2013.  Spectra's premiums paid in 2011 were a retroactive premium for coverage provided from January 1, 2011 to December 31, 2011.  No properly managed and compliant insurance company would assume the risks of an entire year for which no premium had been paid until the second to last day prior to the end of the coverage period.  Claims made in later years related back to dates in 2011 when the Captive Insurance Strategies did not exist.

124.   For all the years in which Spectra paid captive insurance premiums, AmeRisk negligently and fraudulently provided the actuarial services used to price the premiums while Inman provided the underwriting services.  In May 2014, Epsilon, through Ekdom, provided an actuarial report on DVS Series for calendar year 2013.  Inman was not independent; she worked for Artex.  Also, in addition to underwriting the premiums charged to Spectra as part of its captive insurance program, Inman also signed, on behalf of Provincial, the Master Reinsurance Contract between Provincial and all of the Artex Pool Participants.  Inman was also the claims adjuster for Provincial who handled the claims for Spectra.

125.   Artex conspired with AmeRisk and other actuaries to target a certain premium price rather than apply neutral actuarial principles.  In fact, the initial captive formation checklist used by Artex asked the "Desired Insurance Premiums" for years one, two, and three.  Artex was also responsible for reviewing or preparing the Feasibility Study and business plan for DVS Series as well as identifying which risks Spectra should insure and what the premiums should be.  Although the policies issued to Spectra were the same each year, the premiums had material changes from 2011 to 2012.

126.   The premiums determined by Artex were not actuarially determined and did not meet the actuarial principles of ratemaking.  The parameters and assumptions used by Artex to develop the premiums, to the extent that they existed at all, were not supported by any qualitative or quantitative measures.  Moreover, there was insufficient support for the estimation of expected losses. The premiums determined by Artex were, in the end, negligently and fraudulently engineered to produce a large tax deduction.  As a result, the premiums determined by Artex were not reasonable and were disproportionately high, economically implausible, and excessive.  This was known to Defendants, but concealed from Plaintiffs and the Class.

127.   Under Artex's management, Spectra and DVS Series were negligently and fraudulently advised to engage in a pooling arrangement with Provincial, a foreign captive that was indirectly owned by Karl Huish and a member of Karl Huish's family.  Provincial and Artex operated out of the same address in Mesa, AZ.   Under this arrangement, all insureds participating in the Provincial pool would and did pay their respective insurance premiums to PRS as an administrator for Provincial.  Provincial took 2.5% of all premiums paid to PRS as an administrative fee.   Of the net premiums remaining after it took its administrative fee, Provincial represented that it would reinsure 49% of net premiums from Spectra with DVS Series.  In exchange, DVS Series insured 100% of Spectra's primary loss layer equal to 25% (generally $250,000) of the policy limits.  The remaining 51% of net premiums from Spectra went into the Provincial pool. In exchange, the Pool retained the excess layer of 75% of all losses.  Losses within the pool were distributed to participating captives based on each captive's share of the total

reinsured premium.  Thus, if a claim submitted by the insured was greater than the first 25% of the policy limit, then Provincial assessed the amounts greater than 25% against the risk sharing pool.  Each participating captive would then be put on notice regarding claims against the pool.

128.   At no point did Artex or any of the other Defendants disclose the actual conflict of interest between Artex and Provincial.  Both the Insured and Captive looked to Artex to administer and manage every aspect of the Captive Program.  But due to Defendants' failure to disclose their conflicts, neither the Captive nor the Insured knew or understood they should have concerns over Artex's apparent conflict of interest.  The same persons acted on behalf of Artex and the fronting carrier, Provincial, which is related to Artex.  Where the Huish's are owners of Provincial and provide necessary and on-going services for Artex, Insureds and Owners should be fully and completely informed of the conflict of interest.

129.   The Provincial risk sharing pool reinsured 100% of the risk in the quota share layer.  Each participant's quota share was determined using a fraction with a captive's related premium in the numerator and the total of all premiums kept by the pool as the denominator.  For example, assume there are 3 participants (A, B, and C) in a risk sharing pool.  A puts in $4, B puts in $6, and C puts in $8.  The total dollars in the pool are $18.  A's quota share is 4/18ths or 22.2%.  When A reinsures its portion of risk into the pool, it will receive $4 back from the pool, however, $0.89 (22.22% x $4) of that $4 is tied to A's risk and $3.11 (77.78% x $4) is tied to B's and C's risk.

130.    Artex and Provincial, in collusion with each other, executed the quota share pooling arrangement as an elaborate circular cash flow scheme.  A quota share pooling arrangement amounts to fake risk distribution and causes a constant circle of cash flow in contravention to insurance law.  Without true risk distribution, the Captive Insurance Strategy looks more like taxable self-insurance. Under the quota share risk pool, the shifted risk is only notionally distributed.  Artex and Provincial's Pooling Agreement excluded the Insured's primary risks and, because the primary risks of the Insured were not pooled, those risks were not distributed as is required to occur in real insurance. Second, the quota share program risks were *de minimis* and did not correspond or relate to anticipated losses in the pool.  Provincial's own loss projections for the pool do not support a mechanical 49%/51% split but evidence Provincial's attempt to create the illusion of compliance with a safe harbor.

131.    On May 10, 2012, the Delaware Department of Insurance approved a loan request from DVS Series to loan $130,000 to DVS Insurance, LLC to invest in business opportunities.  On June 25, 2012, DVS Insurance, LLC executed a promissory note from DVS Series at a 3% interest rate to be repaid no later than July 1, 2014.  This Note was then renewed in July 2014 for an additional two-year extension.  The purpose of the loan was to provide capital for the short-term investments in real estate loans.

132.    On October 12, 2016, the Delaware Department of Insurance approved an additional loan in the amount of $300,000 from DVS Series to DVS Holdings, LLC (formerly DVS Insurance, LLC).  There is no written statement of the rationale or purpose for which such loan was permitted by the Captive.  For both this loan and the

earlier $130,000 loan, Artex approved the loans and then, as required by law, Artex caused DVS Series to submit the loans to the Delaware Department of Insurance for approval.

133.    Artex promoted the related party loans as a "feature" of the Captive Insurance Strategies to Spectra as well as other members of the Class.    These representations were instrumental in Shivkov and Spectra's decision to retain Artex.   The circular cash flow arrangement that Artex represented to be compliant with all tax and insurance laws is impermissible under the tax code.   Premiums paid to the captive are deducted as an expense to Insured, then (in some cases immediately) a loan is approved for any portion of the premium payment to the owners of Insured for which no tax is paid.   Loans by the captive insurance company also additionally impair the capital base of the captive, risking its ability to pay valid claims—ostensibly the purpose for which the captive was formed. Although Artex required the preparation of certain forms and followed basic protocols in permitting loans, these loans still were not compliant with the Tax Code.

134.    The captive insurance plans that Artex developed for Spectra resulted in few claims made at both the captive level and pool level.   Over the course of purchasing 33 captive insurance policies, Spectra made only three claims against the policies.   The first claim was made on or about December 5, 2012, for product/service rework.   Artex, as manager of the DVS Series Captive, denied payment of this claim, and the claim file was ultimately closed on or about September 18, 2013.   The second claim was made on or about September 12, 2013, for a loss which occurred on December 9, 2011, prior to the

44

formation of DVS Series.  This claim was for $50,000 on the Collection Risks policy. The draft resolution for this claim stated that DVS Series approved the claim and that a majority of the board of DVS Series also approved the claim.  The 2011 policies were issued in December 2011, but were back-dated to January 1, 2011.  The third claim was made against the Loss of Key Employee policy on or about September 12, 2013 for $25,000.  Artex, as manager of the DVS Series Captive, approved this claim.

135.    Spectra paid a total of over $1.2 million in premiums, of which Spectra's claims represented 6.25%.  And Spectra was hardly alone.  Across Artex's Reinsurance Pool, Artex maintained 940 policies in their Reinsurance Pool, but handled on average only 600 claims per year.  Less than one claim *per policy* issued per year occurred.

136.    Although Artex managed DVS Series, it did not invest premiums in a manner consistent with insurance industry practice.   The draft Investment Policy Statement for Spectra Services stated that only $25,000 in premiums needed to be kept in cash/cash equivalent.   Further, the eligible investments section of the draft policy statement stated there were "no specific restrictions on allowable investments whatsoever" and then listed life insurance contracts, private investments, and real estate as allowed investments.  The only "investments" disclosed by the Artex-managed DVS Series captive insurance company were loans and related party loans.  These types of investments fell outside the scope of what a reasonable investor under the circumstances would choose or what a money manager would have done.

137.    As part of their management of DVS Series, Artex submitted periodic reports and memoranda to Shivkov regarding DVS Series' operations.  These reports and

memoranda repeated many of the earlier misrepresentations regarding the proper tax treatment of the Captive Insurance Strategies. They also restated misrepresentations regarding the bona fides of the insurance DVS Series and Provincial were providing under Artex's management.

138. At the time Artex pitched its captive insurance program, Spectra already had commercial insurance with The Hartford. This coverage consisted of a Package – Liability policy with a $1,000,000 limit, an Umbrella Liability policy with a $5,000,000 limit, a Package – Auto Property Insurance policy with a $1,000,000 limit, and a Package – Business Income policy with a $300,000 limit. According to Artex, its goal in marketing captive insurance programs was for the "captive program to partner with the insured's commercial insurance program by adding coverage not currently purchased commercially, broadening existing commercial policy terms, and insuring risks being retained by the insured via deductibles or self-insured retentions in their commercial programs."

139. After participating in Artex's captive insurance program, Spectra did not make any material changes to its commercial policies.

140. DVS Series ceased operations and closed in 2015. As part of winding up the affairs of DVS Series, Spectra sent written notice to Artex terminating the engagement letter between Spectra and Artex.

141. Notwithstanding disclaimers in its engagement letter, Artex provided Spectra with legal, tax, and accounting advice. Artex's materials showcased the credentials of Jeremy Huish, including his JD, CPA, and LLM (Tax) degrees; Artex,

orally and through materials provided to Plaintiffs and the Class, provided legal, tax, and accounting advice to Plaintiffs and the Class; Artex prepared tax returns for the Captive, which impacted the tax return for the insured; and Artex was compensated for providing insurance, legal, and tax advice and assistance during the design, operation, and management of DVS Series by Artex, including through claims management.

### 3.  Tax Returns, Audits and Other IRS Actions

142.   Defendants knew or should have known that to ensure premiums paid to a captive insurance company are lawfully deducted, and to ensure that the captive insurance company can limit its tax obligations to the payment of taxes on investment income, several factors must be met, including but not limited to: (1) whether there is a non-tax business purpose for the transaction; (2) adequate capitalization of the entity; (3) commercial reasonableness and arms-length nature of the transaction; (4) whether the entity faces proper regulatory oversight; and (5) whether there exists sufficient risk shifting and risk distribution to constitute insurance.  Defendants knew or should have known that the Captive Insurance Strategies that Plaintiffs and the Class participated in did not meet these factors.  Defendants knew or should have known that Artex's risk distribution and risk pooling strategies did not adequately distribute and transfer risk.  Defendants also knew or should have known that no reasonable insurance company would operate as Artex operated DVS Series and other captives for Plaintiffs and the Class.  Accordingly, Defendants knew or should have known that the Captive Insurance Strategies would be disallowed and Plaintiffs and the Class would suffer substantial damages.

143.   Defendants knew or should have known that using a captive insurance company to fund personal loan transactions and/or distributions fails to satisfy any of the foregoing factors.   When these factors are not met, Defendants knew or should have known that the IRS deems the principal purpose of the captive insurance company to be tax avoidance, not insurance.   This IRS analysis also looks to the economic substance of the transaction and whether the funds set aside were true business expenses rather than an attempt to avoid taxes.   If the sums paid to the captive insurance company lack the required business purpose, they are disallowed for income tax purposes.

### 4.   Notice 2016-665

144.   In 2016, the IRS issued Notice 2016-66 in which it designated captive insurance arrangements like those designed, promoted, sold, and implemented by Artex were transactions of interest for purposes of § 1.6011-4(b)(6) of the Income Tax Regulations and §§ 6111 and 6112 of the Internal Revenue Code.   Notice 2016-66 also imposed on persons entering into these transactions on or after November 2, 2006 the duty to disclose the transaction as described in § 1.6011-4 by January 30, 2017.

145.   In connection with the disclosure obligations imposed by Notice 2016-66, Artex prepared a form "Artex Information Document" to allegedly give information to Plaintiffs and the Class to use when filling out IRS Forms 8886.   At the time Artex sent this document to Plaintiffs and the Class, it could not have supplied independent advice to any of its clients because it was also under an IRS promoter investigation.   Without disclosing the IRS disclosure investigation, Artex loaded the Artex Information Document with alleged disclaimers.   For instance, the Artex Information Document stated:

a. To help current and former clients comply with IRS Notice 2016-66, Artex is providing available information to assist with the preparation of Form 8886. The information contained herein is accurate to the best of our knowledge, but we advise you to confirm it against your own information.

b. Also, please be advised that Artex is not a law firm or a tax advisory firm. It does not give legal or tax advice. We are providing this information and data to help our clients comply with Notice 2016-66, but in every case, we recommend you consult with your CPA, lawyer, tax preparer, or other tax professional…

c. Though we believe this information to be accurate, the information we provide herein cannot be relied upon as advice…

146. For tax purposes there is no good faith defense for providing partial information to the IRS. Accuracy related penalties are statutory for mistakes in partially completed forms. Although it attempted to disclaim that it was providing tax or legal advice, Artex was unquestionably providing tax and legal advice in the Artex Information Document. As soon as Artex recommended how to comply with Notice 2016-66 by filling out the Form 8886 and recommended answers for these forms, it stepped into the role of tax advisor. Further, the Artex Information Document was specifically prepared for DVS Series, provided only information specific to that captive, and delineated only the policies, premiums, and related information that were provided to DVS Series during the time of the captive's activity.

147. The information within the Artex Information Document confirmed that Artex was giving professional advice. Among other advice, the proposed responses that Artex provided in the Artex Information Document Line 7b contained a "suggested response," a "suggested wording," and an instruction to "continue with the explanation as follows." Further, Artex Information Document Line 7b Item (4) stated a response for

49

the determination of how the insurance was priced.  Plaintiffs fundamentally lacked the understanding of the insurance market and process for creating a viable insurance product.  Accordingly, Plaintiffs used the language recommended by Artex in the Artex Information Document to respond to these questions and relied on the Artex advice.

148.   The Artex Information Document omitted material information.   For instance, Line 6 of the template Form 8886 described in the Artex Information Document only included the formation fee paid to the Captive Manager when it should have disclosed additional fees paid to the actuary, insurance company, manager, and others. Although Artex claimed that "we do not know whether there are other responses…" to Line 6, Artex, as the captive manager, was the only possible source for the answers to Line 6.  Further, Artex Information Document Line 7b Item (6) lists only the assets for 2015 and states the assets as Loans and Related Party Loans without further information about the value, repayment, amounts, or compliance with DVS Series' Investment Policy Statement.

149.   Artex's advice was not only knowingly false, it was also conflicted, all unbeknownst and undisclosed to Plaintiffs.  For advice from Artex, which included Artex Information Document explanations and additional information on Form 8886 preparation and counsel related thereto, to be reasonable, "it must be from competent and independent parties . . . not from promoters of the investment."  In a 2017 press release regarding microcaptives, the IRS noted that "[p]romoters, reinsurers and Captive insurance managers may share common ownership interests that result in conflicts of interest."  These financial conflicts existed here where members of the Huish family and

50

Inman personally benefitted by being on both sides of the DVS Series transactions. These conflicts were neither disclosed nor explained to Plaintiffs.

### 5.    Audit and Tax Court Proceedings

150.    Relying on Artex's opinions, representations and advice, and the DVS Series tax returns Artex prepared, Spectra filed tax returns that included insurance expenses paid in connection with the Captive Insurance Strategies.  The IRS ultimately audited Spectra's tax returns for years 2012-2014.  On March 3, 2016, the IRS issued a notice of deficiency to Spectra for the tax year ending December 31, 2012.  This notice of deficiency indicated that Spectra had a tax deficiency of $131,406.00 in 2012 and owed $52,562.00 in penalties.

151.    The fraudulent Captive Insurance Strategies sold to Plaintiffs and other members of the Class failed to constitute insurance in the commonly accepted sense, did not shift insurance risk, and did not distribute sufficient risk, if any.   Since the transactions under the Captive Insurance Strategies were not insurance, the Plaintiffs and Class members' captives were not insurance companies for federal tax purposes and their attempted elections under IRC §831(b) were unlawful.

152.    On April 29, 2016, Spectra filed a Petition in United States Tax Court seeking a redetermination of the deficiency in income tax, interest, and penalty for tax year 2012 as set forth in the IRS Notice of Deficiency dated March 3, 2016.  Throughout the IRS audit and Tax Court proceedings, Artex continually represented to Plaintiffs that the Captive Insurance Strategies complied with all applicable laws and Plaintiffs would prevail against the IRS.  Artex, orally and through materials it sent to Plaintiffs, purported to distinguish the Artex Captive Insurance Strategies from other captive insurance

arrangements that the Tax Court had found to be illegal.  In addition, Artex, orally and through the use of reports generated by Epsilon, created the false impression that the Captive Insurance Strategies were actuarially sound to encourage Spectra and the other Plaintiffs to contest the IRS Notice of Deficiency.

