**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Dimitri Shivkov, et al., | No. CV-18-04514-PHX-SMM |
| Plaintiffs, | **ORDER** |
| v. | |
| Artex Risk Solutions Incorporated, et al., | |
| Defendants. | |

Before the Court is Defendants' Renewed Joint Motion to Compel Individual Arbitrations (Doc. 37) and Defendants' Joint Motion to Dismiss Amended Complaint (Doc. 41). The motions have been fully briefed and are ripe for review. (See Docs. 46-47, 62-63.) Plaintiffs and Defendants requested oral argument. (Doc. 37 at 1; Doc. 47 at 1.) The Court denies the request because the issues have been fully briefed and oral argument will not aid the Court's decision. See Fed. R. Civ. P. 78(b) (court may decide motions without oral hearing); LRCiv 7.2(f) (same). For the reasons that follow, the Court will grant the Renewed Joint Motion to Compel Individual Arbitrations (Doc. 37) and deny as moot the Joint Motion to Dismiss Amended Complaint (Doc. 41).

**I.     BACKGROUND**

Plaintiffs are a number of individuals and corporate entities who separately contracted with either Defendant Artex Risk Solutions Inc. ("Artex") or Defendant TSA Holdings LLC f/k/a Tribeca Strategic Advisors LLC ("Tribeca") to create captive insurance companies that Plaintiffs believed would alleviate their tax burden while also

providing insurance benefits. According to Plaintiffs, Artex and Tribeca, along with Defendants TBS LLC d/b/a PRS Insurance, Karl Huish, Jeremy Huish, Jim Tehero, Arthur Gallagher & Co., Debbie Inman, Epsilon Actuarial Solutions LLC, Julie A. Ekdom, AmeRisk Consulting LLC, Provincial Insurance, Tribeca Strategic Accountants LLC, and Tribeca Strategic Accountants PLC (collectively, "Defendants") made material misrepresentations and omissions to induce Plaintiffs to hire Artex or Tribeca to set up and manage captive insurance companies for Plaintiffs, even though Defendants knew the captive insurance products could not and were not delivering the advantages Defendants promised. (Doc. 31 at 24-32.)

A captive insurance company is an insurance company that is owned by its own insured. (Id. at 33.) There are two advantages to owning one's own insurance company. First, for the insured, the premium paid to the captive is deductible to the insured for tax purposes. (Id.) Second, for the captive and its owners, the premiums received are not taxable as income. (Id.) The captive must satisfy certain criteria for the Internal Revenue Service (the "IRS") to consider the captive as a bona fide insurance company and recognize the associated tax benefits. (Id. at 33-34.)

Artex and Tribeca[1] assist owners of closely held companies to form captives. (Id. at 36.) According to Plaintiffs, Artex and Tribeca followed the same policies, practices, and procedures for each client in forming these captives. (Id.) First, Artex or Tribeca gave clients a sales presentation regarding captive insurance. (Id.) Then, if the client indicated that he or she wished to proceed, Artex or Tribeca arranged for the preparation of a feasibility study, which was paid for by the client. (Id. at 36-37.) If the client elected to retain Artex or Tribeca to form a captive, Artex or Tribeca would then form the captive and manage all captive operations, for which Artex and Tribeca would charge a fee. (Id. at 37.)

---

[1] According to Plaintiffs, Tribeca was established by Defendant Karl Huish in 1999. (Doc. 31 at 36.) In December 2010, Artex acquired substantially all of the assets of Tribeca, and Karl Huish and his associates continue to operate in Arizona through Artex. (Id.) In some sections, the FAC appears to discuss Artex and Tribeca as if they are the same entity. However, because they are separate entities that formed contractual relationships with different Plaintiffs at different times, the Court will designate them separately.

Each Plaintiff either hired Artex or Tribeca or had some interest in an entity that hired Artex or Tribeca to form, operate, and manage their captive(s). (Id. at 42, 65, 74, 83.) These arrangements were formalized in engagement agreements between a Plaintiff or Plaintiff's representative and either Artex or Tribeca (the "Agreements").[2] (Docs. 38-2, 38-3, 38-4, 38-5.) The Agreements outline the responsibilities of the parties, the fees to be paid for Artex's or Tribeca's services, and the legal relationship between the parties. (See, generally, id.) Plaintiffs allege that Defendants[3] made material misrepresentations to Plaintiffs at each stage of the process outlined above to induce Plaintiffs to hire them to form and manage their captives in exchange for substantial fees. (Doc. 31 at 29-30.) While Plaintiffs identify many specific, alleged misrepresentations and omissions, the crux of their allegations is that Defendants represented to Plaintiffs that the captives qualified as bona fide insurance companies and, as such, would allow Plaintiffs to obtain beneficial tax treatment. (Id. at 99.) After Plaintiffs had paid substantial fees to Defendants for formation and management of their captives and had claimed the tax benefits of owning a captive insurance company, the IRS disallowed the tax benefits claimed by Plaintiffs, requiring Plaintiffs to pay substantial back taxes, penalties, and interest to the IRS. (Id. at 65, 73, 82, 91.)

On December 6, 2019, Plaintiffs, on behalf of themselves and others similarly situated, filed suit against Defendants with a putative class of "hundreds if not thousands." (Doc. 1 at 74; Doc. 31 at 94.) Defendants[4] then filed a Joint Motion to Compel Individual Arbitrations (Doc. 22) and a Joint Motion to Dismiss (Doc. 24). Plaintiffs subsequently

---

[2] There are twelve Agreements at issue before the Court. (Docs. 38-2, 38-3, 38-4, 38-5.) Some were countersigned by Tribeca and some were countersigned by Artex. They vary in some particulars. However, all of the Agreements are essentially identical in the portions at issue in the instant motion. Therefore, the Court focuses its analysis on the Agreement between Artex and Plaintiff Dimitiri Shivkov as representative of the Artex Agreements (Doc. 38-2 at 1-9), and the Agreement between Tribeca and Plaintiff Keith Butler as representative of the Tribeca Agreements (Doc. 38-2 at 19-34).

[3] Plaintiffs plead most of their allegations generally against "Defendants," as a collective. Because the Court lacks further factual detail at this stage of litigation, the Court repeats Plaintiffs' group pleading here.

[4] Defendants Tribeca Strategic Accountants LLC and Tribeca Strategic Accountants PLC were not named as defendants in the original complaint and were not parties to this motion.

filed their First Amended Complaint (the "FAC") on March 29, 2019, mooting the previous motions.[5] (Doc. 31.) The FAC brings claims for breach of fiduciary duty, negligence, negligent misrepresentation, disgorgement, rescission, breach of contract and duty of good faith and fair dealing, fraud, civil conspiracy, aiding and abetting breach of fiduciary duty and fraud, as well as violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") and Arizona's RICO statute. (Doc. 31 at 25.) Defendants[6] then filed their Renewed Joint Motion to Compel Individual Arbitrations and their Joint Motion to Dismiss Amended Complaint on April 12, 2019, and April 19, 2019, respectively. (Docs. 37, 41.) Because the Court finds each of Plaintiffs' claims against Defendants are subject to a binding arbitration clause, the Court will grant the Renewed Joint Motion to Compel Individual Arbitrations and deny as moot the Joint Motion to Dismiss Amended Complaint.