153.   In May 2017, Spectra settled its Tax Court case against the IRS for the year 2012 and agreed that Spectra owed $107,475 in income tax and $19,145 in penalties under Section 6662(a) of the Internal Revenue code for the tax year 2012.  The IRS also required Spectra to pay all interest accrued on the tax deficiency and penalty.  On June 30, 2017, the Tax Court entered its order.

154.   On April 11, 2017, Spectra and the IRS settled tax issues for years 2013 and 2014 that directly related to Spectra's involvement in the Captive Insurance Strategies.  This settlement required Spectra to pay substantial back-taxes, penalties, and all interest accrued on the tax deficiency and penalty.

**D.    Symphony Development and Symphony Homes' Captive Insurance Strategy**

**1.    The Captive Insurance Strategy is Promoted to Symphony**

155.   Plaintiff Symphony Development was founded in 1991.   Plaintiff Symphony Homes was founded in 2002.   Symphony Development and Symphony Homes (together "Symphony") are directly or beneficially owned by, among others, Miller, Brenda Mae Miller, Robinson, and/or Sara Van Alstyne Robinson (together with Symphony, the "Symphony Plaintiffs").

156.   The Symphony Plaintiffs' relationship with Artex began when the Symphony Plaintiffs engaged Artex's predecessor, Tribeca, in 2005.   Miller and Robinson heard of Karl Huish and Tribeca through another residential real estate

developer who referred them to Huish.  In 2005, Karl Huish and Tribeca had established a captive insurance company for the real estate developer who provided the referral to Miller and Robinson.

157.   After receiving the referral, Miller and Robinson met with Karl Huish to discuss the concept of a captive insurance program.  During this meeting, Huish emphasized to Miller and Robinson that the tax code specifically allowed for syndicated captive insurance companies for people like Miller and Robinson.  Karl Huish further represented that Tribeca's captive insurance program complied with all applicable insurance and tax laws and was allowed by the IRS.  Huish told Miller and Robinson that Tribeca would set up the captive insurance program to comply with all applicable tax and insurance laws, run it to comply with all applicable tax and insurance laws, and Tribeca, as the experts, would manage the captive insurance company in accordance with all applicable tax and insurance laws.

158.   During his meeting with Miller and Robinson, Karl Huish also showed Miller and Robinson Section 831(b) of the Tax Code and represented that Tribeca would keep the clients' insurance company within the safe harbor provisions of Section 831(b).  Karl Huish emphasized to Miller and Robinson that as long as premiums paid to the captive insurance company were below the annual limits stipulated in Section 831(b) of the Tax Code, the Captive Insurance Strategies would comply with the law.  This representation was false when made because only bona-fide insurance qualifies for favorable tax treatment under the Tax Code.  It is not enough merely to meet the numeric premium threshold of Section 831(b).  The premiums paid to the captive insurance

company must involve transactions with actual insurance risk to meet the requirements of the Tax Code.

159.   In addition to representing to Miller and Robinson that Tribeca knew all the rules, regulations and tax and insurance laws that applied to captive insurance companies, Karl Huish also represented that Tribeca would lawfully do the underwriting and analysis for the insurance company and determine what policies should be issued and the amount of premiums for each policy.

160.   Huish represented that the underwriting it performed would be actuarially sound.  This representation was false when made, and Tribeca knew it was false when made.  Artex and Tribeca did not calculate premiums using actuarially sound methods.  Instead, they calculated the premiums for the Symphony Captive Insurance Strategies by targeting the Section 831(b) limit rather than applying defensible actuarial and underwriting standards.  The Symphony Plaintiffs relied on AmeRisk for actuarial services and Inman, an Artex employee, for underwriting services even though neither AmeRisk nor Inman were independent.  Further, Huish represented that the accounting group at Tribeca would do all accounting, and the insurance people at Tribeca would perform the insurance work and manage every aspect of the captive after it was formed.  Huish also represented that the lawyers at Tribeca would oversee the captive and make sure that it complied with all applicable tax and insurance laws.

161.   Huish never disclosed that the Captive Insurance Strategies could not meet the requirements of the applicable common law tax doctrines such as the economic substance doctrine.  He also never disclosed the potential for IRS penalties.  In fact,

54

Huish instead represented that the IRS found the captive insurance arrangements were lawful.

162.   Robinson and Miller were also advised that Jeremy Huish was a tax lawyer and had an LLM in tax.   This fact and the fact that Tribeca had insurance experts, accountants, and tax lawyers on staff gave Miller and Robinson confidence.   They never worried or had a concern that they were ever violating the law.

163.   The captive insurance arrangement that Tribeca set up for the Symphony Plaintiffs involved two captive insurance companies: MRP Insurance, Ltd. ("MRP") and Wasatch Insurance, Ltd. ("Wasatch").   The engagement letter that Miller signed with Tribeca called for a $50,000-$90,000 formation fee for up to two captives and a maintenance fee of $3,100-$3,500 per captive per month.

164.   On or around December 21, 2005, Tribeca sent Robinson and Miller a business plan for MRP that repeated many of the misrepresentations that Huish made to Miller and Robinson in person.   In the MRP business plan, Tribeca represented that "the Company will underwrite highly customized policies carefully tailored to the specific needs of its insured.   Underwriting will, therefore, be on a case by case basis with policy terms and conditions determined in consultation with the Company's legal advisors."   The business plan also misrepresented that "[r]ating considerations will be ratified by independent actuaries and/or risk management consultants."   These statements were false when made, and Tribeca knew they were false when made.   Tribeca and later Artex did not design the Captive Insurance Strategies to protect against actual insurable risks

customized to the needs of the Symphony Plaintiffs.  Nor were the rating considerations ratified by independent actuaries and/or risk management consultants.

165.   Tribeca misrepresented that the Captive Insurance Strategies would provide bona fide insurance for material risks.  Tribeca indicated through its misrepresentations that commercial insurance covered just the "tip" of the iceberg of risks facing Symphony. These representations were false when made, and Tribeca knew that they were false.

166.   The MRP business plan also misrepresented that MRP "will operate under Internal Revenue Code Section 831(b) concerning taxation of small insurance companies who collect premiums not in excess of $1,200,000 per year. In accordance with this section, the Company will not be taxed on premium income, but will be taxed on investment income."  This representation was false when made, and Tribeca knew it was false when made.

167.   On the issue of investments, the MRP business plan misrepresented that "[t]he company is projecting to invest primarily upon a long-term growth perspective, with the exception of amounts required for solvency margin."  It further misrepresented that "[t]he shareholder will invest the insurance reserves primarily in marketable securities, although some of the reserves will be retained in cash as determined by the insurance manager as required to meet the obligations of the insurance company and to ensure compliance with the Insurance Act 2004."  The MRP business plan also made the false representation that "[m]ost of the reserves will be retained in 'liquid' investments that can be readily converted to cash to pay claims. It should be noted, however, that some of the reserves may be invested in stable income producing properties such as real

estate, mutual funds, commercial paper, etc." All of the representations regarding MRP's investment strategies were false, and Tribeca and Artex knew they were false. In fact, Artex controlled the investments of MRP, and these investments consisted, for the most part, of loans to entities affiliated with the Symphony Plaintiffs.

168.  MRP and Wasatch merged in 2009. In 2011, due to a slowdown in the housing market, Artex made MRP dormant. In late 2011, Artex sent a new engagement letter to Miller to restart the Captive Insurance Strategies for the Symphony Plaintiffs with a reduced monthly maintenance fee of $1,250 per month. At this time, Artex was a division of AJ Gallagher. Artex used AJ Gallagher's ownership of Artex to promote the Captive Insurance Strategies to Plaintiffs and to convince Plaintiffs to participate in the Captive Insurance Strategies. Artex touted Artex's relationship with AJ Gallagher to Miller and Robinson, and this relationship enhanced their confidence that the Captive Insurance Strategies were legal and complied with all applicable tax and insurance laws.

169.  Unlike Spectra's captive insurer DVS Series, MRP and Wasatch were not series business units of another insurer. Instead, MRP and Wasatch were separate Anguilla captive insurance companies established at Tribeca's direction for the purpose of insuring the risks of Symphony Homes and Symphony Development. In all other material respects, the Captive Insurance Strategies that Tribeca and Artex implemented for the Symphony Plaintiffs were the same as those implemented for Spectra. Both strategies relied on reinsuring risks using Provincial with PRS retaining 2.5% of all premiums paid to Provincial. Provincial would then reinsure the remaining 51% of the insured's premiums with participants in the Provincial pool while 49% of these premiums

were reinsured with MRP.  In promoting the Captive Insurance Strategies, Karl Huish represented that the Provincial Pool provided adequate risk distribution such that MRP would qualify as a bona fide insurer for tax purposes.  This representation was false when made, and Huish knew it was false when he made it.

170.  Over the course of its existence, Artex authorized MRP to provide numerous loans to entities in which Miller or Robinson possessed an ownership stake. The Symphony Plaintiffs engaged in these lending relationships because Artex advised them they could do so.  In fact, Artex advised the Symphony Plaintiffs exactly how to structure the loans, including the contents of the loan documents and the interest rate to charge.  The Symphony Plaintiffs reasonably relied on these instructions.  The loan requests were sent to Artex, as manager of the Symphony Plaintiffs' captive.  Artex, on behalf of the captive, approved and authorized these loans.

171.  The ability of the Symphony Plaintiffs to access their premium payments to MRP through loans without running afoul of the tax code was an important feature and was instrumental in their decision to retain Tribeca and later Artex.  The Symphony Plaintiffs relied upon these loans to fund their businesses and would not have taken these loans without the assurances of Tribeca and Artex that they could legally take loans from MRP.  And the fact that Artex authorized and approved these loans gave the Symphony Plaintiffs great confidence that these loans were completely legal and proper.

172.  At the time Artex promoted its captive insurance program, Symphony already had commercial insurance.  After participating in Artex's captive insurance program, Symphony did not make any material changes to its commercial insurance

policies.   Artex did not review existing insurance in place for Symphony Group to determine the type of coverage, the pricing, and/or any gaps in coverage.   Nor did Artex discuss and analyze the types of risks or claims history that Symphony Group had as part of the process of determining what insurance policies to purchase.   Despite not undertaking a comprehensive claims or risk analysis, Tribeca and Artex advised the Symphony Plaintiffs on which policies they should buy to implement the Captive Insurance Strategies.  The Symphony Plaintiffs relied on this professional advice.

173.   The Symphony Plaintiffs paid substantial fees to Artex and Tribeca in connection with implementing the Captive Insurance Strategies.   These fees included monthly fees to Artex and 2.5% of all premiums to PRS.  In exchange for these fees, Artex managed and administered all aspects of the Captive Insurance Strategies and MRP.  Artex's services included the preparation of MRP's tax returns, which were used by the Symphony Plaintiffs in preparing their tax returns.  Once Artex prepared MRP's tax returns, Artex represented to Miller and Robinson that they should sign and file these tax returns.  Miller and Robinson reasonably relied on this advice.

174.   Tribeca and Artex also advised the Symphony Plaintiffs on how and when to submit claims to MRP.  Tribeca and Artex then processed these claims and either denied or allowed the claims.  Similar to Artex's experiences with Spectra, this resulted in the Symphony Plaintiffs submitting very few claims to MRP and the Provincial pool.

175.   As part of their management of MRP, Tribeca and Artex submitted periodic reports and memoranda to the Symphony Plaintiffs regarding MRP's operations.  These reports and memoranda repeated many of the earlier misrepresentations regarding the

proper tax treatment of the Captive Insurance Strategies. They also restated misrepresentations regarding the bona fides of the insurance MRP and Provincial were providing under Tribeca and Artex's management. In addition, on February 25, 2008, Tribeca provided the Symphony Plaintiffs a captive insurance company owner operations manual that had allegedly been updated on February 22, 2008. Tribeca intended for this document, like the periodic reports and memoranda, to create the false impression that MRP and Provincial were bona fide insurance companies.

### 2. Audit and Tax Court Proceedings

176. The IRS audited the Symphony Plaintiffs' tax returns for years 2012-2015 in connection with their participation in the Captive Insurance Strategies. Throughout the audit and subsequent administrative proceedings before the IRS and the subsequent Tax Court proceeding, Artex advised the Symphony Plaintiffs to continue contesting the IRS's positions regarding the Captive Insurance Strategies. As it did with Spectra, Artex also supplied information to the Symphony Plaintiff to use in filling out the Forms 8886 required by Notice 2016-66. In June of 2016, the Symphony Plaintiffs received a notice of deficiency from the IRS for the 2012 tax year. On June 24, 2016, the Symphony Plaintiffs challenged the 2012 notice of deficiency in Tax Court. On August 8, 2018, the Symphony Plaintiffs reached a settlement with the IRS for the tax years of 2012-2015. This settlement required the Symphony Plaintiffs to pay substantial back taxes, penalties and interest. The Symphony Plaintiffs were also required to close and liquidate MRP, which, in turn, resulted in the payment of capital gains tax by the Symphony Plaintiffs. Artex or Tribeca administered the Captive Insurance Strategies for the Symphony

Plaintiffs for the years 2005-2013 before the Symphony Plaintiffs sent written notice to Artex terminating their engagement letter on or about September 13, 2013.

**E.     Treadstone's Captive Insurance Strategy**

**1.     The Captive Insurance Strategy is Promoted to Treadstone**

177.    Plaintiffs Butler, Wilke, and Linder are medical professionals who are also entrepreneurs (together with Rebecca M. Butler, Julie T. Wilke, and Nina Linder the "Treadstone Individuals").  5T Capital and Boomerang WB are two entities directly or beneficially owned by Butler and Wilke.  In connection with their medical and entrepreneurial businesses, the Treadstone Individuals established numerous entities, like 5T Capital and Boomerang WB, through which they operated and owned their businesses (together with the Treadstone Individuals, the entities owned by the Treadstone Individuals that received insurance coverage through the Captive Insurance Strategies are the "Treadstone Plaintiffs").[3]

178.    Around November 2009, Jim Trujillo and Jeremy Huish of Tribeca presented a webinar to Butler and Wilke regarding the Captive Insurance Strategies. While presenting the webinar, Jeremy Huish represented and emphasized that he was a CPA with a JD and an LLM, which increased Wilke and Butler's confidence in him. This webinar relied on PowerPoint slides and a brochure that was the same as or

---

[3] These entities include the following named Plaintiffs in this action: Affilion of Cobre Valley, LLC, Affilion of Huntsville, PLLC, Affilion of Texas PLLC, Taylor-Wilke Holdings, LLC, Traditions Emergency Medicine, Treadstone Equity Group, LLC, UTA Investments, LLC, Boomerang WB, LLC, AZ Storage 1, LLC, AZ Storage 2, LLC, Boomerang Sonoran, LLC, RV Storage, LLC, Stone Haven Lodge, LLC, TW Management, LLC, UTA Holdings, LLC, Wilke Medical Direction, PLLC, 5T Capital Fund II, LLC, 5T Capital Holdings, LLC, 5T Capital LLC, Ingenuity Auto Leasing, LLC, Ingenuity Aviation, LLC, Ingenuity Equity Group II, LLC, Ingenuity Equity Group III, LLC, Ingenuity Equity Group, LLC, Ingenuity Leasing Company II, LLC, Ingenuity Leasing Company, LLC, Ingenuity Matrix, Inc., Ingenuity Professional Services, PLLC, and Bourne Tempe Land, LLC

substantially similar to the materials Artex presented to Spectra in 2011.  These materials contained the same misrepresentations and omissions relating to the falsely represented tax advantages of the captive insurance companies that Tribeca would establish if retained.  These materials also contained the same misrepresentations that Tribeca would use actuarially sound practices to price policies, that these plans would be tailored to the Treadstone Plaintiffs' risks, and that the plans Tribeca would offer through the Captive Insurance Strategies were plans that were well regarded in the industry.   These representations were false when they were made and Tribeca knew they were false when they were made.

179.   During the webinar presentation with Jeremy Huish and Trujillo, Butler and Wilke confirmed that they had no interest in any product that was illegal.  Huish and Trujillo responded by stating that Tribeca, and later Artex, would stay well within the boundaries of the law, including tax laws, and comply with all applicable laws at all times.

180.   On November 13, 2009, Butler and Wilke signed an engagement letter with Tribeca to establish Treadstone, PCC in Anguilla as a captive insurer.  These engagement letters called for a formation fee of $35,000 and annual maintenance fees of $40,000.  These fees were divided among all participants in Treadstone.  Linder began participating in Treadstone in 2011 when he signed a March 12, 2011 engagement letter with Tribeca.  That engagement letter called for Linder to pay a formation fee of $10,000 and annual maintenance fees of $4,750.   Treadstone used a protected cell company where the Treadstone Individuals and approximately five other persons each individually owned

one cell within Treadstone, which was a single insurance company. The core of Treadstone was owned jointly by all of the cell owners. The assets of the cells were segregated from each other. The participants in Treadstone would then insure their risks both within their own cell and through reinsurance of an excess layer to the core of Treadstone. The Treadstone Individuals, along with some other members of the Class, did not reinsure risk through the Provincial pool.