## II.   LEGAL STANDARD

Outside of a few exceptions, the Federal Arbitration Act (the "FAA") "governs the enforceability of arbitration agreements in contracts involving interstate commerce." Kramer v. Toyota Motor Corp., 705 F.3d 1122, 1126 (9th Cir. 2013) (citing 9 U.S.C. § 1 et seq.). Under the FAA, "arbitration is a matter of contract, and courts must enforce arbitration contracts according to their terms." Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 529 (2019) (citing Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 67 (2010)). However, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1131 (9th Cir. 2000) (quoting Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24-25 (1983)).

---

[5] For this reason, the Joint Motion to Compel Individual Arbitrations and the Joint Motion to Dismiss will be denied as moot.

[6] The motion was originally filed by Defendants Artex, Arthur J. Gallagher & Co., Debbie Inman, Epsilon Actuarial Solutions LLC, Julie A. Ekdom, and AmeRisk Consulting LLC. (Doc. 37; see also Doc. 73 (noting that counsel for some Defendants on the motion had failed to appear as counsel of record, thus disallowing those Defendants' joinder in the motion).) Defendants TSA Holdings LLC f/k/a Tribeca Strategic Advisors LLC, TBS LLC d/b/a PRS Insurance, Karl Huish, Jeremy Huish, Jim Tehero, Provincial Insurance PCC, Tribeca Strategic Accountants LLC, and Tribeca Strategic Accountants PLC later joined the motion. (Docs. 72, 77.)

In determining whether an issue is subject to arbitration, the court must determine: "(1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." Brennan v. Opus Bank, 796 F.3d 1125, 1130 (9th Cir. 2015) (citing Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002)). "If the answer is yes to both questions, the court must enforce the agreement." Lifescan, Inc. v. Premier Diabetic Servs., Inc., 363 F.3d 1010, 1012 (9th Cir. 2004) (citing Chiron Corp., 207 F.3d at 1130). The court's role "is strictly limited to determining arbitrability and enforcing agreements to arbitrate, leaving the merits of the claim and any defenses to the arbitrator." Chiron Corp., 207 F.3d at 1131 (quoting Republic of Nicaragua v. Standard Fruit Co., 937 F.2d 469, 478 (9th Cir. 1991)).

"The scope of an arbitration agreement is governed by federal substantive law," Kramer, 705 F.3d at 1126 (citing Tracer Research Corp. v. Nat'l Envtl. Servs. Co., 42 F.3d 1292, 1294 (9th Cir. 1994)), while state law "govern[s] issues concerning the validity, revocability, and enforceability of contracts generally." Kilgore v. KeyBank, Nat'l Ass'n, 718 F.3d 1052, 1058 (9th Cir. 2013) (quoting Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 685-87 (1996)); see also Rent-A-Ctr., 561 U.S. at 68 (quoting Doctor's Assocs., 517 U.S. at 687) (holding arbitration agreements "may be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability'"). The court "interpret[s] the contract by applying general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration." Wagner v. Stratton Oakmont, Inc., 83 F.3d 1046, 1049 (9th Cir. 1996) (citing Intel Corp. v. Advanced Micro Devices, Inc., 12 F.3d 908, 914 (9th Cir. 1993)).

Where an issue is subject to arbitration, a court has authority, upon application of one of the parties, to stay the case pending arbitration. 9 U.S.C. § 3. However, where all claims in a suit are barred by an arbitration clause, the court may grant a dismissal. Johnmohammadi v. Bloomingdale's, Inc., 755 F.3d 1072, 1074 (9th Cir. 2014) (citing Sparling v. Hoffman Const. Co., 864 F.2d 635, 638 (9th Cir. 1988)).

III.    ANALYSIS

Each of the twelve Agreements signed by Plaintiffs[7] include an identical dispute resolution provision (the "Arbitration Clause" or "Clause"), which reads:

> You and we agree that in the event of any dispute that cannot be resolved between the parties, that we will agree to seek to resolve such disputes through mediation in Mesa, Arizona, and if that fails, that all disputes will be subject to binding arbitration in Mesa, Arizona, with arbitrators to be agreed upon by the parties, and if no agreement is reached, then arbitrated by the American Arbitration Association (AAA). Each party shall bear its own costs in such mediation and arbitration. To reduce time and expenses, we each waive our right to litigate against one another regarding the services provided and obligations pursuant to this Agreement, and instead you and we have chosen binding arbitration. All claims or disputes will be governed by Arizona law.

(Doc. 38-2 at 7, 29-30.) In their Renewed Joint Motion to Compel Individual Arbitrations, Defendants argue that under this Arbitration Clause, all of Plaintiffs' claims must be arbitrated individually. (Doc. 37 at 2.) Plaintiffs do not dispute that the Agreements signed by Plaintiffs include the Arbitration Clause. However, they argue that the Clause is unenforceable because: (1) Defendants breached their fiduciary duties in obtaining the agreement to arbitrate; (2) the Arbitration Clause is substantively and procedurally unconscionable; (3) the terms of the Arbitration Clause were beyond Plaintiffs' reasonable expectations; and (4) the Arbitration Clause terminated when the Agreements ended. (Doc. 47 at 8-9.) Plaintiffs further contend that, even if the Arbitration Clause is enforceable, it only governs Plaintiffs' breach-of-contract claim against Artex and Tribeca. (Id. at 9.) All other Defendants, Plaintiffs argue, are not signatories to the Agreements and, therefore, may not enforce it; and all other claims fall outside the scope of the Arbitration Clause. (Id.) The Court considers each of these arguments in turn.

**A. There Is an Enforceable Agreement to Arbitrate**

1.  Breach of Fiduciary Duty

Plaintiffs argue that the Arbitration Clause is invalid because Defendants breached

---

[7] No party contests that the Agreements are binding on all Plaintiffs.

their fiduciary duties by failing to notify Plaintiffs of the Arbitration Clause and explain its meaning. (Doc. 47 at 9.) Defendants dispute that they had any fiduciary relationship with Plaintiffs. (Doc. 63 at 7-8.)

A fiduciary duty arises when "the fiduciary holds 'superiority of position' over the beneficiary." Standard Chartered PLC v. Price Waterhouse, 945 P.2d 317, 335 (Ariz. Ct. App. 1996) (quoting Rhoads v. Harvey Publ'ns, Inc., 700 P.2d 840, 847 (Ariz. Ct. App. 1984)). This superiority of position exists largely when the degree of confidence in the other constitutes "substitution of that other's will for his in the material matters involved." In re Guardianship of Chandos, 504 P.2d 524, 526 (Ariz. Ct. App. 1972) (quoting 15A C.J.S. Confidential, p. 352). "Mere trust in another's competence or integrity" is insufficient to create a fiduciary relationship. Standard Chartered, 945 P.2d at 335 (citing Stewart v. Phoenix Nat'l Bank, 64 P.2d 101, 106 (Ariz. 1937); Rhoads, 700 P.2d at 846-47). Nor is a fiduciary relationship established where the alleged beneficiary defers to the superior knowledge of the alleged fiduciary, "unless the knowledge is of a kind beyond the fair and reasonable reach of the alleged beneficiary and inaccessible to the alleged beneficiary through the exercise of reasonable diligence." Id. at 336 (citing Denison State Bank v. Madeira, 640 P.2d 1235, 1242 (Kan. 1982)). While the existence of a fiduciary duty is generally a question of fact, the court may resolve the issue where there is insufficient evidence for a jury to conclude such a relationship exists. Id. at 335 (citing Gemstar Ltd. v. Ernst & Young, 917 P.2d 222, 233-34 (Ariz. 1996)).