181. Tribeca represented that so long as the total number of entities insured by all of the Treadstone cell owners exceeded 12 entities, reinsuring some of the cells' risk through the core would sufficiently diversify risks for Treadstone to be considered a bona fide insurer under Section 831(b). Relying on this false representation, the Treadstone Plaintiffs believed that they far surpassed the level of risk diversification necessary to comply with Section 831(b) because the Treadstone cell owners insured approximately 60 entities through Treadstone. Because Treadstone was one company, the $1.2 million premium threshold applied to the sum total of all premiums paid to Treadstone and each of its cells. A portion of these premiums would then, for accounting and tax purposes, be allocated to each of the entities insured by Treadstone.

182. Other than using the protected cell structure, the Captive Insurance Strategies that Tribeca and Artex implemented for the Treadstone Plaintiffs were the same as those implemented for Spectra and the Symphony Plaintiffs.

183. In a feasibility study dated November 16, 2009, Tribeca represented that "[u]ltimately, the decision [to set up a captive insurance company] is a financial one." It represented that "[s]uch decision making is helped by Section 831(b) of the Internal

Revenue Code … which provides tax advantages for small insurance companies."   This feasibility study also represented that "[a]ttention must also be paid to ensuring that the techniques used are acceptable as far as the corporate and tax implications are concerned. That is, how does the level of coverage affect Section 831(b) treatment …. Are the proposed coverages within the scope of Section 831(b)?"   Tribeca's representation that it would establish a captive insurance company for the Treadstone Plaintiffs that complied with Section 831(b) was false, and Tribeca knew it was false.   Tribeca knew at the time that the captive insurance arrangement that it proposed did not meet the requirements of Section 831(b).

184.   In addition to emphasizing the tax benefits of captive insurance, Tribeca also discussed the purported insurance advantages that a captive insurance company would provide.   Tribeca represented in its November 16, 2009 Feasibility Study that "[a] captive insurer would provide specialized 'platinum-level' coverage forms with long-term stability of underwriting, pricing, and coverage availability. In addition, the captive insurer would provide loss control services that are desired and tailored to the proposed insured's particular needs."   These representations regarding the quality of insurance a Tribeca-administered captive would provide as well as representations regarding coverage pricing were false when made, and Tribeca knew they were false.   In fact, the coverage that Tribeca and Artex designed for Treadstone to provide was neither platinum-level nor tailored to the insureds' particular needs.   Instead, Tribeca and Artex designed Treadstone to provide coverage only to the extent they thought necessary to justify premiums approaching the $1.2 million Section 831(b) limitation.

185.    Artex made similar misrepresentations to the Treadstone Individuals in webinars that it presented.  For instance, in the January/February 2012 webinar that it presented to the Treadstone Individuals, Artex continued its misrepresentation that Treadstone would provide bona fide insurance for material risks.  For instance, on slide 9 of this presentation, Artex used the image of an iceberg to illustrate that risks covered by commercial insurance were just the "tip" of the iceberg while the remainder of the iceberg beneath the waterline amounted to "uninsured risks."  These representations were false when made, and Artex knew that they were false.  Artex also falsely represented that spreading risk among 12 entities and keeping premium payments below $1.2 million would suffice to preserve preferential tax treatment under Section 831(b).  Artex knew these representations were false when they made them.  The determination as to whether a captive provides real insurance relies on numerous factors.   Satisfying the $1.2 million premium threshold and spreading risk among 12 entities does not and cannot assure Section 831(b) compliance.

186.    In connection with administering Treadstone, Tribeca and Artex also created business plans for Treadstone.  Artex or Tribeca then periodically submitted these business Plans to regulators in Anguilla, including a submission in January 29, 2015.  In these business plans, Artex and Tribeca repeated their misrepresentations regarding the Captive Insurance Strategies.  In the January 2015 business plan, Artex stated "[f]or the most part, the Company will underwrite highly customized policies carefully tailored to the specific needs of its insured."  It further stated "[r]ating considerations will be ratified by independent actuaries and/or risk management consultants."  On the issue of Section

831(b), the January 2015 business plan stated "[i]n accordance with [Section 831(b)], the Company will not be taxed on premium income, but will be taxed on investment income." The foregoing representations were false when made, and Artex and Tribeca knew that they were false.

187. Over the course of its existence, Artex and Tribeca authorized Treadstone to provide loans or distributions to entities in which the Treadstone Individuals possessed an ownership stake. The Treadstone Individuals engaged in these loans or distributions because Artex and Tribeca advised them they could do so. Artex and Tribeca approved the loans. In addition, Artex and Tribeca authorized Treadstone to make distributions to its owners. Artex and Tribeca approved these distributions. The Treadstone Individuals reasonably relied on the advice and instructions of Artex and Tribeca in connection with the loans and distributions.

188. On the issue of investments, Artex misrepresented in the January 2015 business plan that "[t]he company is projecting to invest primarily upon a long-term growth perspective, with the exception of amounts required for solvency margin." Artex further misrepresented "[t]he financial advisor will invest the insurance reserves in a variety of assets, including marketable securities, although some of the reserves will be retained in cash as determined by the insurance manager as required to meet the obligations of the insurance company and to ensure compliance with the Insurance Act 2004." Artex also made the false representation in the Treadstone business plan that "[a]t least 50% of the insurance company reserves will be retained in liquid investments that can be readily converted to cash to pay claims. It should be noted, however, that some of

66

the reserves may be invested in stable income producing properties such as real estate, mutual funds, commercial paper, etc." All of the representations by Tribeca and Artex regarding Treadstone's investment strategies were false, and Tribeca and Artex knew they were false at the time they were made. In fact, Artex controlled the investments of Treadstone, and these investments consisted, for the most part, of loans to entities affiliated with the Treadstone Individuals.

189. Although Tribeca was not owned by Gallagher when it first approached Butler and Wilke, Tribeca and later Artex actively promoted their relationship with Gallagher to Plaintiffs. Gallagher's acquisition of Tribeca and continued involvement in the Captive Insurance Strategies through Artex further supported the Treadstone Plaintiffs' reasonable reliance in the Captive Insurance Strategies.

190. Jeremy Huish and/or Trujillo represented that the underwriting Tribeca and Artex would perform would be actuarially sound. This was false. Artex and Tribeca did not calculate premiums using actuarially sound methods and never intended to do so. Instead, they artificially calculated the premiums for the Treadstone Captive Insurance Strategies such that the premiums paid to Treadstone and its cells approached the Section 831(b) limit rather than applying defensible actuarial and underwriting standards. In doing so, they relied on AmeRisk for actuarial services and Inman, an Artex employee, for underwriting services when neither AmeRisk nor Inman were independent. Further, Huish and/or Trujillo represented that the accounting professionals at Tribeca were responsible for all of the accounting, and the insurance professionals at Tribeca were responsible for all of the insurance work, including managing every aspect of the captive

after it was formed.  Huish also represented that the lawyers at Tribeca would oversee the captive and make sure that it was legally formed and administered and complied with all applicable tax and insurance laws.

191.   The Treadstone Plaintiffs paid substantial fees to Artex and Tribeca in connection with implementing the Captive Insurance Strategies.  In exchange for these fees, Artex managed and administered all aspects of the Captive Insurance Strategies and Treadstone.  Artex's services included the preparation of Treadstone's tax returns, which were used by the Treadstone Individuals in preparing their tax returns.  Once Artex prepared Treadstone's tax returns, it advised the Treadstone Individuals to sign these tax returns and submit them.  The Treadstone Individuals reasonably relied on this negligent and fraudulent advice.

192.   Tribeca and Artex also advised the Treadstone Plaintiffs on how and when to submit claims to Treadstone.  Tribeca and Artex then processed these claims and either denied or approved these claims.  This resulted in the Treadstone Plaintiffs submitting very few claims.

193.   As part of their management of Treadstone, Tribeca and Artex submitted periodic reports and memoranda to the Treadstone Plaintiffs regarding Treadstone's operations.  These reports and memoranda restated many of the earlier misrepresentations by Tribeca and Artex regarding the proper tax treatment of the Captive Insurance Strategies.  They also restated misrepresentations regarding the bona fides of the insurance Treadstone was providing under the management of Tribeca and Artex.

### 2. Audit and Tax Court Proceedings

194. Eventually, the IRS audited the 2012-2015 tax returns of the Treadstone Individuals. The IRS also audited the 2013 tax return for 5T Capital and the 2012 tax return for Boomerang WB. Throughout the audits and subsequent administrative proceedings before the IRS and Tax Court proceedings, Artex encouraged the Treadstone Individuals to continue contesting the IRS's positions regarding the Captive Insurance Strategies. Artex also supplied false information to the Treadstone Individuals to use to fill out the Forms 8886 required by Notice 2016-66. In August and September of 2016, the Treadstone Individuals received notices of deficiency for their 2012 tax returns. In August of 2017, the Treadstone Individuals received notices of deficiency for their 2013 tax returns. In March of 2016, Boomerang WB received a notice of deficiency for its 2012 tax return. In January of 2017, 5T Capital received a notice of deficiency for its 2013 tax return. The Treadstone Individuals, Boomerang WB, and 5T Capital challenged the notices of deficiency that they received in Tax Court. On July 3, 2018, the Treadstone Individuals reached settlements with IRS for the tax years 2012-2015, Boomerang WB reached an IRS settlement for the 2012 tax year, and 5T Capital reached a settlement for the 2013 tax year. The settlements required the Treadstone Individuals to pay substantial back taxes, penalties, and interest. The Treadstone Individuals also closed and liquidated Treadstone, which, in turn, resulted in the Treadstone Individuals paying capital gains tax. Artex administered the Captive Insurance Strategies for the Treadstone Individuals for the years 2012-2015 before the Treadstone Individuals terminated their engagement letter on or about November 2, 2015.

1
2

## IV.   CONSPIRACY ALLEGATIONS

3

195.   Each of the Defendants and the Other Participants involved in the Captive

4

Insurance Strategies executed by Plaintiffs and other members of the Class conspired

5
6

with one another by agreeing to design, promote, sell, implement, and manage the

7

Captive Insurance Strategies for the purpose of receiving and splitting substantial fees

8

(the "Defendants' Arrangement").  The receipt of those fees was the primary, if not sole,

9

motive in the development and execution of the Captive Insurance Strategies by

10

Defendants and the Other Participants.   The Defendants and the Other Participants

11
12

designed the Captive Insurance Strategies and unlawfully agreed to provide a false veneer

13

of legitimacy to each other's opinions on the alleged lawfulness and tax consequences of

14

the Captive Insurance Strategies.

15

196.   The Defendants and the Other Participants aggressively put their unlawful

16
17

scheme into action.  The Defendants and the Other Participants fraudulently solicited

18

their own clients to enter into the Captive Insurance Strategies.   In addition, the

19

Defendants and Other Participants developed a network of professional advisors that

20

referred clients to them for Captive Insurance Strategies.  The Defendants, directly or

21
22

through the Other Participants, identified the Plaintiffs and other members of the Class as

23

potential clients based on their knowledge of their finances.   The clients became

24

"targets".

25

197.   The receipt of fees and pecuniary gain from those fees was the primary

26
27

motive for the conduct of the Defendants and the Other Participants; the provision of

28

professional services to clients was merely an incidental byproduct of, not a motivating

factor for, the Defendants' conduct alleged herein. Further, the Defendants' Arrangement gave each of the participating Defendants and the Other Participants a significant pecuniary interest in the scheme to provide negligent and fraudulent advice and professional services to Plaintiffs and the members of the Class.

198.   The Defendants and the Other Participants had a financial, business and property interest in inducing the Plaintiffs and the Class, as well as other clients, to enter into the Captive Insurance Strategies, and to do so, Defendants and the Other Participants fraudulently represented that the Captive Insurance Strategies would legally reduce Plaintiffs' income taxes while providing allegedly bona fide insurance.

199.   The Defendants and the Other Participants entered into the Defendants' Arrangement, whereby they agreed and had a meeting of the minds that they would solicit each other's clients and cooperate to execute the Captive Insurance Strategies. Defendants and the Other Participants knew that the objective of the conspiracy—inducing Plaintiffs and the Class to enter into the Captive Insurance Strategies (defined as the "Defendants' Arrangement")—was illegal during the time they participated in the conspiracy. Specifically, the Defendants and the Other Participants knew that the Captive Insurance Strategies would not provide bona fide insurance required to support the promised tax treatment.

200.   The Defendants and the Other Participants conspired to perpetrate a fraud on Plaintiffs and the Class, each with knowledge of the object of the conspiracy. Each of the Defendants and the Other Participants had particular roles and responsibilities in connection with the design, marketing, sale, implementation, and management of the

respective Captive Insurance Strategies.   In addition, the Defendants and the Other

Participants authorized, ratified and/or affirmed the fraudulent misrepresentations and/or

omissions made by each of the Defendants and the Other Participants.  Each Defendant

committed at least one overt act in furtherance of the unlawful conspiracy.

## V.   CLASS ALLEGATIONS

201.   Plaintiffs bring this action on their own behalf and, pursuant to Rule

23(b)(l)(A) and/or (b)(3) of the Federal Rules of Civil Procedure, as a class action on

behalf of themselves and the nationwide class of all persons (the "Class Members," the

"alleged class" or the "Class") defined below against all Defendants:

> All Persons who, from January 1, 2005 to the present, inclusive were
> assessed back-taxes, penalties, and/or interest by the Internal Revenue
> Service as a result of their involvement, either directly or indirectly through
> an ownership stake in another entity, in a Captive Insurance Strategy
> designed, marketed, sold, implemented or managed by Tribeca, Artex
> and/or AJ Gallagher or its predecessors.  Excluded from the Class are:
> Defendants; Defendants' parents, subsidiaries, and affiliates; anyone
> receiving referral, implementation or promotional fees for the Captive
> Insurance Strategies; and federal governmental entities.

202.   Plaintiffs believe that the Class consists of hundreds if not thousands of

Class Members geographically dispersed throughout the United States such that joinder is

impracticable. These Class Members may be identified from information and records

maintained by Defendants, or third parties.

203.   The Individual Plaintiffs and the Class Members each and all have tangible

and legally protectable interests at stake in this action.

204.   The claims of the Individual Plaintiffs and the Class Members have a

common origin and share a common basis. The claims of all Class Members originate

from the same fraudulent transactions predicated by the Defendants.

205.    The Individual Plaintiffs state a claim for which relief can be granted that is typical of the claims of the Class Members. Thus, the class representatives have been the victims of the same illegal acts as each member of the class.

206.    If brought and prosecuted individually, each of the Class Members would necessarily be required to prove the instant claim upon the same material and substantive facts, upon the same remedial theories and would be seeking the same relief.

207.    The claims and remedial theories pursued by the Individual Plaintiffs are sufficiently aligned with the interests of the Class Members to ensure that the universal claims of the alleged class will be prosecuted with diligence and care by the Plaintiffs as representatives of the Class.

208.    There are questions of law and fact common to the alleged class. Such common questions include, *inter alia*:

a.    Whether Defendants and the Other Participants conspired and/or aided and abetted each other in furtherance of the unlawful acts alleged herein;

b.    Whether Defendants and the Other Participants engaged in a pattern of racketeering activity in violation of RICO and/or Arizona's RICO statute ("Arizona RICO") codified at A.R.S. §13-2301, *et seq.*;

c.    Whether Defendants' and the Other Participants' overt and/or predicate acts in furtherance of the conspiracy and/or aiding and abetting resulted in or proximately caused and causes injury to the Plaintiffs' and Class Members' business or property or irreparably harmed and harms the Plaintiffs and the alleged class and if so, the appropriate relief to which they are entitled;

d.    Whether Defendants' acts, practices, and representations constitute violations of applicable law for which Plaintiffs and the Class Members are entitled to recover restitution or damages or for which disgorgement of ill-gotten monies is appropriate;

e.    Whether Defendants' actions constitute mail and wire fraud; and

f.    Whether Defendants have been unjustly enriched through the activities described herein.

209.    Adjudications with respect to individual members of the Class could, as a practical matter, be dispositive of the interests of the other Class Members who are not parties to the action or could substantially impair or impede their ability to protect their interests.

210.    Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate final relief with respect to the Class as a whole. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the alleged Class that would establish incompatible standards of conduct for the party or parties opposing the Class.  Such incompatible standards, inconsistent or varying adjudications on what, of necessity, would be the same essential facts, proof and legal theories, would create and allow to exist inconsistent and incompatible rights within the Class.  Further, the failure to permit this cause to proceed as a class action under Rule 23(b)(1)(A) would be contrary to the beneficial and salutary public policy of judicial economy in avoiding a multiplicity of similar actions.  The Plaintiffs also allege that questions of law and fact applicable to the Class predominate over individual questions and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Therefore, certification is appropriate under Rule 23(b)(3).  Failure to permit this action to proceed under Rule 23 would be contrary to the public policy encouraging the economies of attorney and litigant time and resources.