Plaintiffs contend that a fiduciary relationship arose between the parties because Defendants had superior knowledge of captive insurance and tax law and Defendants influenced Plaintiffs in deciding to pursue the captive insurance strategy. (Doc. 47 at 10.) While such superior knowledge and influence may have created a fiduciary duty at some point in the parties' relationship – a question the Court does not resolve here – Plaintiffs provide no evidence or case law to support the proposition that such a duty extended to the negotiation of commercial terms between the parties. See Dueñas v. Life Care Ctrs. of Am., Inc., 336 P.3d 763, 771 (Ariz. Ct. App. 2014) (finding arbitration clause enforceable

because plaintiff failed to cite authority subjecting defendant nursing facility to a fiduciary duty "in connection with the purely commercial aspects of their relationship," including the arbitration agreements). Instead, Plaintiffs rely wholly upon the district court's holding in <u>Katt v. Riepe</u>, No. CV-14-08042-PCT-DGC, 2014 WL 3720515 (D. Ariz. July 25, 2014), for the proposition that a fiduciary owes a general duty to identify and explain an arbitration clause to a beneficiary. (Doc. 47 at 9-10.) However, in <u>Katt</u>, the defendant brokers, while acting in their fiduciary capacity, inserted an arbitration clause into a contract they were negotiating with a third party on behalf of the plaintiffs. <u>Id.</u> at *2. The defendants did not inform the plaintiffs that the arbitration clause would alter the contractual terms the plaintiffs and defendants had already negotiated and agreed to in a previous contract. <u>Id.</u> Unlike in <u>Katt</u>, there are no allegations here that any Defendant was acting on behalf of Plaintiffs in negotiating the Agreements, or that the Arbitration Clause altered an already existing contractual relationship between fiduciary and beneficiary.

The Agreements created a commercial relationship between the parties and outlined the duties and obligations of the parties in that relationship. Plaintiffs offer no evidence to support the claim that Defendants had superior knowledge or expertise in negotiating such terms; nor was technical information regarding the Arbitration Clause beyond the reach of Plaintiffs or inaccessible through reasonable diligence. <u>See</u> <u>Standard Chartered</u>, 945 P.2d at 336 (quoting <u>Denison State Bank</u>, 640 P.2d at 1242). Therefore, mere trust in the competence of Defendants during negotiation of the Agreements did not create a fiduciary duty to explain all the terms of the contract, including the Arbitration Clause. <u>See id.</u> at 335 (citing <u>Stewart</u>, 64 P.2d at 106; <u>Rhoads</u>, 700 P.2d at 846-47). Accordingly, the Court finds Defendants did not breach any fiduciary duty by failing to identify and explain the Arbitration Clause.

     2.  <u>Unconscionability</u>

Next, Plaintiffs argue that the Arbitration Clause is procedurally and substantively unconscionable. (Doc. 47 at 11-15.) "It is well-established that unconscionability is a generally applicable contract defense, which may render an arbitration provision

unenforceable." <u>Coup v. Scottsdale Plaza Resort, LLC</u>, 823 F. Supp. 2d 931, 947 (D. Ariz. 2011) (citing <u>Doctor's Assocs.</u>, 517 U.S. at 686-87). Procedural unconscionability addresses the fairness of the bargaining process, while substantive unconscionability is concerned with the fairness of the actual terms of the contract. <u>Dueñas</u>, 336 P.3d at 768-69. Each doctrine provides an independent ground to invalidate an agreement. <u>Id.</u> (citing <u>Maxwell v. Fidelity Fin. Servs., Inc.</u>, 907 P.2d 51, 59 (Ariz. 1995)). The plaintiff bears the burden of proving unconscionability. <u>Pinto v. USAA Ins. Agency Inc. of Texas (FN)</u>, 275 F. Supp. 3d 1165, 1170 (D. Ariz. 2017) (citing <u>Maxwell</u>, 907 P.2d at 56; <u>Taleb v. AutoNation USA Corp.</u>, No. CV06-02013-PHX-NVW, 2006 WL 3716922, at *2 (D. Ariz. Nov. 13, 2006)). The determination of unconscionability is made by the court as a matter of law. <u>Maxwell</u>, 907 P.2d at 56 (citing A.R.S. § 47-2302).

*i. Procedural Unconscionability*

Procedural unconscionability "is concerned with 'unfair surprise,' fine print clauses, mistakes or ignorance of important facts or other things that mean bargaining did not proceed as it should." <u>Maxwell</u>, 907 P.2d at 57-58 (quoting Dan B. Dobbs, 2 Law of Remedies 706 (2d ed. 1993)). In determining procedural unconscionability, a court considers factors such as: "age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms were possible, whether there were alternative sources of supply for the goods in question." <u>Id.</u> at 58 (quoting <u>Johnson v. Mobil Oil Corp.</u>, 415 F. Supp. 264, 268 (E.D. Mich. 1976)).

Here, Plaintiffs fail to offer any evidence that Plaintiffs were not of adequate age, education, intelligence, business acumen, or experience to enter into the Agreements, including the Arbitration Clause. In fact, Plaintiffs attempt to obscure this aspect of the analysis by omitting these factors from the legal standard entirely. (<u>See</u> Doc. 47 at 13 (citing <u>Maxwell</u>, 907 P.2d at 58).) The fact that Plaintiffs negotiated agreements to pay "substantial" annual fees to avoid tax liability indicates that Plaintiffs are sophisticated people and businesses capable of negotiating this type of commercial relationship. (<u>See</u>

Doc. 31 at 32.)

Nonetheless, Plaintiffs argue the Arbitration Clause is procedurally unconscionable because the Clause was in a "standardized contract" that Plaintiffs understood to be non-negotiable; Plaintiffs were not notified of or explained the Clause; the Clause was not clearly disclosed in the Agreement; and the Clause does not explicitly state that Plaintiffs were waiving their right to a jury. (Doc. 47 at 13-15.) These objections are insufficient to render the Clause unenforceable on unconscionability grounds.

While the Agreements may have been non-negotiable, standardized contracts, that fact alone does not render the terms of the Agreements unenforceable. See Coup, 823 F. Supp. 2d at 948 (citing Equal Emp't Opportunity Comm'n v. Cheesecake Factory, Inc., No. CV08-1207-PHX-NVW, 2009 WL 1259359, at *3 (D. Ariz. May 6, 2009)). Even an adhesion contract "is fully enforceable according to its terms unless certain other factors are present which, under established legal rules – legislative or judicial – operate to render it otherwise." Broemmer v. Abortion Servs. of Phoenix, Ltd., 840 P.2d 1013, 1016 (Ariz. 1992) (alterations omitted) (quoting Graham v. Scissor–Tail, Inc., 623 P.2d 165, 172 (Cal. 1981)).

The fact that Defendants did not identify or explain the Arbitration Clause to Plaintiffs also does not render the provision unenforceable. Even where a standardized contract is at issue, "a party to a contract is assumed to have read and understood the terms of a contract he or she signs." Coup, 823 F. Supp. 2d at 949 (citing Flores v. ADT Sec. Services, Inc., No. CIV 10-036-TUC-FRZ, 2011 WL 1211769, at *3 (D. Ariz. Jan. 31, 2011)). There is no indication that Plaintiffs were the "weaker parties" when negotiating the commercial transactions with Defendants; therefore, Defendants' failure to explain the Clause carries no weight. See Maxwell, 907 P.2d at 58 (quoting Johnson, 415 F. Supp. at 268) (identifying "whether the terms were explained to the weaker party" as a factor in determining procedural unconscionability).