211.   The named Plaintiffs allege that they are willing and prepared to serve the Court and proposed Class in a representative capacity with all of the obligations and duties material thereto.

212.   The self-interests of the named Class representatives are co-extensive with and not antagonistic to those of the absent Class Members. The proposed representatives will undertake to well and truly protect the interests of the absent Class Members.

213.   The named Plaintiffs have engaged the services of counsel indicated below. Plaintiffs' counsel are experienced in complex class litigation involving *inter alia* tax issues and will adequately prosecute this action and will assert, protect, and otherwise represent well the named Class representatives and absent Class Members.

214.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. There will be no difficulty in the management of this action as a class action.

215.   The Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to or which directly and irrevocably conflict with the interests of other Class Members.

## VI.   ALLEGATIONS RELATING TO RICO AND ARIZONA RICO

216.   Plaintiffs are "persons" within the meaning of 18 U.S.C. §1964(c) and A.R.S. §13-2314.04(A).

217.   At all times relevant hereto, each of Plaintiffs and the Defendants were and are "persons" within the meaning of 18 U.S.C. §1961(3).

## A.   Enterprise

218.   An enterprise need not be a specific legal entity but rather may be "any union or group of individuals associated in fact although not a legal entity."

219.   In this case, the enterprise ("Enterprise") for RICO and Arizona RICO purposes consists of (1) the Defendants; (2) the Other Participants; and (3) all other persons and entities that solicited persons to participate in Artex's Captive Insurance Strategies Arrangement (sometimes referred to as the "Arrangement") for the alleged purpose of generating and sharing fees and commissions for the Artex Captive Insurance Strategies and alleged tax liability reduction.

220.   These individuals and entities individually and through their agents represented to their victims that the Arrangement qualified as bona fide arrangements under IRC §831(b).  In reality, the Arrangement did not qualify under IRC §831(b) and could not support the promised tax benefits.  The plan was devised solely to facilitate the sale of insurance policies and the provision of administrative, investment and professional services that would generate significant fees and commissions.   The Defendants and the Other Participants have made millions of dollars orchestrating the Arrangement and, as of this time, it remains ongoing.

221.   Defendants sought out as clients those persons, like Plaintiffs and other Class Members, that had high taxable income, owned businesses, had significant cash flow available to fund such policies and were "sold on" Defendants' design of how to promote, sell, structure, and capitalize on the Arrangement for the main purposes of providing significant revenue for Defendants.  There was no lawful criteria followed by the Defendants in establishing Plaintiffs' insurable risk, their limits of coverage, or what

insurable risks could not be purchased in the normal insurance marketplace at competitive prices.  The intent by the Defendants was to unlawfully promote and sell the Arrangement for huge and unlawful fees and premiums.

222.    Captive insurance structures are highly sophisticated and complicated with complicated tax and other regulatory requirements. As such, captive insurance entails enormous operational challenges including, but not limited to (i) properly insuring real business risk and then following the requirements for sharing and shifting risk via reinsurance, (ii) using the reserve funds maintained under the policy within guidelines, and (iii) structuring reinvestment vehicles to properly manage and protect those assets so that if and when claims are made, indemnity payments can be issued for properly documented and timely claims.  None of these characteristics were present in the Captive Insurance Strategies that the Defendants convinced the Plaintiffs and the Class members to execute.

223.    The Defendants and the Other Participants engaged in a common plan, transaction and course of conduct described herein in connection with the design, promotion and sale of Captive Insurance Strategies Arrangements, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business that operated as a fraud upon the Plaintiffs and the Class, the primary purpose and effect of which was to generate huge and unlawful fees and commissions by fraudulently selling a series of transactions under the guise of selling "insurance" as part of the defective tax products at issue in this case—the Captive Insurance Strategies.

224.   While the Defendants and the Other Participants participated in the Enterprise and were a part of it, the Defendants and the Other Participants also had an existence separate and distinct from the Enterprise.

225.   Defendants and the Other Participants maintained an interest in and control of the Enterprise and also conducted or participated in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

226.   Defendants and the Other Participants' control and participation in the Enterprise were necessary for the successful operation of Defendants' scheme. The Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engaged.

**B.    Operation of the RICO Enterprise**

227.   Microcaptive insurance plans caught the attention of unscrupulous professionals for three reasons: (1) such plans allegedly could be funded with tax deductible contributions[4]; (2) the rules involved were highly technical and thus unlikely to be understood by laypersons, like the Plaintiffs and members of the Class, who were thus also unlikely to question the advice being offered; and (3) an unlimited number of "insureds" could participate.

228.   Tax deductible captive insurance arrangements are allowed for businesses that meet certain requirements, such as those that have atypical insurance needs that are very costly or non-existent in the commercial insurance marketplace.  However, captive

---

[4] The Defendants and Other Participants represented to Plaintiffs and members of the Class that they would receive an ordinary income deduction for the premium and the premium would not be taxed at the captive insurance level; any subsequent distributions of these funds supposedly would be taxed at capital gains rates as a qualified dividend.

insurance is not tax deductible in every case simply because the insured generates revenue and forms a captive. Promoters of Captive Insurance Strategies can mimic legitimate tax deductible captive insurance arrangements by creating a voluminous paper trail and referencing tax code sections that convince their clients that the transactions are valid. This "illusion of validity" is what the Defendants fraudulently used to persuade and mislead the Plaintiffs to agree to participate in Captive Insurance Strategies: Defendants described a simple scheme, saying the right things to get the structure in place, and minimizing the actual operations of the Captive Insurance Strategy.

229. The Defendants in this case (as well as the Other Participants) had to make premiums appear as a tax-deductible expense to the "participants" and as a microcaptive insurance arrangement plan to the IRS. Defendants also had to constantly forage for clients who could pay thousands of dollars annually for several years into such unlawful arrangements.

230. Each of these participants played an important role in the success of the Enterprise:

   a. <u>Artex and Tribeca.</u> Artex and/or Tribeca were responsible for creating, designing and establishing the microcaptive insurance arrangements. Through Karl Huish, Jeremy Huish, Tehero, and others, Artex and/or Tribeca systematically identified clients like Plaintiffs, which they then induced into entering into captive insurance arrangements. To induce clients to enter into these transactions, Artex commissioned feasibility studies using AmeRisk and other firms to produce the actual studies. These studies purported to show the risks, claims, and financial performance for a hypothetical captive insurance company established for Artex clients. The feasibility studies contained misrepresentations and omissions concerning the quality of insurance that the captive insurance company would provide, the investment policies of the captive insurance companies, and the tax treatment the clients could

expect.  These feasibility studies were designed to create and did create a veneer of legitimacy for the Captive Insurance Strategies. In addition to the feasibility studies, Artex and/or Tribeca made other false and misleading representations in pitch materials and through other communications to induce clients to enter into the Captive Insurance Strategies.  Once Artex secured a client, it used a network of employees, affiliated entities, and other individuals and entities, including other Defendants and the Other Participants, to implement the Captive Insurance Strategies.

b.   Karl Huish. Karl Huish is an Executive Vice President of Artex and the former President and Chief Executive Officer at Tribeca.  He holds himself out as having dedicated his career to captive insurance and having been responsible for the development and management of all types of captives, ranging from single parent, to micro to group. He is a frequent lecturer on issues of captives and alternative risk transfer.  He signed and countersigned numerous documents to establish and operate the captive insurance companies used in the Captive Insurance Strategies.  He also indirectly owned a stake in Provincial, and therefore personally profited from the insurance premiums paid to Provincial.

c.   Jeremy Huish. Jeremy Huish is a Senior Vice President of Artex and the former Director of Business Development at Tribeca who holds a J.D., C.P.A., and LL.M. in tax.  At both Tribeca and Artex, Jeremy Huish was responsible for business development.  He was directly involved in sales presentations to numerous clients.  Jeremy Huish also signed and countersigned numerous documents necessary to implement the Captive Insurance Strategies.   He also indirectly owned a stake in Provincial, and therefore personally profited from the insurance premiums paid to Provincial.

d.   Tehero. Tehero was responsible for drafting and executing the engagement agreements through which the Shivkov Plaintiffs and Treadstone Plaintiffs became Artex clients.

e.   Gallagher.  Gallagher is the parent company of Artex.  Gallagher established Artex for the purpose of, among other things, expanding its captive insurance business.  Artex was therefore directed by its parent Gallagher to focus on the captive insurance industry and, in furtherance of these efforts, Artex acquired Tribeca.  Gallagher also steered its existing clients to Artex.  In connection with these efforts, individuals employed by Gallagher could and did receive referral

80

bonuses or commissions when they referred existing Gallagher clients to Artex.

f.    Inman. Inman provided underwriting services to assist Artex in pricing premiums for captive insurance policies.  Inman was not independent, a material fact not disclosed to Plaintiffs or the Class. In addition to underwriting the premiums charged to Plaintiffs and the Class, Inman also signed agreements on behalf of Provincial. Inman was also the claims adjuster for Provincial.

g.    Epsilon.  Epsilon provided a variety of actuarial services relating to reserve certification, feasibility studies, pricing and rate filings, and actuarial reports.  Here, Epsilon provided reports at the request of Artex that purported to establish the actuarial bona fides of the Captive Insurance Strategies.

h.    Ekdom.  Ekdom is the Chief Executive Officer of Epsilon.  She authored many of the reports that Artex used to administer the Captive Insurance Strategies and to misrepresent to Artex clients that the Captive Insurance Strategies provided actual insurance in compliance with the Internal Revenue Code.

i.    AmeRisk.  AmeRisk is an actuarial firm.  At Artex's direction, it prepared the feasibility studies for numerous Plaintiffs and members of the class.  In addition, for all years in which Spectra paid captive insurance premiums, AmeRisk provided the actuarial services used to price the premiums while Inman provided the underwriting services.  Artex encouraged AmeRisk to target a certain premium price rather than apply neutral actuarial principles to price the captive insurance policies.  In fact, the initial captive formation checklist used by Artex inquired about the "Desired Insurance Premiums" for years one, two, and three.

j.    Provincial.  Provincial is a protected cell company organized under the laws of Anguilla.  It was the fronting insurance carrier that insured risks for some of Artex's captive insurance clients, and then reinsured a portion of those risks with individual captive insurers. The risk reinsured with each individual captive insurer is called the "primary" layer whereas the risk retained by the Provincial pool is called the "excess loss" layer.  The captive insuring the primary layer received approximately 49% of the premiums net a 2.5% administrative fee, whereas the Provincial pool kept the remaining 51% of premiums and divided these premiums pro-rata to the captive insurers that made up the Provincial pool.  Provincial was

1
2
3

indirectly owned by Huish and a member of his family, and the underwriter Inman sometimes signed documents on Provincial's behalf.

4
5

k.     <u>PRS</u>. PRS is the company that collected the 2.5% administrative fee paid by all Tribeca and Artex clients who participated in the Provincial pool.

6
7
8
9
10
11
12
13
14
15

231.    The Defendants intended to, and did, commit mail and wire fraud in connection with the promotion and operation of the Captive Insurance Strategies since they used the mails and wires in creating, designing, establishing, promoting, selling, implementing, and vouching for the Captive Insurance Strategies.   The Defendants' racketeering activity in creating, designing, establishing, promoting, selling, implementing, and vouching for the Captive Insurance Strategies involved numerous false and misleading misrepresentations and omissions that amount to a scheme or artifice to defraud.

16
17
18
19
20
21
22
23
24

232.    As a result of Defendants' unlawful acts, the "participants" (*i.e.*, the Plaintiffs and the Class) have been deemed by the IRS to have participated in an "abusive tax shelter", have been assessed back-taxes, penalties and interest by the IRS for the underpayment of taxes due to filing tax returns reflecting the promised tax benefits of the Captive Insurance Strategies Arrangement, and have incurred substantial amounts of additional accounting and legal fees in connection with the IRS audits of their tax returns and the Tax Court proceedings.

25
26
27
28

233.    Taxpayers like the Plaintiffs, who were fully reliant on the advice and representations of the credentialed professionals like Defendants that developed, promoted, sold, implemented and managed the Captive Insurance Strategies

Arrangement, were the intended victims of the Defendants' scheme to extract fees and commissions.   Plaintiffs were fully reliant on the credentialed professionals like Defendants who developed, promoted, implemented, and managed the Captive Insurance Strategies Arrangements and trusted they were truthfully and honestly being advised, counseled and directed by those professionals who represented that they were experts and highly experienced with these types of structures.  Defendants received large amounts of fees and commissions while at all times assuring Plaintiffs they were in full compliance with all applicable tax and insurance laws and compliance and operational requirements.

## C.    Predicate Acts

234.   With respect to the activities alleged herein, the Defendants and Other Participant acted at all times with malice toward the Plaintiffs and the Class, intending to engage in the conduct complained of for the benefit of Defendants and with knowledge that such conduct was unlawful.  Such conduct was done with actionable wantonness and reckless disregard for the rights of Plaintiffs and the Class, as well as the laws to which the Defendants are subject, the same amounting to actionable wantonness.

235.   With respect to the activities alleged herein, each Defendant and Other Participant agreed to the operation of the transaction or artifice to deprive Plaintiffs and the Class of property interests.  In furtherance of these agreements, each Defendant also agreed to interfere with, obstruct, delay or affect interstate commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants were not entitled.

236.   With respect to the overt acts and activities alleged herein, each Defendant conspired with each other, the Other Participants, and with others not named as

Defendants in this Complaint, to violate 18 U.S.C. §1962(c) and A.R.S. §§13-2312, all in violation of 18 U.S.C. §1962(d) and Arizona law.  Each Defendant also agreed and conspired with each other Defendant to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants were not entitled.

237.   The numerous predicate acts of mail and wire fraud described herein, in addition to other fraudulent acts, are part of separate fraudulent transactions by Defendants designed to defraud the Individual Plaintiffs and the Class of money and property interests under false pretenses. As victims of these unlawful patterns of illegal activity, Plaintiffs and members of the Class have and continue to suffer losses as a result of these activities.  The acts which caused injuries to the Plaintiffs and members of the Class were performed for financial gain.

238.   In carrying out the overt acts and fraudulent transactions described above, the Defendants engaged in, inter alia, conduct in violation of federal laws, including 18 U.S.C. §§1341-1346, and 18 U.S.C. §1961 et seq.  They also violated A.R.S. §§13-2312 and 13-2301 et seq.

239.   Section 1961(1) of RICO provides that "racketeering activity" means any act indictable under any of the following provisions of Title 18, United States Code: §1341 (relating to mail fraud), §1343 (relating to wire fraud), and §1346 (relating to scheme or artifice to defraud).

240.   Section 13-2301(D)(4) of the Arizona Revised Statutes provides that "[r]acketeering means any act, including any preparatory or completed offense, that is

chargeable or indictable under the laws of the state or country in which the act occurred and, if the act occurred in a state or country other than this state, that would be chargeable or indictable under the laws of this state if the act had occurred in this state." Racketeering is further defined to include only those acts that are punishable by imprisonment of one year or more that involve one of 27 categories of offenses.  Among these offenses are those involving "[a] scheme or artifice to defraud."

**D.     Violations of 18 U.S.C. §§1341 and 1343 and A.R.S. §13-2301(D)(4)**

241.   Plaintiffs repeat and reallege each and every prior al1egation in this Complaint as if fully set forth herein.

242.   For the purpose of executing and/or attempting to execute their transaction to defraud and to obtain money by means of false pretenses, representations or promises, the Defendants and their co-conspirators, in violation of 18 U.S.C. §1341, placed in post offices and/or in authorized repositories for mail matter and things to be sent or delivered by the Postal Service and received matter and things therefrom including but not limited to contracts, instructions, correspondence, and others.

243.   For the purpose of executing and/or attempting to execute their transaction to defraud and to obtain money by means of false pretenses, representations or promises, the Defendants and their co-conspirators, in violation of 18 U.S.C. §1343, transmitted and received by wire matter and things therefrom including but not limited to contracts, instructions, correspondence, funds, and others.

244.   Defendants' efforts in connection with executing or attempting to execute their transactions to defraud and to obtain money by means of false pretenses, representations or promises, including without limitation acts done in violation of 18

U.S.C. §§1341 and 1343, also violated A.R.S. §13-2301(D)(4) because these acts amounted to a scheme or artifice to defraud for financial gain.