Plaintiffs further contend that the Clause was unconscionable because it was found in a section entitled "About this Agreement" and was not capitalized or bolded or

separately initialed, and thus, it was obscured. (Doc. 47 at 13-14.) However, the Clause was neither obscured nor hidden. It was in the regular text of relatively short contracts and written in the same font and spacing as every other portion. (Doc. 38-2 at 7, 29-30.) Despite Plaintiffs' emphasis on the fact that the contracts were "8 to 15 **single-spaced** pages long," (Doc. 47 at 14 (emphasis in original)), there is no reason to believe that parties of Plaintiffs' sophistication were not capable of reading a contract of such length, particularly when they knew the Agreements obligated them to pay "substantial fees." (Doc. 31 at 32.)

Plaintiffs' claim that, in many cases, the Agreements were signed with other documents in a "'hurry up' fashion" is also not supported by the evidence. (See Doc. 47 at 14.) Plaintiffs do not cite any portion of the record to support this assertion. Upon its own review of the declarations submitted by Plaintiffs, the Court found only one Plaintiff who stated how long he had to review the Agreement, and he stated that he did not return the Agreement for "a few weeks." (Doc. 48 at 3.) While some Plaintiffs did state that there was pressure on them to sign and return the Agreements "so they could continue the steps that were already in process," such vague statements are not sufficient to establish that Plaintiffs were rushed in a fashion that would make the Arbitration Clause procedurally unconscionable. (Doc. 51 at 4; Doc. 54 at 4; Doc. 55 at 4; Doc. 56 at 4; Doc. 58 at 3-4.)

Lastly, Plaintiffs do not cite any case law to support their assertion that Defendants were required to clearly state that Plaintiffs were waiving their right to a jury trial. The Court is also aware of none. Furthermore, the Arbitration Clause states that the parties "each waive our right to litigate against one another." (Doc. 38-2 at 7.) This may not include the word "jury," but it is sufficiently clear for the average businessperson to understand that he was waiving his right to a jury trial. Therefore, the Court finds this argument unpersuasive.

For these reasons, Plaintiffs have failed to establish that the Arbitration Clause is procedurally unconscionable.

> ### ii.  Substantive Unconscionability

Plaintiffs also contend that the Agreements are substantively unconscionable

because they include a "Limitation of Liability" provision (the "Liability Provision") that

would prevent any recovery in this case. (Doc. 47 at 12-13.) The Liability Provision states:

> [Y]ou agree that Artex shall have no liability (whether direct or indirect, in contract, tort or otherwise) to you, or to any other person or entity related to or affiliated with you, for any losses, claims, demands, damages, liabilities, costs or expenses arising out of, in connection with, in relation to, as a result of, or by reason of this Agreement or the assistance and services rendered or contemplated hereunder (collectively, "losses"), other than losses incurred by the insurance company that have resulted primarily from our gross negligence.[8]

(Doc. 38-2 at 6.) Plaintiffs argue that as a result of this provision the Agreements fail "to

provide for all of the types of relief that would otherwise be available in court," and are,

therefore, unenforceable under Arizona law. (Doc. 47 at 13 (quoting Williams v. Atl.

Specialty Ins. Co., No. CV-18-00061-TUC-DCB, 2018 WL 2046999, at *6 (D. Ariz. May

2, 2018)).) However, the Liability Provision is not part of the Arbitration Clause. It applies

to any dispute between the parties whether the parties resolve their disputes in arbitration

or in court. Thus, Plaintiffs' objection to the Liability Provision goes to the validity of the

Agreements as a whole, not the Arbitration Clause. The Supreme Court has clearly held

that "an arbitration provision is severable from the remainder of the contract[,]" and "unless

the challenge is to the arbitration clause itself, the issue of the contract's validity is

considered by the arbitrator in the first instance." Buckeye Check Cashing, Inc. v.

Cardegna, 546 U.S. 440, 445-46 (2006). Therefore, Plaintiffs' argument that the Liability

Provision is substantively unconscionable must be resolved by the arbitrator, not by the

Court.

---

[8] The provision is slightly different in some Tribeca Agreements. It reads:

> You agree that Tribeca (and its owners, officers, employees, affiliates, vendors and agents) shall have no liability (whether direct or indirect, in contract, tort or otherwise) to you or any person or entity related to or affiliated with you for any losses, claims, taxes, demands, damages, liabilities, costs or expenses arising out of, in connection with, in relation to, as a result of, or by reason of this agreement or the services rendered or contemplated hereunder (collectively, "losses") other than the losses incurred by you which have resulted primarily and directly Tribeca's reckless and willful misconduct.

(Doc. 38-2 at 30; Doc. 38-3 at 21; Doc. 38-4 at 31, 47.)

- 12 -

1          3.  Reasonable Expectations

2          Plaintiffs also argue that the Clause is unenforceable because it violates the

3   reasonable-expectations doctrine. (Doc. 47 at 15-16.) Under Arizona law, a term in a

4   standardized contract may be unenforceable "if one party to the contract 'has reason to

5   believe that the [other party] would not have accepted the agreement if he had known that

6   the agreement contained the particular term.'" Harrington v. Pulte Home Corp., 119 P.3d

7   1044, 1050 (Ariz. Ct. App. 2005) (alteration in original) (quoting Darner Motor Sales, Inc.

8   v. Universal Underwriters Ins. Co., 682 P.2d 388, 396-97 (Ariz. 1984)). A party's reason

9   to believe the other party would not have assented to a term may be "(1) shown by the prior

10  negotiations, (2) inferred from the circumstances, (3) inferred from the fact that the term is

11  bizarre or oppressive, (4) proved because the term eviscerates the non-standard terms

12  explicitly agreed to or (5) proved if the term eliminates the dominant purpose of the

13  transaction." Id. (internal quotations omitted) (quoting Darner Motor Sales, 682 P.2d at

14  397). "Additionally, the doctrine of reasonable expectations (6) requires drafting of

15  provisions which can be understood if the customer does attempt to check on his rights and

16  consideration of (7) any other facts relevant to the issue of what the party reasonably

17  expected in this contract." Coup, 823 F. Supp. 2d at 945 (internal quotations and alterations

18  omitted) (quoting Harrington, 119 P.3d at 1051). A term is presumptively valid unless the

19  reasonable-expectations limitation is shown to apply. Harrington, 119 P.3d at 1050.

20         Plaintiffs argue the Arbitration Clause violates the reasonable-expectations doctrine

21  because (1) Defendants did not specifically inform Plaintiffs of the Clause and the fact that

22  they were waiving their right to a jury trial, and (2) the Clause was obscurely placed in the

23  "About this Agreement" section of the Agreement "when **all other** headings in the

24  Agreement are specifically labeled." (Doc. 47 at 15-16 (emphasis in original).) Both

25  arguments fail.