245.    In those matters and things sent or delivered by the Postal Service, by wire and through other interstate electronic media, Defendants and their co-conspirators falsely and fraudulently misrepresented and fraudulently suppressed material facts from Plaintiffs and the Class as described above, in violation of 18 U.S.C. §§1341 and 1343. These acts, in addition to false and fraudulent misrepresentations communicated outside the interstate wire and mail systems, also violated A.R.S. §13-2301(D)(4)  Defendants' fraudulent statements and omissions include but are not limited to the following:

(1)    Advising and recommending that Plaintiffs and members of the Class engage in illegal and abusive tax shelters, the Captive Insurance Strategies;

(2)    Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies were illegal and abusive tax shelters;

(3)    Advising Plaintiffs and members of the Class that the Captive Insurance Strategies would be upheld as a legal tax-advantaged captive insurance strategy if audited;

(4)    Failing to Advise Plaintiffs and members of the Class that the Captive Insurance Strategies would not be upheld as a legal captive insurance strategy if audited;

(5)    Advising Plaintiffs and members of the Class that the IRS would allow the Captive Insurance Strategies;

(6)    Failing to advise Plaintiffs and members of the Class that the IRS would not allow the Captive Insurance Strategies;

(7)    Advising Plaintiffs and members of the Class that the Captive Insurance Strategies involved the purchase of bona fide insurance;

(8)     Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies did not involve the purchase of bona fide insurance;

(9)     Advising Plaintiffs and the members of the Class that the Captive Insurance Strategies provided insurance coverages that were highly rated by the insurance industry;

(10)    Failing to advise Plaintiffs and the members of the Class that the Captive Insurance Strategies provided insurance coverages that were not highly rated by the insurance industry;

(11)    Advising Plaintiffs and members of the Class that the Captive Insurance Strategies covered gaps in commercial coverage for material risks facing Captive Insurance Strategy clients;

(12)    Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies did not cover gaps in commercial coverage for material risks facing Captive Insurance Strategy clients;

(13)    Advising Plaintiffs and members of the Class that the risks covered by the Captive Insurance Strategies were actual risks;

(14)    Failing to advise Plaintiffs and members of the Class that the risks covered by the Captive Insurance Strategies were not actual risks;

(15)    Advising Plaintiffs and members of the Class that the captive insurance companies that Defendants formed, operated, and managed in connection with the Captive Insurance Strategies would be operated as normal insurance companies;

(16)    Failing to advise Plaintiffs and members of the Class that the captive insurance companies that Defendants formed, operated, and in connection with the Captive Insurance Strategies would not be operated as normal insurance companies;

(17)    Advising Plaintiffs and members of the Class that the pooling arrangements of the Captive Insurance Strategies through Provincial or the core of a protected cell company complied with all risk shifting and risk distribution requirements;

87

(18)    Failing to advise Plaintiffs and members of the Class that the pooling arrangements of the Captive Insurance Strategies through Provincial or the core of a protected cell company did not comply with all risk shifting and risk distribution requirements;

(19)    Advising Plaintiffs and members of the Class that if they filed tax returns that deducted the premiums, fees, and expenses of the Captive Insurance Strategies they could not be liable for taxes, penalties, and/or interest;

(20)    Failing to disclose to Plaintiffs and members of the Class that if they filed tax returns that deducted the premiums, fees, and expenses of the Captive Insurance Strategies they would be liable for taxes, penalties and interest;

(21)    Advising Plaintiffs and members of the Class that the captive insurance companies would comply with Section 831(b) of the Internal Revenue Code and therefore would not pay taxes on the premiums they received;

(22)    Failing to advise Plaintiffs and members of the Class that the captive insurance companies would not comply with Section 831(b) of the Internal Revenue Code and therefore would pay taxes on the premiums they received;

(23)    Advising Plaintiffs and members of the Class that the captive insurances companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies would fall within the safe harbor provision of Section 831(b) of the Internal Revenue Code;

(24)    Failing to advise Plaintiffs and members of the Class that the captive insurances companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies would not fall within the safe harbor provision of Section 831(b) of the Internal Revenue Code;

(25)    Advising Plaintiffs and members of the Class that taking loans and distributions from the captive insurances companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies complied with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(26)     Failing to advise Plaintiffs and members of the Class that taking loans and distributions from the captive insurances companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies did not comply with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(27)     Advising Plaintiffs and members of the Class that circular cash flows between them and the captive insurances companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies complied with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(28)     Failing to advise Plaintiffs and members of the Class that circular cash flows between them and the captive insurances companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies did not comply with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(29)     Advising Plaintiffs and members of the Class that premiums paid to the captive insurance companies would be tax deductible;

(30)     Failing to advising Plaintiffs and members of the Class that premiums paid to the captive insurance companies would not be tax deductible

(31)     Advising Plaintiffs and members of the Class that the deductions created by the Captive Insurance Strategies were legitimate, proper, and in accordance with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(32)     Failing to advise Plaintiffs and members of the Class that the deductions created by the Captive Insurance Strategies were not legitimate, proper, and in accordance with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(33)     Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies lacked the required business purpose and economic substance;

(34)  Failing to advise Plaintiffs and members of the Class that the insurance policies used to implement the Captive Insurance Strategies were significantly overpriced;

(35)  Making and endorsing the statements and representations contained in the Defendants' and the Other Participants' oral advice, instructions, and recommendations;

(36)  Failing to advise Plaintiffs and members of the Class that each of the Defendants and the Other Participants were not "independent" of one another and in fact were involved in a conspiracy to design, market, sell, and implement the Captive Insurance Strategies;

(37)  Advising, instructing, and assisting Plaintiffs and members of the Class in the purchase and execution of the captive insurance policies;

(38)  Failing to revise, alter, amend, or modify the advice, recommendations, instructions, opinions, and representations made to Plaintiffs and members of the Class, orally or in writing, regarding the propriety of the Captive Insurance Strategies;

(39)  Advising, instructing, and assisting in the preparation of the tax return for Plaintiffs and members of the Class, which reported the premiums, fees, and expenses generated in connection with the Captive Insurance Strategies;

(40)  Preparing the tax returns for the captive insurances companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies and advising Plaintiffs and members of the Class to sign, file, and rely upon these tax returns;

(41)  Advising Plaintiffs and members of the Class to use the premiums, fees, and expenses generated in connection with the Captive Insurance Strategies on the tax returns of Plaintiffs and members of the Class;

(42)  Failing to advise Plaintiffs and members of the Class not to use the premiums, fees, and expenses generated in connection with the Captive Insurance Strategies on the tax returns of Plaintiffs and members of the Class;

(43)     Advising Plaintiffs and members of the Class that their tax returns, which utilized the reduction in taxes generated by the Captive Insurance Strategies, were prepared pursuant to and/or complied with IRS guidelines and established legal authorities;

(44)     Failing to advise Plaintiffs and members of the Class that their tax returns, which utilized the reduction in taxes generated by the Captive Insurance Strategies, were not prepared pursuant to and/or complied with IRS guidelines and established legal authorities;

(45)     Failing to disclose existing published authority that indicated that the purported tax consequences for transactions such as the Captive Insurance Strategies were improper and not allowable for federal income tax purposes;

(46)     Advising Plaintiffs and members of the Class that the Captive Insurance Strategies the Defendants and the Other Participants advised Plaintiffs and members of the Class to execute complied with the applicable tax and insurance laws, rules, regulations, common law doctrines, and published court decisions;

(47)     Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies the Defendants and the Other Participants advised Plaintiffs and members of the Class to execute did not comply with the applicable tax and insurance laws, rules, regulations, common law doctrines, and published court decisions;

(48)     Failing to advise Plaintiffs and members of the Class that the step transaction, sham transaction, business purpose and economic substance doctrines would disallow the tax benefits of the Captive Insurance Strategies;

(49)     Advising Plaintiffs and members of the Class that each of the various steps of the Captive Insurance Strategies were meaningful and imbued with the requisite non-tax considerations;

(50)     Recommending, instructing, and advising Plaintiffs and members of the Class that they would receive substantial tax advantages by entering into policies with the captive insurer as part of a tax strategy;

91

(51)   Advising Plaintiffs and members of the Class that the premium prices of the captive insurance companies were calculated through actuarially sound methods;

(52)   Failing to advise Plaintiffs and members of the Class that their premiums for the insurance policies were not in fact arrived at by actuarial calculations but were instead dictated by Artex to target a certain level of deductions;

(53)   Failing to advise Plaintiffs and members of the Class that they would be assessed back taxes, penalties, and/or interest by the IRS and/or Tax Court for claiming tax reductions generated by the Captive Insurance Strategies;

(54)   Advising Plaintiffs and members of the Class that the management of the investments of each individual captive insurance company would comply with the tax code and prevailing insurance industry standards;

(55)   Failing to advise Plaintiffs and members of the Class that the management of the investments of each individual captive insurance company would not comply with the tax code and prevailing insurance industry standards;

(56)   Advising Plaintiffs and members of the Class, both before and after the IRS audit, that the Captive Insurance Strategies they executed were different and distinguishable from other Captive Insurance Strategies that the IRS and/or Tax Court had disallowed;

(57)   Failing to advise Plaintiffs and members of the Class, both before and after the IRS audit, that the Captive Insurance Strategies they executed were not different and distinguishable from other Captive Insurance Strategies that the IRS and/or Tax Court had disallowed;

(58)   Advising Plaintiffs and members of the Class that they should challenge the IRS in both audit and Tax Court proceedings because Plaintiffs and members of the Class would prevail and the Captive Insurance Strategies would be allowed;

(59)   Failing to advise Plaintiffs and members of the Class that they should not challenge the IRS in both audit and Tax Court proceedings because Plaintiffs and members of the Class would not prevail and the Captive Insurance Strategies would be disallowed;

92

(60)   Advising Plaintiffs and members of the Class that they would prevail in litigation with the IRS on the merits of the Captive Insurance Strategies; and

(61)   Failing to advise Plaintiffs and members of the Class that they would not prevail in litigation with the IRS on the merits of the Captive Insurance Strategies and would be assessed back taxes, penalties, and interest.

246.   The predicate acts, including the predicate acts of mail and wire fraud, are continuing. The Defendants, and the other wrongdoers, on their own and as part of a common fraudulent scheme and conspiracy, defrauded Plaintiffs as set out above.

247.   The Defendants and their co-conspirators intentionally and knowingly made these material misrepresentations and intentionally and knowingly suppressed material facts from Plaintiffs and the Class, for the purpose of deceiving them and thereby obtaining financial gain. The Defendants either knew or recklessly disregarded that the misrepresentations and omissions described above were material.  Plaintiffs and the Class were injured as a result of the misrepresentations and omissions in carrying out the transactions and subsequently filing tax returns based on the fraudulent and false misrepresentations and omissions from Defendants and their co-conspirators.

248.   The Defendants and their co-conspirators made continual use of mail and wire transmissions, in addition to communications made outside the interstate mail and wire systems, to effectuate their fraudulent scheme.  In addition to using in person, telephonic, and other means of communication to make fraudulent statements, the Defendants and their co-conspirators transmitted numerous specific fraudulent statements to Plaintiffs and the Class through the mail, by fax, and/or by email.

249.   The Defendants and their co-conspirators intentionally and knowingly made these material misrepresentations and intentionally and knowingly suppressed material facts from Plaintiffs and the Class, for the purpose of deceiving them and thereby obtaining financial gain. The Defendants and their co-conspirators either knew or recklessly disregarded that the misrepresentations and omissions described above were material. Plaintiffs and the Class were injured as a result of the misrepresentations and omissions in carrying out the transactions and subsequently filing tax returns based on the fraudulent and false misrepresentations and omissions from Defendants and their co-conspirators.

250.   As set forth above, there are numerous specific examples of the predicate acts of fraud, including mail and wire fraud, committed by Defendants pursuant to their transactions to defraud Plaintiffs.

251.   Plaintiffs have therefore been injured in their business or property as a result of the Defendants' overt acts and racketeering activities.

**E.    Pattern of Racketeering Activity**

252.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

253.   As set forth above, the Defendants have engaged in a "pattern of racketeering activity," as defined in §1961(5) of RICO and A.R.S. §13-2314.04(T)(3), by committing and/or conspiring to commit at least two such acts of racketeering activity, as described above, within the past ten years.  Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of

commission, and had similar results impacting upon similar victims, including Plaintiffs and the Class.

254.    The multiple acts of racketeering activity committed and/or conspired to by Defendants, as described above, were related to each other and amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5) and A.R.S. §13-2314.04(T)(3). Plaintiffs allege that the course of conduct engaged in by the Defendants constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. §1961(5) and A.R.S. §13-2314.04(T)(3).  Plaintiffs can show the relatedness prong because the predicate acts have "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise."   All predicate acts had the same purpose of utilizing the Enterprise to misrepresent the nature of the transactions underlying the Captive Insurance Strategies Arrangement so that the Defendants could defraud Plaintiffs.  Plaintiffs allege that the continuity of the pattern of racketeering activity is "closed-ended" inasmuch as a series of related predicate offenses extended since at least 2005 (a substantial period of time).  Moreover, the continuity of the pattern of racketeering can also be established under "open-ended continuity" as the predicate offenses are part of the Enterprise's regular way of doing business, and the predicates are attributed to Defendants' operations as part of a long-term association that existed for criminal purposes.  Further, the last act of racketeering activity that is alleged as the basis of Plaintiffs' claims occurred within four years of a prior act of racketeering.

255.   Plaintiffs and the Class therefore have been injured in their business or property as a result of Defendants' overt acts and racketeering activities as described above and throughout this Complaint.

## VII.   PLAINTIFFS' CLAIMS WERE TIMELY FILED OR, ALTERNATIVELY THE DISCOVERY RULE AND EQUITABLE TOLLING DEFERRED ACCRUAL OF STATUTES OF LIMITATIONS AS TO ALL DEFENDANTS

256.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

257.   The causes of action asserted by Plaintiffs against Defendants herein are timely filed because Plaintiffs' claims first accrued within the applicable limitation period for each claim.

258.   In the alternative, the causes of action asserted by Plaintiffs against Defendants herein are timely filed as the discovery rule and/or equitable tolling deferred accrual of the respective statutes of limitation for such causes of action.

259.   The Shivkov Plaintiffs did not and could not discover the wrongful acts of the Defendants or the injuries caused by the wrongful acts of the Defendants alleged herein until, at the earliest, June 30, 2017, the date that the IRS and the Shivkov Plaintiffs finalized a stipulation resolving the case that arose from Spectra's petition challenging the IRS's notice of deficiency.

260.   The Symphony Plaintiffs did not and could not discover the wrongful acts of the Defendants or the injuries caused by the wrongful acts of the Defendants alleged herein until, at the earliest, August 8, 2018, the date that the IRS and the Symphony Plaintiffs finalized a stipulation resolving the IRS proceedings against them.

261.   The Treadstone Plaintiffs did not and could not discover the wrongful acts of the Defendants or the injuries caused by the wrongful acts of the Defendants alleged herein until, at the earliest, July 3, 2018, the date that the IRS and the Treadstone Plaintiffs finalized a stipulation resolving the IRS proceedings against them.

262.   Prior to and up until the timeframe referenced in the immediately preceding paragraphs, Defendants continued to advise Plaintiffs orally and in writing that the Captive Insurance Strategies were completely legal and that they complied with all applicable insurance and tax laws.  Defendants further advised Plaintiffs orally and in writing that Plaintiffs and members of the Class should challenge the IRS's determinations and file cases in Tax Court if necessary.  Defendants further advised Plaintiffs and the members of the Class that they would win in Tax Court because the Captive Insurance Strategies were completely legal and in compliance with all applicable tax laws, rules, and common law doctrines.  These representations were wrongful and false and concealed material facts relating to Defendants' wrongdoing.  These misrepresentations followed earlier Tribeca and Artex representations to Plaintiffs and members of the Class that their Captive Insurance Strategy clients who had been audited had prevailed against the IRS.  Artex even advised Plaintiffs and members of the Class that it would work closely with them throughout the IRS audit, which gave Plaintiffs and members of the Class further confidence in Artex and Tribeca's misrepresentations.  In reliance on these representations, Plaintiffs and the members of the Class were delayed and deterred from bringing their claims against Defendants earlier.   Defendants'

concealment therefore prevented Plaintiffs and the members of the Class from discovery of the nature of their claims.

263.   Plaintiffs and the members of the Class exercised due diligence in pursuing discovery of their claims during the time period that commenced with Defendants rendering faulty advice and continued through Tax Court proceedings and judgment.

## VIII.  TOLLING OF STATUES OF LIMITATIONS AS TO ALL DEFENDANTS DUE TO FRAUDULENT CONCEALMENT

264.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

265.   The causes of action asserted by Plaintiffs, and on behalf of the Class, against Defendants are timely filed as Defendants and their co-conspirators fraudulently concealed the injuries and wrongful conduct alleged herein.

266.   The Defendants and their co-conspirators had actual knowledge of the injuries and wrongful conduct alleged herein, but concealed the injuries and wrongful acts and omissions alleged herein by intentionally remaining silent and/or making misrepresentations about the injuries and their wrongful conduct despite having a duty to inform Plaintiffs of such injuries and wrongful acts and omissions.  The Defendants' silence and misrepresentations prevented Plaintiffs from discovering their injuries and the Defendants' wrongful acts and omissions.

267.   The Defendants had a fixed purpose to conceal the wrongful conduct and injuries. Plaintiffs and the members of the Class reasonably relied on the Defendants' silence and misrepresentations to the detriment of Plaintiffs and the members of the Class.