26         Arizona courts have specifically rejected any application of the reasonable-

27  expectations doctrine that predicates the enforceability of an arbitration agreement solely

28  upon either an express waiver of a jury trial or evidence that the right to a jury trial was

- 13 -

knowingly, voluntarily, and intelligently waived. See Harrington, 119 P.3d at 1052, 1054. Plaintiffs argue that the Arizona Supreme Court's decision in Broemmer v. Abortion Servs. of Phoenix, Ltd., 840 P.2d 1013 (Ariz. 1992), imposed such a requirement, but Plaintiffs read the court's analysis far too broadly. It is true that in finding an arbitration clause in a standardized contract beyond the reasonable expectations of a young woman seeking an abortion, the Broemmer court noted that there was no explicit waiver of the plaintiff's right to jury trial in the agreement or evidence of knowing, voluntary, and intelligent waiver by the plaintiff. Id. at 1017.[9] However, the court relied upon multiple additional factors, not present here, in finding the arbitration clause unenforceable. Id. The court found the plaintiff was a young woman seeking an abortion and experiencing a great deal of stress. Id. She had only a high school education and did not understand what arbitration was. Id. The court also emphasized the fact that the arbitration provision favored the defendants by requiring the arbitrator to be a licensed obstetrician/gynecologist. Id. Thus, the Broemmer court considered the relevant factors under the reasonable-expectations doctrine and concluded that the arbitration clause, based on the facts before the court, violated the plaintiff's reasonable expectations. See Harrington, 119 P.3d at 1054 (discussing Broemmer). None of the factors present in Broemmer are present in this case, which involves a commercial transaction between sophisticated parties and a neutral arbitration provision that does not favor either party. Therefore, the Court finds that the Arbitration Clause did not violate the reasonable-expectations doctrine because it failed to include an explicit waiver of the right to a jury trial.

Plaintiffs second argument regarding the obscurity of the Arbitration Clause is unpersuasive for the reasons already discussed. The Clause had the same font, spacing, and structure as every other provision in relatively short Agreements and was, therefore, not

---

[9] Plaintiffs also cite a California state court case for the proposition that "[t]he essential factor in determining whether a contract term is within the reasonable expectations of the weaker party is whether that 'party is . . . given plain and clear notice of the contract term.'" (Doc. 47 at 16 (citing Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc., 89 Cal. App. 4th 1042, 1057 (Cal. Ct. App. 2001)). However, the California court applies California law and directly contradicts the holding of an Arizona court that "the lack of a conspicuous and explicit waiver of the right to jury trial does not mean [an] arbitration clause [is] beyond [a party's] reasonable expectations." Harrington, 119 P.3d at 1053.

obscured. Accordingly, the Court finds that the Arbitration Clause does not violate the reasonable-expectations doctrine. See Harrington, 119 P.3d at 1053 (upholding arbitration clause where "[t]he font size for the text was neither abnormally small nor different from the other contract provisions").

### 4. Termination of the Agreement

Finally, Plaintiffs argue the Arbitration Clause is unenforceable because, for most Plaintiffs, the agreement to arbitrate ended when the Agreements were terminated pursuant to the Agreements' "Termination and Withdrawal" section (the "Termination Provision").[10] (Doc. 47 at 17-18.) The Termination Provision outlines how the Agreements may be terminated by either party and then provides a survival clause (the "Survival Clause") that reads: "The terms of this section shall survive the termination of this Agreement and/or the dissolution or other effective termination of the business of [Artex or Tribeca]." (Doc. 38-2 at 5.) Plaintiffs contend that because the Survival Clause only applies to the Termination Provision itself, under the rule of *expressio unius est exclusion alterius*, meaning "to express or include one thing implies the exclusion of the other," there is a clear implication that the parties did not intend the Arbitration Clause to survive termination of the Agreements. (Doc. 47 at 17-18.) Expressio Unius Est Exclusio Alterius, BLACK'S LAW DICTIONARY (11th ed. 2019).

It is well established that termination of an agreement does not automatically extinguish the duty to arbitrate disputes arising under an agreement. Operating Eng'rs Local Union No. 3 v. Newmont Min. Corp., 476 F.3d 690, 693 (9th Cir. 2007) (citing Nolde Bros., Inc. v. Local No. 358, Bakery & Confectionary Workers Union, 430 U.S. 243, 251-52 (1977)). There is a presumption that, absent a contrary indication, a valid arbitration clause continues to bind parties after termination of the agreement if the relevant dispute arises under that agreement. See Nolde Bros., 430 U.S. at 255; Operating Eng'rs,

---

[10] The Termination Provision is found in the Agreements with Plaintiffs Dimitri Shivkov, Robert C. Miller, John Linder, Nadim B. Bikhazi, Blake G. Welling, Bradley S. Bullard, Ryan P. Frank, and Paul M. McHale. (Doc. 38-2 at 5, 13; Doc. 38-3 at 5, 29; Doc. 38-4 at 5, 15; Doc. 38-5 at 5, 14.) It is identical in each Agreement, except to the extent that it identifies Artex or Tribeca for purposes of the dissolution and effective termination clause.

476 F.3d at 693 (quoting Litton Fin. Printing Div., Inc. v. NLRB, 501 U.S. 190, 206 (1991)). This presumption "must be negated expressly or by clear implication." Nolde Bros., 430 U.S. at 255.

The Ninth Circuit Court of Appeals has not addressed whether failure to list an arbitration clause in a survival clause is sufficient to override the presumption that an arbitration agreement continues to apply post-expiration. The Sixth Circuit, however, addressed this question in Huffman v. Hilltop Companies, LLC, 747 F.3d 391 (6th Cir. 2014). The Huffman Court held that in answering this question a court should consider "the contract as a whole – the survival clause and its relationship to the other clauses in the agreement – . . . to determine whether the parties unambiguously intended for the arbitration clause to expire with the contract." Id. at 397. Applying this standard, the Sixth Circuit noted that neither the agreement's severability nor integration clauses were listed in the survival clause and that it was illogical to conclude the parties did not intend these clauses to remain in effect after expiration of the agreement. Id. As a result, the court concluded there was ambiguity as to whether the survival clause was meant to be exhaustive and the fact that the arbitration clause was not listed in the survival clause was insufficient to overcome the presumption in favor of post-expiration arbitration. Id. At least one Ninth Circuit district court has adopted this rationale. See OwnZones Media Network, Inc. v. Sys. in Motion, LLC, No. C14-0994JLR, 2014 WL 4626302, at *7 (W.D. Wash. Sept. 15, 2014).

The Court confronts nearly identical facts here. The Agreements contain integration and severability clauses that, like the Arbitration Clause, are not included in the Survival Clause. (Doc. 38-2 at 6, 15; Doc. 38-3 at 6, 30-31; Doc. 38-4 at 6-7, 16; Doc. 38-5 at 6, 15.) Under the interpretation offered by Plaintiffs, the only provisions which would survive termination of the Agreements are those included within the Termination Provision that dictate how fees and services will be finalized and related documents distributed. (Doc. 38-2 at 5.) Just as in Huffman, "it is illogical to conclude that upon expiration of the contract, the parties no longer intended the agreement to be severable" or intended "the ban on

extrinsic evidence to be in effect only prior to the agreement's expiration." 747 F.3d at 397. Thus, it is ambiguous whether the Survival Clause is an exhaustive list of provisions intended to survive expiration of the Agreements.

Plaintiffs, however, contend that Huffman and OwnZones are distinguishable because they "involve and hinge on the combination of a broad arbitration clause and a free-standing 'survival' clause, neither of which is present here." (Doc. 47 at 18 n.15 (citing Bonner v. Michigan Logistics Inc., 250 F. Supp. 3d 388, 395-96 (D. Ariz. 2017) (citing Huffman, 747 F.3d at 397-98; OwnZones, 2014 WL 4626302, at *7)).) The Court disagrees. Huffman may have noted that the arbitration clause at issue was broadly worded and, therefore, entitled to a greater presumption of arbitrability, but the Sixth Circuit applied the "clear implication" standard set out in Nolde, which applies no matter the breadth of the arbitration clause. Id. at 395, 397-98. That is the standard the Court applies here.

There is also no indication that the "free-standing" nature of the survival clauses at issue in Huffman and OwnZone played any role in the courts' reasoning. If anything, the fact that the Survival Clause here was included within the Termination Provision, weakens Plaintiffs' argument that it was intended to be an exhaustive list of provisions surviving expiration, as it suggests that the parties simply wanted to make clear that provisions governing dissolution of the Agreements survived termination. An exhaustive survival clause was more likely to be free standing.