## IX.   TOLLING OF STATUTE OF LIMITATIONS
## AS TO THE DEFENDANTS DUE TO CONTINUOUS
## REPRESENTATION/CONTINUING TORT DOCTRINES

268.   Plaintiffs repeat, reallege, and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

269.   The causes of action asserted by Plaintiffs against the Defendants are timely filed pursuant to the Continuous Representation/Continuing Tort Doctrines.   In addition, the Defendants breached the fiduciary duties they owed to Plaintiffs and the members of the Class because, among other things, the Defendants failed to disclose the wrongful conduct and injuries alleged herein and concealed such wrongful conduct and injuries.

270.   Until the Tax Court decision and/or settlement agreements, Defendants continued to advise Plaintiffs and the members of the Class, and Plaintiffs and members of the class continued to rely on Defendants' advice in challenging the IRS's determination in the Tax Court proceeding discussed herein, and continued to believe they could and should rely on their advice.  Indeed, as late as January of 2017, Karl Huish of Artex publicly stated in a press release:

> Our industry has been under a great deal of scrutiny, especially over the past 12 months. However it is also a very exciting time. The evolution of this industry means that we're continually able to provide creative solutions to our customers and help them solve their business challenges. Both Jeremy and I have dedicated our careers to this niche and we're extremely proud to have been recognized by our peers.

As the IRS increased scrutiny on Artex and its clients, Artex took the position, both publicly and privately, that this scrutiny amounted to a mere "evolution" of the industry and that Artex's work provided "creative solutions" that helped solve "business

challenges." In fact, as Artex knew at the time it made these representations, Artex's "solutions" did not solve business challenges and could not withstand IRS scrutiny.

271. Artex also knowingly circulated purportedly independent actuarial reports that were false.

## X.   PLAINTIFFS' CLAIMS ARE NOT SUBJECT TO ARBITRATION

272. Pursuant to the Termination and Withdrawal Provision of the engagement letters ("Retainer Agreements") signed by members of the Class, Plaintiffs terminated the Retainer Agreement before filing this suit, which per the terms of that agreement had the explicit effect of terminating the purported arbitration provision therein. Accordingly, the purported arbitration provisions do not apply to the claims Plaintiffs assert in this Complaint.

273. In addition, even if the purported arbitration provisions were not terminated, Plaintiffs and the members of the Class may still avoid them because the purported arbitration provisions are procedurally unconscionable.

274. The arbitration provision here is also unenforceable because it was used to effect a fraudulent scheme and is substantively unconscionable. Artex and its predecessor Tribeca inserted the arbitration provision to reduce liability exposure for and prevent public disclosure of conduct that it knew to be illegal and fraudulent.

275. There was no real meeting of the minds regarding the arbitration provisions. The Retainer Agreements were drafted by Defendant Artex—the party with the relative bargaining power who would seek to enforce the purported arbitration provision, and the terms of the purported arbitration provision were never explained to Plaintiffs and the members of the Class. The purported arbitration provisions are not

clearly disclosed and could have been (and were) easily overlooked. The purported arbitration provision is under an unhelpful heading entitled "About This Agreement", which does not include line breaks and is not set off in any way to indicate that an arbitration provision is included. The purported arbitration provisions do not have their own heading, they aren't capitalized or bolded, and they are inconspicuously bundled with other terms. Finally, the arbitration provision is neither explicit nor clearly worded that the parties have agreed to arbitrate in lieu of a jury trial.

276.   The vagueness and uncertainty of the arbitration provision further underscores that there was no meeting of the minds regarding the arbitration provision. Even if Plaintiffs and the members of the Class attempted to investigate these rights in the Retainer Agreement, they would not have understood the language in the "About This Agreement" section to mandate arbitration or waive a jury trial.  Although the Retainer Agreement refers to arbitration being conducted by the AAA, the clause does not identify how many arbitrators would preside over the arbitration, any particular rules that would apply, any particular rules relating to arbitration, or whether any of those rules permit or foreclose a jury trial.

277.   In addition, the arbitration provision is unenforceable under the reasonable-expectations doctrine because Artex had reason to believe that Plaintiffs and the members of the Class would not accept the Retainer Agreement if they realized or knew the Retainer Agreement contained the arbitration clause and jury-trial waiver.  The vagueness of the arbitration provision and its obscure placement in the "About this Agreement" section of the Retainer Agreements demonstrate that the term is bizarre and oppressive.

Further, the ostensible purpose of Plaintiffs and the members of the Class in entering the Retainer Agreement was to establish a captive insurance company that complied with all applicable legal standards.   But the fraud-furthering purpose and effect of Artex's arbitration provision eviscerates the non-standard terms explicitly agreed to and eliminates the dominant purpose of the transaction.   Plaintiffs and the members of the Class would not have entered into Retainer Agreement had they known these clauses were present.

278.   In addition, the claims of Plaintiffs and the Class are beyond the scope of the arbitration provision in the Retainer Agreements because these agreements specifically do not govern the tax, legal, investment, and accounting advice Artex provided.

## XI   CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF RICO 18 U.S.C. §1962(c)

279.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

280.   Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

281.   Plaintiffs incorporate, as though fully set out herein, their allegations regarding Enterprise.

282.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

283.   The Defendants, who are associated with and are part of the Enterprise, conduct and have conducted the Enterprise's affairs through a pattern of racketeering activity, as set forth in this Complaint. Through the fraudulent and wrongful conduct described in this Complaint, Defendants seek and have sought to deprive Plaintiffs and members of the Class of money and property rights. In order to successfully execute their scheme in the manner set forth in this Complaint, Defendants must have a system that allows Defendants to access their victims in a manner to effectuate the fraudulent transactions. The Enterprise allows the Defendants this access.

284.   With respect to the activities alleged herein, the Defendants have acted at all times with malice toward Plaintiffs and members of the Class in their efforts to acquire and maintain an interest in an Enterprise that affects interstate commerce.

285.   In carrying out the overt acts and fraudulent scheme described above, the Defendants have engaged in conduct in violation of federal laws, including *inter alia* 18 U.S.C. §§1341 and 1343, 18 U.S.C. §§1341 and 1346, 18 U.S.C. §§1343 and 1346, and 18 U.S.C. §1961, et seq. as set forth more fully above.

286.   Therefore, Defendants have each engaged in "racketeering activity" which is defined in §1961(1) of RICO to mean "any act which is indictable under any of the following provisions of 18 U.S.C. §1341 (relating to mail fraud) and §1343 (relating to wire fraud) ...."

287.   As a proximate result of Defendants' unlawful pattern of illegal fraudulent conduct as described above, Plaintiffs and members of the Class have been injured in their business or property as described above.

**COUNT II**
**VIOLATIONS OF RICO 18 U.S.C. §1962(d)**
**BY CONSPIRING TO VIOLATE 18 U.S.C. §1962(c)**

288.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

289.   This claim for relief arises under 18 U.S.C. §1964(a) of RICO and seeks relief from the Defendants' activities described herein for violations of 18 U.S.C. §1962(d) for their conspiracy to violate 18 U.S.C. §1962(c).

290.   Plaintiffs incorporate, as if fully set forth herein, their allegations regarding the Enterprise.

291.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

292.   Absent Defendants' conspiracy and joint efforts, Defendants' scheme would not be successful. Acting jointly, Defendants have and have possessed greater power, have been able to exert greater influence, have been able to successfully engage in the activities set forth herein, and have had greater ability to conceal their activities.

293.   Defendants have also violated §1962(d) by conspiring to violate 18 U.S.C. §1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the §1962(c) Enterprise(s) described previously through a pattern of racketeering activity.

294.   Defendants, their employees, and multiple agents have been joined in the conspiracies to violate 18 U.S.C. §1962(c) in violation of §1962(d) by various third parties not named as Defendants herein, such as the Other Participants.

295.   As demonstrated in detail above, the Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy including systemic fraudulent practices designed to defraud the Plaintiffs and the Class of money and other property interests.

296.   The nature of the above described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that Defendants not only agreed to the objective of a violation of 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(c), but also they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

297.   The Defendants have engaged in the commission of and continue to commit overt acts and the following described unlawful racketeering predicate acts that have and continue to generate income or proceeds received by Defendants from such pattern of racketeering activity, including:

        a.   Multiple instances of mail and wire fraud violations of 18 U.S.C. §§1341 and 1343; and

        b.   Multiple instances of travel in interstate commerce to attempt to and to actually commit mail fraud and wire fraud.

298.   As a proximate result of Defendants' conduct as described above, Plaintiffs and the Class have been injured in their business or property as described above.

**COUNT III**
**VIOLATIONS OF ARIZONA RICO A.R.S. §13-2312**

299.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

300.   Section 12-312 of Arizona RICO provides, among other things, that "[a] person commits illegally conducting an enterprise if such person is employed by or associated with any enterprise and conducts such enterprise's affairs through racketeering or participates directly or indirectly in the conduct of any enterprise that the person knows is being conducted through racketeering."

301.   Plaintiffs incorporate, as though fully set out herein, their allegations regarding the Enterprise.

302.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

303.   The Defendants, who are employed by and/or associated with and a part of the Enterprise, conduct the Enterprise's affairs through racketeering, as set forth in this Complaint. Through the fraudulent and wrongful conduct described in this Complaint, Defendants sought to obtain financial gain by depriving Plaintiffs and the Class of money and property rights. In order to successfully execute their scheme in the manner set forth in this Complaint, Defendants needed a system that allowed Defendants to access their victims in a manner to effectuate the fraudulent transactions. The Enterprise allowed the Defendants this access.

304.   With respect to the activities alleged herein, the Defendants have acted at all times with malice toward Plaintiffs and the Class in their efforts to acquire and maintain an interest in an Enterprise that affects interstate commerce.

305.   In carrying out the overt acts and fraudulent scheme described above, the Defendants have engaged in conduct in violation of Arizona state law, including *inter alia* A.R.S. §§13-2312 and 13-2301 as set forth more fully above.

306.   Therefore, Defendants have each engaged in "racketeering activity" which is defined in § 2301(D)(4) of Arizona RICO to mean "any act, including any preparatory or completed offense, that is chargeable or indictable under the laws of the state or country in which the act occurred and, if the act occurred in a state or country other than this state, that would be chargeable or indictable under the laws of this state if the act had occurred in this state . . . and the act involves," among other things, a scheme or artifice to defraud.

307.   As a proximate result of Defendants' unlawful pattern of illegal fraudulent conduct as described above, Plaintiffs and the Class have been injured in their business or property as described above.

**COUNT IV**
**CONSPIRACY TO VIOLATE ARIZONA RICO A.R.S. §13-2312**

308.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

309.   This claim for relief arises under A.R.S. §13-2314.04 and seeks relief from the Defendants' activities described herein as part of their conspiracy to violate A.R.S.

§13-2312, which qualifies as a "preparatory" offense under the definition of racketeering activity in A.R.S. §13-2301(D)(4).

310.    Plaintiffs incorporate, as if fully set forth herein, their allegations regarding the Enterprise.

311.    Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

312.    Absent Defendants' conspiracy and joint efforts, Defendants' scheme would not be successful. Acting jointly, Defendants have and have possessed greater power, have been able to exert greater influence, have been able to successfully engage in the activities set forth herein, and have had greater ability to conceal their activities.

313.    Defendants have also conspired to violate A.R.S. §13-2312. The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Enterprise(s) described previously through racketeering activity.

314.    Defendants, their employees, and multiple agents have been joined in the conspiracies to violate A.R.S. §13-2312 by various third parties not named as Defendants herein, such as the Other Participants.

315.    As demonstrated in detail above, the Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy including systemic fraudulent practices designed to defraud the Individual Plaintiffs and the Class of money and other property interests.

316.    The nature of the above described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that Defendants not only agreed to the objective of conspiring to violate A.R.S. §13-2312, but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

317.    The Defendants have sought to and have engaged in the commission of and continue to commit overt acts and unlawful racketeering predicate acts that have and continue to generate income or proceeds received by Defendants from such pattern of racketeering activity, including acts that involve a scheme or artifice to defraud as set forth more fully in Section VI.C. and VI.D. *supra*.

318.    As a proximate result of Defendants' conduct as described above, Plaintiffs and the Class have been injured in their business or property as described above.

## COUNT V
## BREACH OF FIDUCIARY DUTY

319.    Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

320.    The Defendants, as the insurance, tax, financial and investment advisors of Plaintiffs and the members of the Class, were fiduciaries of the Plaintiffs and the members of the Class.  Plaintiffs and the members of the Class placed their trust and confidence in Defendants, and Defendants had influence and superiority over the Plaintiffs and the members of the Class.  Thus, Defendants owed Plaintiffs and the members of the Class the duties of honesty, loyalty, care, and compliance with the applicable codes of professional responsibility.  Where possible, Defendants focused on

prospective clients with preexisting relationships either with Defendants or with a professional advisor in Defendants' referral network, where they had details on each client and could use any existing relationship of trust to readily market the program and its alleged benefits.

321. Defendants breached their fiduciary duties to Plaintiffs and the members of the Class by, among other things:

(1) Advising Plaintiffs and the members of the Class to engage in the Captive Insurance Strategies;

(2) Advising Plaintiffs and the members of the Class that the policies issued by their Captive Insurance Strategies constituted insurance and therefore created lawful tax deductions;

(3) Charging and collecting unreasonable and excessive fees;

(4) Orchestrating the implementation, operation, and management of the Captive Insurance Strategies;

(5) Providing opinions falsely verifying that the Captive Insurance Strategies were completely legal;

(6) Advising Plaintiffs and the members of the Class to sign and file tax returns in reliance on Defendants' advice, representations, recommendations, instructions, and opinions, which Defendants knew or should have known the IRS would conclude were improper and illegal, for the purpose of generating huge fees for Defendants.

(7) Advising and recommending that Plaintiffs and members of the Class engage in illegal and abusive tax shelters, the Captive Insurance Strategies;

(8) Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies were illegal and abusive tax shelters;

(9) Advising Plaintiffs and members of the Class that the Captive Insurance Strategies would be upheld as a legal tax-advantaged captive insurance strategy if audited;

110

(10)    Failing to Advise Plaintiffs and members of the Class that the Captive Insurance Strategies would not be upheld as a legal captive insurance strategy if audited;

(11)    Advising Plaintiffs and members of the Class that the IRS would allow the Captive Insurance Strategies;

(12)    Failing to advise Plaintiffs and members of the Class that the IRS would not allow the Captive Insurance Strategies;

(13)    Advising Plaintiffs and members of the Class that the Captive Insurance Strategies involved the purchase of bona fide insurance;

(14)    Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies did not involve the purchase of bona fide insurance;

(15)    Advising Plaintiffs and the members of the Class that the Captive Insurance Strategies provided insurance coverages that were highly rated by the insurance industry;

(16)    Failing to advise Plaintiffs and the members of the Class that the Captive Insurance Strategies provided insurance coverages that were not highly rated by the insurance industry;

(17)    Advising Plaintiffs and members of the Class that the Captive Insurance Strategies covered gaps in commercial coverage for material risks facing Captive Insurance Strategy clients;

(18)    Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies did not cover gaps in commercial coverage for material risks facing Captive Insurance Strategy clients;

(19)    Advising Plaintiffs and members of the Class that the risks covered by the Captive Insurance Strategies were actual risks;

(20)    Failing to advise Plaintiffs and members of the Class that the risks covered by the Captive Insurance Strategies were not actual risks;

(21)    Advising Plaintiffs and members of the Class that the captive insurance companies that Defendants formed, operated, and managed in connection with the Captive Insurance Strategies would be operated as normal insurance companies;

(22)   Failing to advise Plaintiffs and members of the Class that the captive insurance companies that Defendants formed, operated, and in connection with the Captive Insurance Strategies would not be operated as normal insurance companies;

(23)   Advising Plaintiffs and members of the Class that the pooling arrangements of the Captive Insurance Strategies through Provincial or the core of a protected cell company complied with all risk shifting and risk distribution requirements;

(24)   Failing to advise Plaintiffs and members of the Class that the pooling arrangements of the Captive Insurance Strategies through Provincial or the core of a protected cell company did not comply with all risk shifting and risk distribution requirements;

(25)   Advising Plaintiffs and members of the Class that if they filed tax returns that deducted the premiums, fees, and expenses of the Captive Insurance Strategies they could not be liable for taxes, penalties, and/or interest;

(26)   Failing to disclose to Plaintiffs and members of the Class that if they filed tax returns that deducted the premiums, fees, and expenses of the Captive Insurance Strategies they would be liable for taxes, penalties and interest;

(27)   Advising Plaintiffs and members of the Class that the captive insurance companies would comply with Section 831(b) of the Internal Revenue Code and therefore would not pay taxes on the premiums they received;

(28)   Failing to advise Plaintiffs and members of the Class that the captive insurance companies would not comply with Section 831(b) of the Internal Revenue Code and therefore would pay taxes on the premiums they received;

(29)   Advising Plaintiffs and members of the Class that the captive insurances companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies would fall within the safe harbor provision of Section 831(b) of the Internal Revenue Code;

(30)   Failing to advise Plaintiffs and members of the Class that the captive insurances companies Defendants formed, operated, and managed in connection with the Captive Insurance

112

Strategies would not fall within the safe harbor provision of Section 831(b) of the Internal Revenue Code;