Because it is ambiguous whether the Survival Clause is exhaustive, there is no clear implication that the parties did not intend the Arbitration Clause to survive termination of the Agreements and the presumption in favor of arbitrability dictates that the Clause survives expiration.

As Plaintiffs do not contest that they signed the Clause and have failed to show that it is unenforceable, the Court must next determine whether the Clause covers the claims and Defendants at issue in this matter. See Brennan, 796 F.3d at 1130 (citing Howsam, 537 U.S. at 84) (holding a court must determine "(1) whether there is an agreement to arbitrate

between the parties; and (2) whether the agreement covers the dispute").

**B. The Arbitration Clause Covers All Claims Against Each Defendant**

1. <u>Claims Covered by the Arbitration Agreement</u>

Plaintiffs argue that every claim, but their breach-of-contract claim, falls beyond the scope of the Arbitration Clause. (Doc. 47 at 18-20.) Their argument relies upon the unusual structure of the Clause. In its first sentence, the Clause states broadly that the parties "agree that in the event of *any dispute* that cannot be resolved between the parties, that [they] agree to seek to resolve such disputes through mediation . . . , and if that fails, that *all disputes* will be subject to binding arbitration." (Doc. 38-2 at 7, 29-30 (emphasis added).) However, the paragraph then goes on to state: "To reduce time and expenses, we each waive our right to litigate against one another *regarding the services provided and obligations pursuant to this Agreement*, and instead you and we have chosen binding arbitration." (<u>Id.</u> (emphasis added).) Plaintiffs argue that the latter sentence narrows the broader first sentence by enumerating the specific subjects that are subject to arbitration – those "regarding the services provided and obligations pursuant to this Agreement." (Doc. 47 at 19.) They contend that another provision, which provides that "Artex does not provide any legal, tax or accounting advice,"[11] excludes tax and legal advice from the scope of the Agreements. (<u>Id.</u>) Because Plaintiffs' claims "stem from Defendants' erroneous legal and tax advice," they argue, their claims do not regard the services and obligations under the Agreements and are, thus, not subject to arbitration. (<u>Id.</u> at 20.) This argument is unpersuasive.

Assuming, as Plaintiffs contend, that the Arbitration Clause is limited to those disputes "regarding the services provided and obligations pursuant to this Agreement," the Clause is nevertheless broadly worded to encompass each of Plaintiffs' claims. Plaintiffs argue that the Arbitration Clause here is similar to that at issue in <u>Mesquite Lake Assocs. v. Lurgi Corp.</u>, which the Northern District of California held to have a "narrow definition

---

[11] This is found in the Agreement with Plaintiff Shivkov. The other Agreements provide similar, although not always identically worded, limitations. (Doc. 38-2 at 15, 30; Doc. 38-3 at 7, 21, 31; Doc. 38-4 at 7, 17, 31, 47; Doc. 38-5 at 7.)

of arbitrable issues." 754 F. Supp. 161, 163 (N.D. Cal. 1991). However, in Mesquite Lake, the arbitration clause stated that "any controversy or dispute between the Parties concerning this Agreement *and* specifically subject to resolution pursuant to this Article shall be subject to arbitration." Id. at 162 (emphasis added). The Mesquite Lake court then identified "[t]hree other clauses in the contract [that] delineate the areas of dispute which are 'specifically subject to resolution' by arbitration." Id. Here, there is no "specifically subject to resolution" limitation in the Arbitration Clause; it covers any dispute "regarding the services provided and obligations pursuant to this Agreement." (Doc. 38-2 at 7.)

In practical effect, the Arbitration Clause is largely indistinguishable from arbitration clauses covering "[a]ll disputes arising in connection with" an agreement, which the Ninth Circuit has held should be liberally construed. See Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 721 (9th Cir. 1999). The Court finds no substantive difference between those disputes "arising in connection with" and those "regarding" an agreement. See Family Prod. LLC v. Infomercial Ventures P'ship, No. CV0700926JVSCWX, 2010 WL 11519420, at *2 (C.D. Cal. Apr. 14, 2010) (finding language subjecting "any dispute regarding this Agreement" to arbitration, "substantively identical" to "[a]ll disputes arising in connection with" the agreement). Moreover, a contract of the type at issue here consists primarily, if not entirely, of services and obligations; so, it is unclear what aspects of the Agreements, if any, fall beyond the services and obligations under the Agreements. If there is a limitation effected by the restriction of the Arbitration Clause to "services" and "obligations," that limitation does not restrict the reach of this otherwise broadly worded clause into any matters regarding those services and obligations. See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 624 n.13 (1985) (holding "the exclusion of some areas of possible dispute from the scope of an arbitration clause does not serve to restrict the reach of an otherwise broad clause in the areas in which it was intended to operate"). Therefore, the Arbitration Clause is broadly worded and should be liberally construed. See Simula, 175 F.3d at 721.

Where an arbitration agreement is broadly worded, the factual allegations

underlying a claim need only "touch matters" covered by the arbitration agreement in order for the claim to be sent to arbitration. <u>Mitsubishi Motors</u>, 473 U.S. at 624 n.13; <u>see also</u> <u>Simula</u>, 175 F.3d at 720 (citing <u>Mitsubishi Motors</u>, 473 U.S. at 624 n.13; <u>Genesco, Inc. v.</u> <u>Kakiuchi & Co.</u>, 815 F.2d 840, 846 (2d Cir. 1987)) (applying the "touch matters" standard in determining the scope of arbitration clause covering "[a]ll disputes arising in connection with" the agreement). Applying the standard here, the Court must determine whether the factual allegations underlying Plaintiffs' claims "touch matters" regarding the services provided and obligations pursuant to the Agreements. The Court finds each of Plaintiffs' claims satisfy this standard.

Although some portions of Plaintiffs' claims do stem from "Defendants' erroneous legal and tax advice," each of Plaintiffs' claims is fundamentally about Defendants' role in inducing Plaintiffs to engage Artex or Tribeca to form and manage captive insurance companies and for their alleged failure to do so in a manner that provided the benefits Plaintiffs were promised.[12] Thus, each claim relates directly to how the Agreements were created and how the services and obligations under those Agreements were performed. For example, Plaintiffs' fiduciary-duty claim states that Defendants breached their fiduciary duties by, *inter alia*, "[o]rchestrating the design, development, implementation, operation, and management of the Captive Insurance Strategies" and "[a]dvising, instructing, and assisting Plaintiffs . . . in the purchase and execution of the captive insurance policies." (Doc. 31 at 139, 142.) These allegations would require a jury to assess the services promised under the Agreements and the services ultimately provided. The same factual allegations underlie Plaintiffs' RICO, negligent misrepresentation, and fraud claims. (<u>Id.</u> at 114, 117, 149, 157, 160.) Therefore, each of these claims is covered by the Arbitration

---

[12] The focus of Plaintiffs' claims makes this matter distinguishable from <u>Khan v. BDO</u> <u>Seidman, LLP</u>, 935 N.E.2d 1174 (Ill. App. Ct. 2010), upon which Plaintiffs rely to argue that their claims fall outside the scope the Arbitration Clause. (<u>See</u> Doc. 47 at 20.) In <u>Khan</u>, the plaintiffs sued for financial harm resulting from the defendants "(1) giving them dishonest investment advice, (2) preparing defective income-tax returns for them, and (3) conspiring with law firms to issue bogus opinion letters attesting to the legality of losses claimed in the tax returns." <u>Khan</u>, 935 N.E.2d at 1178. The court found this type of tax and legal advice was excluded from the scope of the agreement. <u>Id.</u> at 1194-95. Here, Plaintiffs' claims are focused on the formation and management of the captives, actions related to the services and obligations under the Agreement.