(31)    Advising Plaintiffs and members of the Class that taking loans and distributions from the captive insurances companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies complied with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(32)    Failing to advise Plaintiffs and members of the Class that taking loans and distributions from the captive insurances companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies did not comply with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(33)    Advising Plaintiffs and members of the Class that circular cash flows between them and the captive insurances companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies complied with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(34)    Failing to advise Plaintiffs and members of the Class that circular cash flows between them and the captive insurances companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies did not comply with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(35)    Advising Plaintiffs and members of the Class that premiums paid to the captive insurance companies would be tax deductible;

(36)    Failing to advising Plaintiffs and members of the Class that premiums paid to the captive insurance companies would not be tax deductible

(37)    Advising Plaintiffs and members of the Class that the deductions created by the Captive Insurance Strategies were legitimate, proper, and in accordance with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(38)      Failing to advise Plaintiffs and members of the Class that the deductions created by the Captive Insurance Strategies were not legitimate, proper, and in accordance with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(39)      Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies lacked the required business purpose and economic substance;

(40)      Failing to advise Plaintiffs and members of the Class that the insurance policies used to implement the Captive Insurance Strategies were significantly overpriced;

(41)      Making and endorsing the statements and representations contained in the Defendants' and the Other Participants' oral advice, instructions, and recommendations;

(42)      Failing to advise Plaintiffs and members of the Class that each of the Defendants and the Other Participants were not "independent" of one another and in fact were involved in a conspiracy to design, market, sell, and implement the Captive Insurance Strategies;

(43)      Advising, instructing, and assisting Plaintiffs and members of the Class in the purchase and execution of the captive insurance policies;

(44)      Failing to revise, alter, amend, or modify the advice, recommendations, instructions, opinions, and representations made to Plaintiffs and members of the Class, orally or in writing, regarding the propriety of the Captive Insurance Strategies;

(45)      Advising, instructing, and assisting in the preparation of the tax return for Plaintiffs and members of the Class, which reported the premiums, fees, and expenses generated in connection with the Captive Insurance Strategies;

(46)      Preparing the tax returns for the captive insurances companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies and advising Plaintiffs and members of the Class to sign, file, and rely upon these tax returns;

(47)     Advising Plaintiffs and members of the Class to use the premiums, fees, and expenses generated in connection with the Captive Insurance Strategies on the tax returns of Plaintiffs and members of the Class;

(48)     Failing to advise Plaintiffs and members of the Class not to use the premiums, fees, and expenses generated in connection with the Captive Insurance Strategies on the tax returns of Plaintiffs and members of the Class;

(49)     Advising Plaintiffs and members of the Class that their tax returns, which utilized the reduction in taxes generated by the Captive Insurance Strategies, were prepared pursuant to and/or complied with IRS guidelines and established legal authorities;

(50)     Failing to advise Plaintiffs and members of the Class that their tax returns, which utilized the reduction in taxes generated by the Captive Insurance Strategies, were not prepared pursuant to and/or complied with IRS guidelines and established legal authorities;

(51)     Failing to disclose existing published authority that indicated that the purported tax consequences for transactions such as the Captive Insurance Strategies were improper and not allowable for federal income tax purposes;

(52)     Advising Plaintiffs and members of the Class that the Captive Insurance Strategies the Defendants and the Other Participants advised Plaintiffs and members of the Class to execute complied with the applicable tax and insurance laws, rules, regulations, common law doctrines, and published court decisions;

(53)     Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies the Defendants and the Other Participants advised Plaintiffs and members of the Class to execute did not comply with the applicable tax and insurance laws, rules, regulations, common law doctrines, and published court decisions;

(54)     Failing to advise Plaintiffs and members of the Class that the step transaction, sham transaction, business purpose and economic substance doctrines would disallow the tax benefits of the Captive Insurance Strategies;

115

(55) Advising Plaintiffs and members of the Class that each of the various steps of the Captive Insurance Strategies were meaningful and imbued with the requisite non-tax considerations;

(56) Recommending, instructing, and advising Plaintiffs and members of the Class that they would receive substantial tax advantages by entering into policies with the captive insurer as part of a tax strategy;

(57) Advising Plaintiffs and members of the Class that the premium prices of the captive insurance companies were calculated through actuarially sound methods;

(58) Failing to advise Plaintiffs and members of the Class that their premiums for the insurance policies were not in fact arrived at by actuarial calculations but were instead dictated by Artex to target a certain level of deductions;

(59) Failing to advise Plaintiffs and members of the Class that they would be assessed back taxes, penalties, and/or interest by the IRS and/or Tax Court for claiming tax reductions generated by the Captive Insurance Strategies;

(60) Advising Plaintiffs and members of the Class that the management of the investments of each individual captive insurance company would comply with the tax code and prevailing insurance industry standards;

(61) Failing to advise Plaintiffs and members of the Class that the management of the investments of each individual captive insurance company would not comply with the tax code and prevailing insurance industry standards;

(62) Advising Plaintiffs and members of the Class, both before and after the IRS audit, that the Captive Insurance Strategies they executed were different and distinguishable from other Captive Insurance Strategies that the IRS and/or Tax Court had disallowed;

(63) Failing to advise Plaintiffs and members of the Class, both before and after the IRS audit, that the Captive Insurance Strategies they executed were not different and distinguishable from other Captive Insurance Strategies that the IRS and/or Tax Court had disallowed;

116

(64)     Advising Plaintiffs and members of the Class that they should challenge the IRS in both audit and Tax Court proceedings because Plaintiffs and members of the Class would prevail and the Captive Insurance Strategies would be allowed;

(65)     Failing to advise Plaintiffs and members of the Class that they should not challenge the IRS in both audit and Tax Court proceedings because Plaintiffs and members of the Class would not prevail and the Captive Insurance Strategies would be disallowed;

(66)     Advising Plaintiffs and members of the Class that they would prevail in litigation with the IRS on the merits of the Captive Insurance Strategies; and

(67)     Failing to advise Plaintiffs and members of the Class that they would not prevail in litigation with the IRS on the merits of the Captive Insurance Strategies and would be assessed back taxes, penalties, and interest.

322.    The Defendants' breaches were a proximate cause of damages to Plaintiffs and the Class.   In reasonable reliance on Defendants' advice regarding the Captive Insurance Strategies, Plaintiffs and the Class: (1) paid fees and premiums to the Defendants and Other Participants for insurance, tax, investment, financial, and legal advice; (2) did not avail themselves of legitimate tax savings opportunities; (3) filed federal tax returns that reflected deductions for premiums paid in connection with the Captive Insurance Strategies; and (4) spent substantial funds defending the IRS audits and in the Tax Court proceedings.  But for Defendants' breaches, Plaintiffs and the Class would not have hired Defendants and the Other Participants for advice on the Captive Insurance Strategies, engaged in the Captive Insurance Strategies, paid substantial fees and insurance premiums in connection with the Captive Insurance Strategies,  filed and signed federal and state tax returns that reflected deductions of premiums paid in connection with the Captive Insurance Strategies, failed to avail themselves of other

legitimate tax savings opportunities, failed to file qualified amended returns, and/or spent substantial funds disputing the IRS audits and Tax Court challenges.

323.   As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial but in excess of $75,000.00 and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT VI
## NEGLIGENCE/PROFESSIONAL MALPRACTICE

324.   Plaintiffs repeat and reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

325.   As the insurance, tax, legal, financial and investment advisors for Plaintiffs and the members of the Class, Defendants owed Plaintiffs and the members of the Class a duty to comply with the applicable standards of care and the applicable provision of their codes of professional responsibility.

326.   Defendants failed to meet those applicable standards of care.  Defendants' failure to meet the standard of care proximately caused damages to the Plaintiffs as set forth elsewhere in this Complaint.

327.   Defendants' failures to meet the applicable standards of care constitute negligence.

328.   The actions of all Defendants rise to the level of gross negligence. Accordingly, Plaintiffs and the members of the Class seek punitive/exemplary damages against the Defendants, jointly and severally.

329.   The Defendants' negligence/gross negligence was a proximate cause of the damages for Plaintiffs and members of the Class.  In reasonable reliance on Defendants' professional advice regarding the Captive Insurance Strategies, Plaintiffs and members of the Class: (1) paid fees and premiums to the Defendants and Other Participants for insurance, tax, investment, financial, and legal advice; (2) did not avail themselves of legitimate tax savings opportunities; and (3) filed federal tax returns that reflected deductions for premiums paid in connection with the Captive Insurance Strategy.  But for Defendants' negligence/gross negligence, Plaintiffs and members of the Class would not have hired Defendants and the Other Participants for advice on the Captive Insurance Strategies, engaged in the Captive Insurance Strategies, paid substantial fees and insurance premiums in connection with the Captive Insurance Strategies,  filed and signed federal and state tax returns that reported deductions of premiums paid in connection with the Captive Insurance Strategies, failed to avail themselves of other legitimate tax savings opportunities, failed to file qualified amended returns, and/or spent substantial funds fighting the IRS audits and in Tax Court proceedings.

330.   As a result of the Defendants' negligent and grossly negligent misrepresentations and omissions, Plaintiffs and members of the Class incurred substantial additional costs in hiring new tax and legal advisors to rectify the situation.

331.   Defendants' negligence/gross negligence proximately caused damages to Plaintiffs and members of the Class in that (1) they paid significant fees and premiums to the Defendants and Other Participants, (2) Plaintiffs and members of the Class owe substantial back-taxes, penalties, and interest, (3) Plaintiffs and members of the Class

spent substantial funds fighting the IRS audits and in Tax Court challenges, (4) Plaintiffs and members of the Class lost the opportunity to avail themselves of other legitimate tax-savings opportunities, and (5) Plaintiffs and members of the Class have and will continue to incur substantial additional costs to rectify the situation.

332.    As a proximate cause of the foregoing, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $75,000.00 and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

**COUNT VII**
**NEGLIGENT MISREPRESENTATION**

333.    Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

334.    During the course of their representation of Plaintiffs and members of the Class, Defendants each negligently made numerous affirmative representations, including those misrepresentations and omissions detailed in Count XI below, that were incorrect, improper, or false; negligently made numerous misleading omissions of material fact; and negligently gave numerous improper, inaccurate, and wrong recommendations, advice, instructions, and opinions to Plaintiffs and members of the Class.

335.    Defendants either knew or reasonably should have known that their representations, recommendations, advice and instructions were improper, inaccurate, or wrong.  Defendants either knew or reasonably should have known that their failures to disclose material information to Plaintiffs and members of the Class were improper and wrong and would mislead Plaintiffs and members of the Class.

120

336.   The Defendants' negligent and grossly negligent misrepresentations were a proximate cause of the damages of the Plaintiffs and members of the Class.  In reasonable reliance on Defendants' advice regarding the Captive Insurance Strategies, Plaintiffs and members of the Class: (1) paid substantial premiums and fees to the Defendants and Other Participants for insurance, tax, financial, investment, and legal advice; (2) did not avail themselves of legitimate tax savings opportunities; (3) filed federal tax returns that reflected deductions for premiums paid in connection with the Captive Insurance Strategy; and (4) spent substantial funds defending the IRS audits and in the Tax Court proceedings.

337.   But for Defendants' negligent and grossly negligent misrepresentations and material omissions described above, Plaintiffs and members of the Class would not have hired Defendants and the Other Participants for advice on the Captive Insurance Strategies, engaged in the Captive Insurance Strategies, paid premiums to effectuate the Captive Insurance Strategies,  filed and signed federal and state tax returns that reported deductions of premiums paid in connection with the Captive Insurance Strategies, failed to avail themselves of other legitimate tax savings opportunities, and/or spent substantial funds fighting the IRS audits and in Tax Court challenges.

338.   As a result of the Defendants' negligent and grossly negligent misrepresentations and omissions, Plaintiffs and members of the Class incurred substantial additional costs in hiring new tax and legal advisors to rectify the situation.

339.   The Defendants' conduct set forth herein proximately caused Plaintiffs and members of the Class to suffer injury in that Plaintiffs and members of the Class (1) paid

significant premiums and fees to the Defendants and Other Participants, (2) owe substantial back-taxes, penalties, and interest, (3) lost the opportunity to avail themselves of other legitimate tax-savings opportunities, (4) spent substantial funds defending the IRS audits and in the Tax Court proceedings; and (5) Plaintiffs and members of the Class have and will continue to incur substantial additional costs to rectify the situation.

340.    As a proximate cause of the foregoing, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $75,000.00 and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest and costs.

**COUNT VIII**
**DISGORGEMENT**

341.    Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

342.    As a result of Defendants' breach of their fiduciary duties, they should be required to disgorge all payments received by them from Plaintiffs and members of the Class or from any entity for work performed in connection with the Captive Insurance Strategies.

343.    Additionally, regardless of the merits of the insurance, tax, legal, financial and investment advice and services Defendants rendered to Plaintiffs and members of the Class, the fees the Defendants charged and which Plaintiffs and members of the Class paid are unlawful.

344.    Further, the Defendants did not disclose information that they were required to disclose—*i.e.,* the Defendants' pre-planned scheme; the Defendants conspired

to design, market, sell, implement, and manage the Captive Insurance Strategies; the Defendants had a significant pecuniary interest in the Captive Insurance Strategies; and the Defendants' representation of Plaintiffs and members of the Class and their arrangement with the other Defendants violated the applicable rules of professional conduct.  Due to these failures to disclose and misconduct, the Defendants' fee agreements with Plaintiffs and members of the Class are not enforceable.

345.   Accordingly, the Defendants must disgorge their fees to Plaintiffs and members of the Class in an amount far in excess of $75,000.00.  In addition, Plaintiffs and members of the Class seek an award of attorneys' fees, interest, and costs.

## COUNT IX
## RESCISSION

346.   Plaintiffs and members of the Class reallege and incorporate each and every prior factual allegation set forth in the preceding paragraphs as if fully set forth herein.

347.   Plaintiffs and members of the Class and Defendants entered into several agreements in connection with the Captive Insurance Strategies (collectively "Agreements").  In deciding to enter into the Agreements, Plaintiffs and members of the Class relied on numerous material knowingly false affirmative representations and intentional omissions of material fact Defendants made to Plaintiffs and members of the Class.  Had Defendants not made those misrepresentations or omissions, Plaintiffs and members of the Class would not have entered into the Agreements.  Defendants made those misrepresentations and omissions with the intent that Plaintiffs and members of the Class would rely on them.  Plaintiffs and members of the Class are not in breach of any of their obligations pursuant to the Agreements.

348. Further, as set forth above, the Agreements that Plaintiffs and members of the Class entered into with Defendants were procured by fraud, and Defendants fraudulently induced Plaintiffs and members of the Class to enter into these Agreements in furtherance of the conspiracy between and among the Defendants and the Other Participants.

349. Plaintiffs and members of the Class seek rescission of the Agreements. In addition, Plaintiffs and members of the Class seek an award of attorneys' fees, interest, and costs.

**COUNT X**
**BREACH OF CONTRACT AND BREACH**
**OF THE DUTY OF GOOD FAITH AND FAIR DEALING**
**(IN THE ALTERNATIVE)**

350. Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

351. In the alternative to the fraud and rescission claims of Plaintiffs and members of the Class, Plaintiffs and members of the Class entered into oral and/or written contracts, including the Agreements that constituted valid and existing agreements with Defendants. As a result, Defendants owed the Plaintiffs and members of the Class a duty of good faith and fair dealing under applicable law. This contractual duty includes all promises which a reasonable person in the position of Plaintiffs and members of the Class would be justified in understanding were included and it prohibits Defendants from acting in a manner which would have the effect of destroying or injuring the right of Plaintiffs and members of the Class to receive the fruits of the

agreements.   In this instance, that includes explicit and/or implicit promises that the Captive Insurance Strategies were legal tax-advantaged captive insurance strategies.

352.   Based on the foregoing, Defendants breached their agreements with Plaintiffs and members of the Class, and their duty of good faith and fair dealing, by, among other things, structuring the Captive Insurance Strategies in a manner that violated applicable tax and insurance laws, improperly advising Plaintiffs that they could deduct the insurance premiums on their respective tax returns, and by failing to provide accurate, independent advice regarding the Captive Insurance Strategies.

353.   Plaintiffs and members of the Class entered into oral and/or written contracts to provide Plaintiffs and members of the Class with competent, proper, and accurate insurance, legal, financial, investment, and tax advice and services and to design, develop, sell, implement and manage completely legal tax-advantaged Captive Insurance Strategies.   Defendants breached their oral and/or written contracts with the Plaintiffs and members of the Class.

354.   Plaintiffs and members of the Class fully performed their obligations under these contracts and thus did not contribute to Defendants' breaches in any way.

355.   As a result of Defendants' breaches of contract and breaches of the duty of good faith, Plaintiffs and members of the Class have suffered injury in that (1) they paid significant premiums and fees to the Defendants and Other Participants, (2) they owe substantial back-taxes, penalties, and interest, (3) Plaintiffs and members of the Class lost the opportunity to avail themselves of other legitimate tax-savings opportunities, (4) they spent substantial funds defending the IRS audit and in Tax Court proceedings, and (5)

Plaintiffs and members of the Class have incurred substantial additional costs to rectify the situation.