Clause.

Plaintiffs' disgorgement and rescission claims are even more directly related to the services and obligations under the Agreements. Plaintiffs seek disgorgement of the fees Defendants charged for their services related to the captives. (Id. at 151.) Under the Agreements, Plaintiffs agreed to pay thousands of dollars annually for the formation and management of their captives. (See, e.g., Doc. 38-2 at 3-4, 21-22.) Therefore, Plaintiffs' disgorgement claim is, at least in part, about the parties' obligations under the Agreements. Plaintiffs' rescission claim is also specifically about the parties' obligations under the Agreements as it seeks rescission of those Agreements. (Doc. 31 at 152-53.)

Plaintiffs' negligence claim also relies on the Agreements. Actual damages are a necessary element of any negligence claim. Gipson v. Kasey, 150 P.3d 228, 230 (Ariz. 2007) (citing Ontiveros v. Borak, 667 P.2d 200, 204 (Ariz. 1983)) ("To establish a claim for negligence, a plaintiff must prove four elements: (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages.") Plaintiffs allege that they suffered damages in the form of fees and premiums paid to Defendants "for insurance . . . advice" and that Defendants' negligence caused those damages. (Doc. 31 at 147-48.) As noted above, Plaintiffs paid thousands to Defendants for the formation and management of their captives under the terms of the Agreements. (See, e.g., Doc. 38-2 at 3-4, 21-22.) Therefore, Plaintiffs' negligence claim requires construction of and reliance on the Agreements to show damages and is, therefore, subject to the Arbitration Clause.

Finally, Plaintiffs' conspiracy and aiding-and-abetting claims are derivative of all other claims and, therefore, subject to the Arbitration Clause. As a result, each of Plaintiffs' claims touches matters regarding the services provided and obligations pursuant to the Agreements and is subject to arbitration.

2.  All Defendants May Compel Arbitration

While all claims are subject to arbitration, Artex and Tribeca are the only

Defendants who are parties to the Agreements. Defendants argue that those Defendants who are not parties to the Agreements may nevertheless compel arbitration under estoppel principles. (Doc. 37 at 13 n.4; Doc. 63 at 12.) Plaintiffs contend that Defendants have failed to satisfy the elements of equitable estoppel and thus only Artex and Tribeca, as signatories to the Agreements, may compel arbitration. (Doc. 47 at 20-21.)

Under the FAA, a non-signatory to an agreement may invoke arbitration if the relevant state contract law allows the non-signatory to enforce the agreement. Kramer, 705 F.3d at 1128 (citing Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 632 (2009)). Arizona courts have adopted the "alternative estoppel" theory to determine whether a non-signatory to an arbitration agreement may compel arbitration by a signatory. Sun Valley Ranch 308 Ltd. P'ship ex rel. Englewood Props., Inc. v. Robson, 294 P.3d 125, 134-35 (Ariz. Ct. App. 2012). A non-signatory may enforce an arbitration clause against a signatory when: (1) "the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided"; or (2) "each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement," such that "the signatory's claims arise out of and relate directly to the written agreement." Id. at 134-35 (quoting CD Partners, LLC v. Grizzle, 424 F.3d 795, 798 (8th Cir. 2005)).

Here, the Court finds that the non-signatory Defendants may compel arbitration because Plaintiffs' claims arise out of and relate directly to the Agreements. Plaintiffs pleaded each of their claims against "Defendants" as a whole, rarely distinguishing between the signatory and non-signatory Defendants. And, as the Court determined above, all of Plaintiffs' claims relate to the services and obligations provided under the Agreements.[13] Therefore, each of the claims against the non-signatory Defendants

_____

[13] Plaintiffs argue in their responses to the notices of joinder that the non-signatory Defendants have not been sued for breach of the Agreements and, therefore, may not rely on estoppel for purposes of the breach-of-contract claim. (Doc. 79 at 3; Doc. 83 at 3.) The FAC alleges that Plaintiffs were third-party beneficiaries of agreements between Defendants and these agreements included promises that Defendants "would provide services in connection with forming, managing, calculating premiums for, analyzing risks

sufficiently arise out of and relate to the Agreements to allow for the non-signatory defendants to rely on the Arbitration Clause through estoppel principles. See Sun Valley Ranch, 294 P.3d at 135 (finding alternative estoppel standard met where the court had already determined that each claim arose out of and related to the agreement in determining which claims were subject to the arbitration agreement).

## C. The Court Must Compel Individual Arbitration

Lastly, Defendants request that the Court compel individual, rather than class, arbitration. (Doc. 37 at 17.) Plaintiffs argue that the Court should allow the arbitrator to decide whether class arbitration is available. (Doc. 47 at 21.) The Court first addresses who should decide whether the dispute is subject to class arbitration and then considers whether the Court should compel class arbitration here.

Generally, whether a particular dispute is subject to arbitration – the question of arbitrability – is "an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'" Howsam, 537 U.S. at 83 (quoting AT & T Techs., Inc. v. Commc'ns Workers, 475 U.S. 643, 649 (1986)); see also Local Joint Exec. Bd. v. Mirage Casino-Hotel, Inc., 911 F.3d 588, 595-96 (9th Cir. 2018). Questions of arbitrability exist "where contracting parties would likely have expected a court to have decided the gateway matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the gateway dispute to the court avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate." Howsam, 537 U.S. at 83-84. On the other hand, questions the parties would typically expect to be resolved by an arbitrator, such as procedural questions, "which grow out of the dispute and bear on its final disposition," are presumptively resolved by the arbitrator, not the court. Id. at 84 (quoting John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 557 (1964)).

---

for, calculating taxes for, and filing tax returns for captive insurance companies." (Doc. 31 at 155.) As the Court noted above, the formation and management of the captives occurred under the Agreements. Therefore, any benefits Plaintiffs received from unidentified agreements between the various Defendants relate to the services and obligations provided under the Agreements.

Neither the Supreme Court nor the Ninth Circuit has yet concluded whether determination of class availability is a question of arbitrability presumptively for a court to resolve. However, nearly every circuit court to have considered the question has found that class arbitrability is a gateway question for judicial determination. See JPay, Inc. v. Kobel, 904 F.3d 923, 936 (11th Cir. 2018) (deciding that the question of class arbitration lies with the courts); Catamaran Corp. v. Towncrest Pharmacy, 864 F.3d 966, 972 (8th Cir. 2017) (same); Del Webb Cmtys., Inc. v. Carlson, 817 F.3d 867, 876-77 (4th Cir. 2016) (same); Opalinski v. Robert Half Int'l Inc., 761 F.3d 326, 334 (3d Cir. 2014) (same); Reed Elsevier, Inc. ex. rel. LexisNexis Div. v. Crockett, 734 F.3d 594, 599 (6th Cir. 2013) (same); but see Robinson v. J & K Admin. Mgmt. Servs., Inc., 817 F.3d 193, 197 (5th Cir. 2016) (deciding that questions of class arbitrability should be deferred to an arbitrator). These courts generally reasoned that the differences between class and bilateral arbitration are so fundamental and substantial that the availability of class arbitration is a gateway question "that determines what type of proceeding will determine the parties' rights and obligations" and "that contracting parties would expect a court to decide." JPay, Inc., 904 F.3d at 936; see also Catamaran Corp., 864 F.3d at 972; Del Webb Cmtys., 817 F.3d at 869; Opalinski, 761 F.3d at 334; Reed Elsevier, 734 F.3d at 598-99.