356.    As a proximate cause of the foregoing, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $75,000.00 and should be awarded all actual, consequential, and incidental damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT XI
## FRAUD

357.    Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

358.    In order to induce Plaintiffs and members of the Class to pay them substantial fees, Defendants directly—and indirectly—through the Other Participants— made numerous knowingly false affirmative misrepresentations and intentional omissions of material fact to Plaintiffs and members of the Class, including but not limited to:

(1)    Advising and recommending that Plaintiffs and members of the Class engage in illegal and abusive tax shelters, the Captive Insurance Strategies;

(2)    Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies were illegal and abusive tax shelters;

(3)    Advising Plaintiffs and members of the Class that the Captive Insurance Strategies would be upheld as a legal tax-advantaged captive insurance strategy if audited;

(4)    Failing to Advise Plaintiffs and members of the Class that the Captive Insurance Strategies would not be upheld as a legal captive insurance strategy if audited;

(5)    Advising Plaintiffs and members of the Class that the IRS would allow the Captive Insurance Strategies;

126

(6)     Failing to advise Plaintiffs and members of the Class that the IRS would not allow the Captive Insurance Strategies;

(7)     Advising Plaintiffs and members of the Class that the Captive Insurance Strategies involved the purchase of bona fide insurance;

(8)     Failing to advise Plaintiffs and members of the Class that that the Captive Insurance Strategies did not involve the purchase of bona fide insurance;

(9)     Advising Plaintiffs and the members of the Class that the Captive Insurance Strategies provided insurance coverages that were highly rated by the insurance industry;

(10)    Failing to advise Plaintiffs and the members of the Class that the Captive Insurance Strategies provided insurance coverages that were not highly rated by the insurance industry;

(11)    Advising Plaintiffs and members of the Class that the Captive Insurance Strategies covered gaps in commercial coverage for material risks facing Captive Insurance Strategy clients;

(12)    Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies did not cover gaps in commercial coverage for material risks facing Captive Insurance Strategy clients;

(13)    Advising Plaintiffs and members of the Class that the risks covered by the Captive Insurance Strategies were actual risks;

(14)    Failing to advise Plaintiffs and members of the Class that the risks covered by the Captive Insurance Strategies were not actual risks;

(15)    Advising Plaintiffs and members of the Class that the captive insurance companies that Defendants formed, operated, and managed in connection with the Captive Insurance Strategies would be operated as normal insurance companies;

(16)    Failing to advise Plaintiffs and members of the Class that the captive insurance companies that Defendants formed, operated, and in connection with the Captive Insurance Strategies would not be operated as normal insurance companies;

127

(17)     Advising Plaintiffs and members of the Class that the pooling arrangements of the Captive Insurance Strategies through Provincial or the core of a protected cell company complied with all risk shifting and risk distribution requirements;

(18)     Failing to advise Plaintiffs and members of the Class that the pooling arrangements of the Captive Insurance Strategies through Provincial or the core of a protected cell company did not comply with all risk shifting and risk distribution requirements;

(19)     Advising Plaintiffs and members of the Class that if they filed tax returns that deducted the premiums, fees, and expenses of the Captive Insurance Strategies they could not be liable for taxes, penalties, and/or interest;

(20)     Failing to disclose to Plaintiffs and members of the Class that if they filed tax returns that deducted the premiums, fees, and expenses of the Captive Insurance Strategies they would be liable for taxes, penalties and interest;

(21)     Advising Plaintiffs and members of the Class that the captive insurance companies would comply with Section 831(b) of the Internal Revenue Code and therefore would not pay taxes on the premiums they received;

(22)     Failing to advise Plaintiffs and members of the Class that the captive insurance companies would not comply with Section 831(b) of the Internal Revenue Code and therefore would pay taxes on the premiums they received;

(23)     Advising Plaintiffs and members of the Class that the captive insurances companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies would fall within the safe harbor provision of Section 831(b) of the Internal Revenue Code;

(24)     Failing to advise Plaintiffs and members of the Class that the captive insurances companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies would not fall within the safe harbor provision of Section 831(b) of the Internal Revenue Code;

(25)     Advising Plaintiffs and members of the Class that taking loans and distributions from the captive insurances companies Defendants formed, operated, and managed in connection

128

with the Captive Insurance Strategies complied with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(26)    Failing to advise Plaintiffs and members of the Class that taking loans and distributions from the captive insurances companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies did not comply with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(27)    Advising Plaintiffs and members of the Class that circular cash flows between them and the captive insurances companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies complied with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(28)    Failing to advise Plaintiffs and members of the Class that circular cash flows between them and the captive insurances companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies did not comply with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(29)    Advising Plaintiffs and members of the Class that premiums paid to the captive insurance companies would be tax deductible;

(30)    Failing to advising Plaintiffs and members of the Class that premiums paid to the captive insurance companies would not be tax deductible

(31)    Advising Plaintiffs and members of the Class that the deductions created by the Captive Insurance Strategies were legitimate, proper, and in accordance with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(32)    Failing to advise Plaintiffs and members of the Class that the deductions created by the Captive Insurance Strategies were not legitimate, proper, and in accordance with all applicable tax and insurance laws, rules, regulations, common law doctrines, and court decisions;

(33)   Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies lacked the required business purpose and economic substance;

(34)   Failing to advise Plaintiffs and members of the Class that the insurance policies used to implement the Captive Insurance Strategies were significantly overpriced;

(35)   Making and endorsing the statements and representations contained in the Defendants' and the Other Participants' oral advice, instructions, and recommendations;

(36)   Failing to advise Plaintiffs and members of the Class that each of the Defendants and the Other Participants were not "independent" of one another and in fact were involved in a conspiracy to design, market, sell, and implement the Captive Insurance Strategies;

(37)   Advising, instructing, and assisting Plaintiffs and members of the Class in the purchase and execution of the captive insurance policies;

(38)   Failing to revise, alter, amend, or modify the advice, recommendations, instructions, opinions, and representations made to Plaintiffs and members of the Class, orally or in writing, regarding the propriety of the Captive Insurance Strategies;

(39)   Advising, instructing, and assisting in the preparation of the tax return for Plaintiffs and members of the Class, which reported the premiums, fees, and expenses generated in connection with the Captive Insurance Strategies;

(40)   Preparing the tax returns for the captive insurances companies Defendants formed, operated, and managed in connection with the Captive Insurance Strategies and advising Plaintiffs and members of the Class to sign, file, and rely upon these tax returns;

(41)   Advising Plaintiffs and members of the Class to use the premiums, fees, and expenses generated in connection with the Captive Insurance Strategies on the tax returns of Plaintiffs and members of the Class;

(42)   Failing to advise Plaintiffs and members of the Class not to use the premiums, fees, and expenses generated in connection

130

with the Captive Insurance Strategies on the tax returns of Plaintiffs and members of the Class;

(43)   Advising Plaintiffs and members of the Class that their tax returns, which utilized the reduction in taxes generated by the Captive Insurance Strategies, were prepared pursuant to and/or complied with IRS guidelines and established legal authorities;

(44)   Failing to advise Plaintiffs and members of the Class that their tax returns, which utilized the reduction in taxes generated by the Captive Insurance Strategies, were not prepared pursuant to and/or complied with IRS guidelines and established legal authorities;

(45)   Failing to disclose existing published authority that indicated that the purported tax consequences for transactions such as the Captive Insurance Strategies were improper and not allowable for federal income tax purposes;

(46)   Advising Plaintiffs and members of the Class that the Captive Insurance Strategies the Defendants and the Other Participants advised Plaintiffs and members of the Class to execute complied with the applicable tax and insurance laws, rules, regulations, common law doctrines, and published court decisions;

(47)   Failing to advise Plaintiffs and members of the Class that the Captive Insurance Strategies the Defendants and the Other Participants advised Plaintiffs and members of the Class to execute did not comply with the applicable tax and insurance laws, rules, regulations, common law doctrines, and published court decisions;

(48)   Failing to advise Plaintiffs and members of the Class that the step transaction, sham transaction, business purpose and economic substance doctrines would disallow the tax benefits of the Captive Insurance Strategies;

(49)   Advising Plaintiffs and members of the Class that each of the various steps of the Captive Insurance Strategies were meaningful and imbued with the requisite non-tax considerations;

(50)   Recommending, instructing, and advising Plaintiffs and members of the Class that they would receive substantial tax

advantages by entering into policies with the captive insurer as part of a tax strategy;

(51)   Advising Plaintiffs and members of the Class that the premium prices of the captive insurance companies were calculated through actuarially sound methods;

(52)   Failing to advise Plaintiffs and members of the Class that their premiums for the insurance policies were not in fact arrived at by actuarial calculations but were instead dictated by Artex to target a certain level of deductions;

(53)   Failing to advise Plaintiffs and members of the Class that they would be assessed back taxes, penalties, and/or interest by the IRS and/or Tax Court for claiming tax reductions generated by the Captive Insurance Strategies;

(54)   Advising Plaintiffs and members of the Class that the management of the investments of each individual captive insurance company would comply with the tax code and prevailing insurance industry standards;

(55)   Failing to advise Plaintiffs and members of the Class that the management of the investments of each individual captive insurance company would not comply with the tax code and prevailing insurance industry standards;

(56)   Advising Plaintiffs and members of the Class, both before and after the IRS audit, that the Captive Insurance Strategies they executed were different and distinguishable from other Captive Insurance Strategies that the IRS and/or Tax Court had disallowed;

(57)   Failing to advise Plaintiffs and members of the Class, both before and after the IRS audit, that the Captive Insurance Strategies they executed were not different and distinguishable from other Captive Insurance Strategies that the IRS and/or Tax Court had disallowed;

(58)   Advising Plaintiffs and members of the Class that they should challenge the IRS in both audit and Tax Court proceedings because Plaintiffs and members of the Class would prevail and the Captive Insurance Strategies would be allowed;

(59)   Failing to advise Plaintiffs and members of the Class that they should not challenge the IRS in both audit and Tax Court

132

proceedings because Plaintiffs and members of the Class would not prevail and the Captive Insurance Strategies would be disallowed;

(60)     Advising Plaintiffs and members of the Class that they would prevail in litigation with the IRS on the merits of the Captive Insurance Strategies; and

(61)     Failing to advise Plaintiffs and members of the Class that they would not prevail in litigation with the IRS on the merits of the Captive Insurance Strategies and would be assessed back taxes, penalties, and interest.

359.    The above affirmative misrepresentations and/or intentional omissions of material fact made by each Defendant were false when made, and the Defendants knew these representations to be false when made with the intention that Plaintiffs and members of the Class rely upon them in entering into the Captive Insurance Strategies and pay them substantial fees. In addition, the above affirmative misrepresentations and/or intentional omissions of material fact were committed knowingly by the Defendants with the intent to induce Plaintiffs and members of the Class to enter into the Captive Insurance Strategies and pay Defendants substantial fees.

360.    In reasonable reliance on the Defendants' false affirmative misrepresentations and intentional omissions of material facts regarding the Captive Insurance Strategies, Plaintiffs and members of the Class paid substantial fees to Defendants, paid additional amounts to execute the Captive Insurance Strategies, unnecessarily paid premiums to effectuate the Captive Insurance Strategies, filed tax returns that reflected improper tax treatment resulting from the Captive Insurance Strategies, did not disclose the Captive Insurance Strategies on their tax returns as tax

shelters, and spent substantial funds defending the IRS audits and in Tax Court proceedings.

361.    But for Defendants' intentional misrepresentations and material omissions described above, Plaintiffs and members of the Class would not have hired Defendants and the Other Participants for advice on the Captive Insurance Strategies, engaged in the Captive Insurance Strategies, paid premiums in connection with the Captive Insurance Strategies, signed federal and state tax returns that reported deductions of premiums paid in connection with the Captive Insurance Strategies,  failed to avail themselves of other legitimate tax savings opportunities, and spent substantial funds fighting the IRS audits and in Tax Court challenges.

362.    As a result of Defendants' conduct set forth herein, Plaintiffs and members of the Class have suffered injury in that (1) they paid significant fees and premiums to the Defendants and Other Participants, (2) they owe substantial back-taxes, penalties, and interest, (3) they lost the opportunity to avail themselves of other legitimate tax-savings opportunities, (4) they spent substantial funds to defend the IRS audits and in Tax Court proceedings; and (5) they incurred substantial additional costs to rectify the situation.

363.    As a proximate cause of the foregoing injuries, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $75,000.00 and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT XII
## AIDING AND ABETTING

364.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

365.   As described more fully throughout this Complaint, each of the Defendants aided and abetted the wrongful conduct (including fraud and breaches of fiduciary duty) of each of the other Defendants.  Each Defendant was aware of its respective role and responsibility in the overall tortious activity and intentionally provided aid and substantial assistance in the other Defendants' tortious activity.

366.   As a proximate cause of Defendants' conduct set forth herein, Plaintiffs have suffered injury and damages.

367.   Plaintiffs have been injured in an actual amount to be proven at trial, but in excess of $75,000.00, and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT XIII
## CIVIL CONSPIRACY

368.   Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

369.   As described more fully above, the Defendants and the Other Participants knowingly acted in concert to design, market, sell, implement, and manage tax-advantaged captive insurance strategies that were fraudulent, illegal and abusive tax shelters—the Captive Insurance Strategies.   In furtherance of their conspiracy, the Defendants and the Other Participants conspired to perpetrate fraud on the Plaintiffs and

members of the Class.  In doing so, the Defendants and the Other Participants acted with full knowledge and awareness that the transactions were designed to give the false impression that a complex series of financial transactions were legitimate business transactions that had economic substance from an investment standpoint and complied with all applicable insurance and tax laws, when the transactions in fact lacked those features (which were necessary for a successful Captive Insurance Strategy).

370.   The Defendants and the Other Participants acted in the respective roles as described above according to a predetermined and commonly understood and accepted plan of action to perpetrate fraud on Plaintiffs (i.e., the Defendants' Arrangement), all for the purposes of obtaining fees from consumers, including the Plaintiffs and members of the Class.   The Defendants and the Other Participants authorized, ratified, and/or affirmed the fraudulent misrepresentations and omissions of material fact that each Defendant and/or Other Participant made to Plaintiffs and members of the Class.

371.   The acts of the Defendants and the Other Participants were contrary to numerous provisions of law, as stated above, and constitute a conspiracy to perpetrate fraud on Plaintiffs and members of the Class.

372.   There was a meeting of the minds between and among the Defendants and the Other Participants to commit the unlawful acts alleged herein, including a conspiracy to perpetrate fraud on Plaintiffs and members of the Class.  The conspiracy to commit these unlawful and fraudulent acts proximately caused and continue to cause damages to Plaintiffs and members of the Class as previously set forth herein.

373.     As a result of Defendants' conduct set forth herein, Plaintiffs and members of the Class have suffered injury in that (1) they paid significant fees and premiums to the Defendants and Other Participants, (2) they owe substantial back-taxes, penalties, and interest, (3) they lost the opportunity to avail themselves of other legitimate tax-savings opportunities, (4) they spent substantial funds defending the IRS audits and in Tax Court proceedings, and (5) Plaintiffs and members of the Class have and will continue to incur substantial additional costs to rectify the situation.

374.     Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $75,000.00 and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## XII.   PRAYER FOR RELIEF

375.     Based upon the foregoing, Plaintiffs request that Defendants be cited to appear and answer; that the requested class be certified for trial and/or settlement; and that on final hearing Plaintiffs and the members of the Class have judgment against Defendants, jointly and severally for:

       a.     actual, consequential, and incidental damages;

       b.     rescission and disgorgement;

       c.     pre- and post-judgment interest at the highest legal rate allowed by law;

       d.     all attorneys' fees and costs in pursuing this matter;

1

e.   punitive and treble damages in an amount to be determined at trial;

2

and

3

f.   such other and further relief, both at law and in equity, to which

4

Plaintiffs and the Class may show themselves to be justly entitled.

5

6   Dated:  December 6th, 2018          Respectfully submitted,

7

/s/ *Jeffrey R. Finley*

8   Jeffery R. Finley, AZ Bar No. 009683
**SCHNEIDER WALLACE COTTRELL**

9   **KONECKY WOTKYNS LLP**
8501 North Scottsdale Road, Suite 270

10   Scottsdale, Arizona  85253
Telephone: (480) 428-0143

11   Facsimile: (866) 505-8036
pvanzanen@schneiderwallace.com

12   jfinley@schneiderwallace.com

13

14   David R. Deary*
W. Ralph Canada, Jr.*

15   Jim L. Flegle*
Wilson E. Wray*

16   John McKenzie*
Donna Lee*

17   **LOEWINSOHN FLEGLE**

18   **DEARY SIMON LLP**
12377 Merit Drive, Suite 900

19   Dallas, Texas 75251
(214) 572-1700 Telephone

20   (214) 572-1717 Facsimile

21

22   *Attorneys for Plaintiffs*

23   *(Pro Hac Vice* applications to be filed)

24

25

26

27

28