Supreme Court precedent supports the circuit courts' reasoning. Although a plurality of the Supreme Court held that class arbitrability is a question for the arbitrator in Green Tree Fin. Corp. v. Bazzle, 539 U.S. 444, 452-53 (2003), since that time, the Supreme Court has "given every indication, short of an outright holding, that classwide arbitrability is a gateway question." Reed Elsevier, 734 F.3d at 598. In determining whether parties to an arbitration agreement agreed to class arbitration, the Supreme Court held that class arbitration "changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator." Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 685 (2010). Addressing the same question in another case, the Court emphasized that class arbitration "sacrifices the principal advantage of arbitration – its informality – and makes the process slower, more

costly, and more likely to generate procedural morass than final judgment." Lamps Plus, Inc. v. Varela, 139 S. Ct. 1407, 1416 (2019) (quoting AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 348 (2011)). It also "raises serious due process concerns by adjudicating the rights of absent members of the plaintiff class . . . with only limited judicial review." Id. (citing Concepcion, 563 U.S. at 349). Because of these differences, the Supreme Court has held that "courts may not infer consent to participate in class arbitration absent an affirmative 'contractual basis for concluding that the party *agreed* to do so.'" Id. (emphasis in original) (quoting Stolt-Nielsen S.A., 559 U.S. at 684).

The Supreme Court's reasoning is equally applicable to the question of *who* resolves the question of class arbitrability. See Oxford Health Plans LLC v. Sutter, 569 U.S. 564, 575 (2013) (Alito, J., concurring) (noting that because class arbitration seeks to bind class members who have not consented to an arbitrator's authority, courts should be wary of allowing an arbitrator to decide questions of class arbitrability). Given the fundamental differences between bilateral and class arbitration, the Court follows the majority of circuit courts in holding that the availability of classwide arbitration is a gateway question of arbitrability decided by the Court, unless there is clear and unmistakable evidence that the parties intended the arbitrator to decide. See Howsam, 537 U.S. at 83.

The Agreements at issue here are silent as to who should decide the question of class arbitrability. Plaintiffs argue that clear and unmistakable evidence that the parties intended for the arbitrator to decide the issue can be found in the fact that the Agreements incorporate the American Arbitration Association ("AAA") rules into the Arbitration Clause. (Doc. 47 at 21-22.) But Plaintiffs' argument misrepresents the Arbitration Clause.

The relevant portion of the Clause states that arbitration will occur "with arbitrators to be agreed upon by the parties, and if no agreement is reached, then arbitrated by the American Arbitration Association (AAA)." (Doc. 38-2 at 7.) Thus, the Arbitration Clause does not explicitly refer to AAA rules and it indicates that the AAA will arbitrate only if the parties fail to agree upon an arbitrator. Both factors make the Clause ambiguous as to whether the parties intended to allow an arbitrator to decide questions of arbitrability.

1       Relying on the Eleventh Circuit's decision in <u>Spirit Airlines, Inc. v. Maizes</u>, 899

2   F.3d 1230, 1232 (11th Cir. 2018), Plaintiffs argue that the Agreements' reference to the

3   AAA as an arbitrator is sufficient to incorporate the AAA rules. (Doc. 47 at 21-22.) They

4   contend that <u>Spirit Airlines</u> holds that an arbitration agreement making reference to the

5   AAA, but not specific AAA rules, indicates that the parties plainly chose AAA rules. (Doc.

6   47 at 21.) But the agreement at issue in <u>Spirit Airlines</u> stated that any dispute would be

7   resolved "in accordance with the rules of the American Arbitration Association then in

8   effect." 899 F.3d at 1232. Therefore, the case simply does not support Plaintiffs'

9   proposition.

10       Plaintiffs also argue that the condition precedent of failing to agree to an arbitrator

11   has been satisfied by their refusal to arbitrate, making the AAA rules binding, or, at the

12   very least, indicating that an arbitrator should decide whether the condition has been

13   satisfied. (Doc. 47 at 23.) However, a court should analyze the parties' intent from the time

14   the parties entered into the contract. <u>Taylor v. State Farm Mut. Auto. Ins.</u>, 854 P.2d 1134,

15   1139 (Ariz. 1993). Thus, the satisfaction of a condition precedent is irrelevant to the

16   Court's determination of Plaintiffs' and Defendants' intent when they entered into the

17   Agreements. The fact that the AAA rules were not incorporated explicitly into the Clause

18   and an AAA arbitrator is designated only as backup arbitrator makes the parties' intent

19   ambiguous at the time of contract formation, regardless of whether the condition precedent

20   for selecting an AAA arbitrator was later met. Therefore, the Agreements do not contain

21   clear and unmistakable evidence that the parties intended for an arbitrator to determine

22   class arbitrability and the question remains with the Court.

23       Defendants ask the Court to compel individual arbitration, arguing there is no

24   contractual basis to conclude the parties agreed to class arbitration. (Doc. 37 at 17.) A court

25   may not compel class arbitration unless there is a clear contractual basis for concluding the

26   parties agreed to do so. <u>Stolt-Nielsen S.A.</u>, 559 U.S. at 684. Neither silence nor ambiguity

27   in a contract is sufficient to show that the parties agreed to class arbitration. <u>Lamps Plus</u>,

28   139 S. Ct. at 1416. Here, the Agreements are silent as to class arbitration and Plaintiffs'

offer no argument for how the Agreements indicate that the parties agreed to class arbitration. Accordingly, the Court must compel individual arbitration.

## IV.   CONCLUSION

For the reasons above, the Court finds that Defendants' Renewed Joint Motion to Compel Individual Arbitrations (Doc. 37) should be granted. Plaintiffs must individually arbitrate their claims against Defendants. Because all claims in this suit are barred by the Arbitration Clause, the Court will dismiss without prejudice this action in its entirety. See Johnmohammadi, 755 F.3d at 1074 (citing Sparling, 864 F.2d at 638). All pending motions are denied as moot.

Accordingly,

**IT IS HEREBY ORDERED granting** Defendants' Renewed Joint Motion to Compel Individual Arbitrations (Doc. 37).

**IT IS FURTHER ORDERED** that Plaintiffs must individually arbitrate their claims against Defendants.

**IT IS FURTHER ORDERED denying as moot** Defendants' Joint Motion to Compel Individual Arbitrations (Doc. 22); Joint Motion to Dismiss (Doc. 24); and Joint Motion to Dismiss Amended Complaint (Doc. 41).

**IT IS FURTHER ORDERED dismissing without prejudice** the claims against Defendants Artex Risk Solutions Inc., TSA Holdings LLC f/k/a Tribeca Strategic Advisors LLC, TBS LLC d/b/a PRS Insurance, Karl Huish, Jeremy Huish, Jim Tehero, Arthur Gallagher & Co., Debbie Inman, Epsilon Actuarial Solutions LLC, Julie A. Ekdom, AmeRisk Consulting LLC, Provincial Insurance, Tribeca Strategic Accountants LLC, and Tribeca Strategic Accountants PLC.

**IT IS FURTHER ORDERED directing** the Clerk of Court to enter judgment in favor of Defendants and against Plaintiffs.

**Dated** this 5th day of August, 2019.

Honorable Stephen M. McNamee
Senior United States District Judge